[No. S015384. July 29, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD LACY LETNER and CHRISTOPHER ALLAN TOBIN,
Defendants and Appellants.

110

COUNSEL

J. Thomas Bowden and R. Clayton Seaman, Jr., under appointments by the Supreme Court, for Defendant and Appellant Richard Lacy Letner.

Fern M. Laethem, Lynn S. Coffin and Michael J. Hersek, State Public Defenders, under appointment by the Supreme Court, Alison Pease and Ronald F. Turner, Deputy State Public Defenders, for Defendant and Appellant Christopher Allan Tobin.

Daniel E. Lungren, Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, George Williamson and Robert R. Anderson, Chief Assistant Attorneys General, Mary Jo Graves, Assistant Attorney General, Ward A. Campbell, Matthew L. Cate, Eric L. Christoffersen, John G. McLean and Mark A. Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GEORGE, C. J.**—Defendants Richard Lacy Letner and Christopher Allan Tobin were convicted of first degree murder (Pen. Code, § 187),[1] burglary (§ 459), robbery (§§ 211, 212.5), attempted rape (§§ 664, 261, subd. (a)(2)), and theft of an automobile (Veh. Code, § 10851, subd. (a)), arising from the murder of Ivon Pontbriant in her home in Visalia, California, on March 1, 1988. As to each defendant, the jury found true three special circumstance allegations—that the murder was committed in the course of the burglary, attempted rape, and robbery (§ 190.2, subd. (a)(17)(A), (C), (G))—and returned a verdict of death. The trial court, having denied defendants' motions for new trial and the automatic applications to modify the verdicts (§ 190.4, subd. (e)), sentenced defendants to death and to consecutive prison terms of six years eight months for the noncapital offenses. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment as to each defendant in its entirety.

## I. FACTS

### A. *Guilt Phase*

#### 1. *Prosecution Evidence*

Ivon Pontbriant, then 59 years of age, lived with Walter Gilliland, with whom she was romantically involved, in a residence located at 804 North Jacob Street in Visalia in Tulare County. On Wednesday, March 2, 1988, Ted and Ida Blevins, Pontbriant's parents, became concerned because Ivon had

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

not telephoned them as she had planned. That evening, the Blevinses contacted Pontbriant's cousin, Jack Cantrell, and with him went to the house on North Jacob Street. After they knocked on the door without receiving any response, Cantrell looked through a window and saw Pontbriant sprawled on the floor of the living room.

When the police arrived, they found Pontbriant's body lying facedown in a pool of blood on the floor between a couch and a coffee table. She was unclothed except for her socks and a brassiere that was pulled down to her waist. Her hands were tied behind her back with a telephone cord that also was looped around her neck. The cord was tied tightly enough to have made ligature marks upon her neck and wrists. A large, deep cut on the back of her neck had severed her spinal cord and lacerated several blood vessels including the right carotid artery, causing her death. Death from the severed spinal cord could have been essentially instantaneous; she would have bled to death within minutes. Pontbriant also had suffered three stab wounds to her neck— two on the left and one on the right—that narrowly missed her blood vessels, and three superficial lacerations on the right side of the neck. Had these other wounds severed Pontbriant's carotid arteries, she would have lost consciousness almost immediately, and would have died within minutes. Pontbriant's face had sustained severe blunt force trauma, as though she repeatedly had been kicked or punched in the face while alive, and there were defensive wounds on her arms. Portions of her hair had been ripped out of her head. A Heineken beer bottle, which had fecal matter on it, was wedged between Pontbriant's buttocks, near her genitals. A pile of clothing found in the living room included a pair of pants and underwear that also had fecal matter on them, and a sweater that appeared to have been cut or ripped open. There was no blood on the clothing. Several hairs were found on Pontbriant's chest.

An ashtray on the coffee table contained several Marlboro and Camel cigarette butts and a Lowenbrau beer bottle cap. The top of the coffee table had a cut that could have been made by stabbing a knife into it. Nearby was a photograph of Pontbriant with a hole in it that matched the cut in the table. Two of Pontbriant's purses were on the floor; the entire contents of one purse had been dumped on the floor, and the contents of the other purse, which contained Pontbriant's checkbook, had been only partially removed. The checkbook did not contain any money, but more than $18 in bills and change were found at the bottom of the purse. The kitchen area appeared to have been wiped down, and in the bathroom was a washrag that appeared to have had blood on it and to have been rinsed. A distinctive wine bottle opener of a type sold at a local liquor store was on the kitchen counter. Gilliland testified that he never had seen the bottle opener in the house. In the bedroom, which was in disarray, the police found a blue baseball cap, blood smears on a pillow on the bed and on a doily on the dresser, and semen stains on the carpet. Pontbriant's automobile, a red-and-white Ford Fairmont, was missing.

A quilt that Pontbriant used to cover the front seat of her car was found on a bush near the location where the passenger's side door would be when the car was parked in the driveway. Gilliland testified that Pontbriant was very protective of her car; very rarely would she allow anyone else to drive it.

Gilliland testified that three days earlier, on the morning of Sunday, February 28, 1988, defendants drove to the Jacob Street residence in a car they said belonged to Tobin's girlfriend. For somewhat more than a month prior to that Sunday, Letner had worked for Gilliland two or three days a week helping him repair appliances in the garage behind the house. Gilliland and Pontbriant had befriended Letner; Pontbriant told people that he reminded her of her son. On that Sunday morning, defendants gave Pontbriant and Gilliland a bottle of Kahlua liqueur and a couple of cartons of Marlboro cigarettes. Defendants went inside the house and had coffee with Pontbriant and Gilliland. In defendants' presence, Gilliland mentioned that he was planning to go to Modesto to visit his family. Pontbriant reminded him that the rent was due soon, and Gilliland gave her approximately $340 in cash. She placed the cash in her checkbook and put the checkbook inside her purse. Defendants left after approximately one hour.

Letner and Tobin were long-standing, very close friends. They had known each other for several years while attending high school in the City of Napa, California. Sometime during 1984, Tobin moved to Visalia, where he met and became romantically involved with Jeanette Mayberry. Tobin and Mayberry lived in a residence at 248 South Crenshaw Street, which they shared with Darlene Jolly and Mike Kinnett. Letner also stayed at the house for approximately one month. Sometime during 1986, Tobin and Mayberry moved to an apartment at 301 East Murray Street, and Letner later joined them. After relocating to a different apartment in the building on Murray Street, in March of 1987 the three moved to an apartment on Stevenson Street. Mayberry was pregnant with Tobin's child and gave birth in May of that year. Soon after the baby was born, Letner moved back to the Murray Street apartment. A couple of months later, Tobin also moved back to Murray Street, while Mayberry moved to an apartment at 720 North Bridge Street. Mayberry testified that she and Tobin separated because of Letner's interference with their relationship. Tobin and Mayberry continued to see each other, however, and in December 1987, Tobin moved to the Bridge Street apartment.

In May 1987, Tobin had begun working for a company that manufactured prefabricated buildings. Letner started working for the same company in June. Defendants were laid off near the beginning of 1988, however, and had no steady employment after that time. Defendants, who did not own a car, occasionally borrowed Mayberry's car to get around. On Sunday, February 28, 1988, Mayberry lent defendants her vehicle to attend a local swap meet in order to attempt to sell various items. When Letner returned the car that

afternoon, he told Mayberry that Tobin was meeting with Tobin's ex-wife at a nearby park. Mayberry was angered by this report, and twice confronted Tobin and his ex-wife that day. At one point Mayberry angrily threw away the engagement ring Tobin had given her.

On the next day, Monday, February 29, 1988, Mayberry returned to her apartment and discovered that the bedroom window was broken. She suspected that Tobin had broken the window in order to enter the apartment, because she had removed his house key from his keyring after their quarrels on the previous day. Within a few moments, Tobin (who was intoxicated) and Letner arrived at the apartment. Tobin and Mayberry began to argue, and Tobin struck her and pulled out some of her hair. Letner yelled insults at Mayberry and encouraged Tobin to continue to strike her. After Mayberry managed to get away from Tobin, she ran to an upstairs apartment. The neighbors admitted her and called the police. When the neighbors informed defendants that the police had been summoned, Tobin broke the living room windows of Mayberry's apartment, retrieved his shotgun, and used it to break the windows of her car in the parking lot. He then reentered the apartment, obtained his ornamental sword, and departed with Letner. Tobin returned to the apartment the next day to search for his driver's license and to apologize to Mayberry. Mayberry did not accept Tobin's apology and left. Mayberry returned to the apartment the following day, Tuesday, after the windows had been repaired. Tobin's personal belongings were still there. Mayberry believed Tobin would return and they would reconcile; he had not mentioned anything regarding moving away.

Meanwhile, also on Sunday, February 28, Gilliland and Pontbriant had a disagreement, and Gilliland decided to leave for Modesto. He arranged to meet his son at a motel, so that his son could drive him to Modesto. Gilliland's son picked him up early the next morning, and they drove to the residence on Jacob Street. Gilliland testified that he retrieved several items, including a toolbox and a puppy, and that Pontbriant was asleep while he was at the house. Gilliland's son drove with Gilliland to Modesto and dropped him off at his ex-wife's house.

Marilyn Reid testified that on Sunday evening, Gilliland appeared with a suitcase at the Break Room Bar in Visalia. Letner, who already was there, talked and drank beer with Gilliland; later, they departed at the same time.

On Tuesday, March 1, 1988, Pontbriant drove her friend Flourene Gentry to shop for groceries, as she always did on the first of the month. Later that evening, Pontbriant telephoned Gentry three times, telling her that she (Pontbriant) was concerned because Gilliland had not returned, and a person who had purchased a stove from Gilliland had come by the residence to complain. Gentry testified that during the third telephone call, at approximately 9:30 p.m., Pontbriant told her that two individuals, one of whom

reminded her of her son, had just arrived and were entering her house, and everything would be all right. Pontbriant also mentioned that she was "feeling no pain."

On that Tuesday evening, Marilyn Reid saw defendants drinking together at the Break Room. They departed together sometime between 7:30 p.m. and 9:30 p.m. Frank's Liquors was located directly across the street from the Break Room. A clerk at the liquor store, who recognized defendants because they were frequent customers of the store, was working one night (which he could identify only as a night in Mar. 1988), when one of the two defendants purchased a six-pack of Heineken beer, a bottle of inexpensive wine, and a distinctive wine bottle opener of the type later found at Pontbriant's house. The same person returned later that night and bought a six-pack of Lowenbrau beer.

Later that Tuesday evening, Pontbriant and Letner made a series of angry telephone calls to Edward Burdette and his common law wife, Kathy Coronado. Pontbriant accused Burdette of helping Gilliland take the dog and a toolbox that apparently belonged to Letner. Letner threatened to "kick [Gilliland's] ass" and to harm Burdette if Letner's tools were not returned. In the later calls, Pontbriant became increasingly upset, and at one point, while crying, told Coronado that "He will hurt me" if the tools were not returned. Because the calls were obscene and threatening, Burdette and Coronado ultimately unplugged their telephone.

On the same night at approximately midnight, Visalia Police Officer Alan Wightman was in his patrol car when he observed a red-and-white Ford Fairmont automobile at a stop sign on Garden Street. The car was facing south, and the driver turned east on Main Street in front of the patrol car. Officer Wightman followed in his vehicle. The car turned south on Bridge Street, west on Mineral King Avenue, and then continued west onto State Highway 198. Officer Wightman conducted a vehicle stop.[2] Letner was driving the car and Tobin was in the front passenger seat. Letner told the officer that he had borrowed the car from the owner, Ivon Pontbriant, in order to drive Tobin home. Tobin separately told the officer they were going to his home on South Crenshaw Street, where he resided with a woman named Jeanette. Letner did not have a driver's license, and there was no registration card in the vehicle. Letner said that Pontbriant lived on North Jacob Street, but that he did not know the exact address or her telephone number. Officer

---

[2] The trial court denied defendants' pretrial motions challenging the legality of the vehicle stop. Officer Wightman testified at the suppression hearing that initially he suspected the car might have been stolen, and later suspected the driver might have been intoxicated. Officer Wightman's explanation for the stop was not presented to the jury. We address defendants' renewed challenges to the traffic stop, *post*, in part II.A.3.

Wightman provided a police dispatcher with Pontbriant's name, but obtained only her post office box and prior address.

At the time the officer approached the vehicle, he noticed a six-pack container with four unopened green bottles located behind the front passenger's seat. After Tobin got out of the car, Officer Wightman saw an opened bottle half filled with beer under Tobin's seat. He also conducted a brief search of the trunk of the vehicle for any other open containers of alcoholic beverages. Officer Wightman conducted a patdown of Letner and found a folding pocketknife in Letner's pants pocket, which the officer temporarily confiscated while questioning defendants. Because Letner smelled as if he had been consuming an alcoholic beverage, Officer Wightman conducted a series of sobriety tests. Officer Wightman determined that Letner was not under the influence of alcohol to the degree that his driving was illegal, and therefore the officer merely issued a citation for driving without a license. Nonetheless, because Tobin appeared not to be in a condition to drive, Officer Wightman told defendants to lock the vehicle and continue on foot. Defendants walked west along the highway. Officer Wightman noticed that Pontbriant's vehicle remained parked alongside the highway when he drove past on his way home Wednesday at 4:00 a.m., and also when he returned to work at 5:30 p.m. that evening.

Upon receiving the report of Pontbriant's murder, Officer Wightman contacted the investigating officers and guided them to her car, which subsequently was impounded and searched. The items found in the trunk, which included several bags, some clothing, and a sword, appeared to be the same items that were in the trunk the previous night when Officer Wightman conducted a brief search for open containers of alcohol. Tobin's shotgun, which Officer Wightman did not remember seeing earlier, also was found in the trunk. After the vehicle was impounded, a more thorough search was conducted during which the police also found on the floor of the car a white rag that had blood on it. One Heineken and three Lowenbrau beer bottles, all unopened, were found behind the passenger's seat. The opened bottle that had been under the seat was a Heineken bottle as well.

At approximately 4:00 a.m. on Wednesday, March 2, 1988, Pamela Loop heard her dogs barking and then noticed two men in her front yard. One of the men said that John Novotny was supposed to give them a ride to work and asked where he resided. Loop told the men that Novotny's house was behind hers, and they began walking in that direction. Loop telephoned the Novotny residence, and told Denise Novotny, who was awakened by Loop's telephone call, that two men were on the way to her house. At the same time, Novotny observed the shadow of a person approaching her front door. She looked out of the window and saw Letner, whom she recognized from picnics

hosted by the company that had employed her husband and defendants. After Novotny stepped outside, Letner told her they wanted John to give them a ride to work. Novotny responded that Letner should have known John was out of town on a work assignment. Letner told her they believed John might have returned early. Another man asked Novotny whether she could give them a ride to work, and offered to give her money for the cost of gasoline.[3] When Novotny refused, the man became more insistent, and said it was an "emergency." Novotny continued to say she could not drive them. Eventually, Letner looked at the other man, appeared to make a decision, and said, "Okay, that's fine." The men then departed.

On March 3, 1988, Letner made a collect telephone call from Reno, Nevada, to his grandmother in Council Bluffs, Iowa, and told her he was coming to Iowa to seek employment. Despite her urging to the contrary, on March 6 Letner and Tobin arrived in Council Bluffs. They told her they had hitchhiked from Reno, and had been robbed of all their belongings on the way. Letner's grandfather gave them some clothes, drove them to the Iowana Motel, and paid for one week's rental of a room on their behalf.

Earl Bothwell, who then was staying at the Iowana, met defendants there. Bothwell, who owned a contracting business, hired Tobin to perform some work for him. At some point, defendants mentioned that they were wanted for murder in California, and asked Bothwell if he could assist them in obtaining false identification. When Bothwell later asked Letner what had happened, Letner explained that he had stolen $12 or $14 and a red-and-white Ford vehicle from a woman. Letner stated he would have driven the car to Iowa, had the police not stopped him for driving erratically or too slowly. During this conversation, Tobin entered the room, and when Bothwell asked whether he was wanted for murder, Tobin replied, "Yeah, I killed the old bitch" because she was yelling and threatening to call the police. Tobin confirmed they had taken approximately $12 to $13 from her. Bothwell told Tobin he had no work for Tobin that day.

During the early morning hours of the following day, the police responded to a report of a disturbance at the Iowana Motel involving defendants and Bothwell. Discovering defendants' outstanding murder warrants, the police arrested them. At the time of his arrest, Letner had in his pocket a "buck" knife that appeared to be the same as the one seen by Officer Wightman on the night of the murder. Jeanette Mayberry testified that Letner regularly carried that knife with him.

---

[3] Novotny could not see the other man during the conversation. Novotny believed he was Tobin, based upon her husband's description of him, his profile as he turned to leave, and defendants' reputation for always being together. At trial, however, Novotny was unable to identify Tobin positively as the other man.

Investigators from Tulare County arrived in Iowa and returned with Tobin to California. A private extradition company was hired to escort Letner to California. While in Texas, however, Letner escaped by stealing the van in which he and several other prisoners were being transported. More than one week later, Letner, who was driving a stolen pickup truck, was arrested at a border patrol checkpoint after providing the checkpoint officer with a known alias recorded in information pertaining to wanted persons. The Tulare County investigators then transported Letner back to California. While in jail awaiting trial, Tobin told another inmate, Gregory Garrard, that of all the evidence against him, Tobin was most concerned about a bloody rag found in Pontbriant's car.

At trial, Jeanette Mayberry identified, as belonging to defendants, most of the items found in the trunk of Pontbriant's car. The items included three bags of stolen cosmetics and hair care products, all belonging to Letner. Mayberry also identified as belonging to Letner the blue baseball cap found in the bedroom of Pontbriant's house. Mayberry testified that Letner usually smoked Camel cigarettes, but that Tobin did not smoke.

At the time of her death, Pontbriant's blood-alcohol content was 0.29 percent. Based upon the lividity of her body, it was estimated she had been killed late on the evening of Tuesday, March 1. Three of the hairs found on Pontbriant's chest matched hair samples obtained from Letner. Two of these hairs appeared to have blood on them, and to have been forcibly removed from his head. Two of the other hairs found on Pontbriant's chest could have been "fringe hairs," meaning they would have come from an area near the pubic region of the donor, but these hairs were not sufficiently distinct to confirm their type or source. The other hairs found on or near Pontbriant's body were not of human origin, or matched Pontbriant's hair, or could not be identified. Many of the hairs belonging to Pontbriant had been forcibly removed. Six hairs found inside the blue baseball cap recovered from the bedroom also matched Letner's hair. The blood on the pillowcase and on the doily recovered from Pontbriant's bedroom, and the blood on the rag found in her car, was consistent with both Tobin's and Gilliland's blood type. The semen stains found on the carpet of the bedroom manifested antigenic activity, and therefore were consistent with Tobin's having deposited them, because he was a "secretor" of blood antigens in his bodily fluids. It could not be confirmed, however, whether the semen contained the same antigen that Tobin secreted, nor when the semen had been deposited. Letner and Gilliland were not secretors.

The cuts in the coffee table and the photograph could have been made by Letner's buck knife. In addition, that knife could have inflicted the stab wounds to the side of Pontbriant's neck, but the probability was that a larger knife had been used to render the fatal cutting wound to the back of her neck.

## 2. Defense Evidence

In their defenses, both defendants attempted primarily to discredit the witnesses who had provided incriminating evidence during the prosecution's case. Defendants also presented experts whose opinions concerning the forensic evidence conflicted with the opinions of the prosecution's experts. In addition, Tobin testified in his own defense, essentially to the effect that he and Letner were both present at Pontbriant's house on the night of the murder, but he (Tobin) left earlier than Letner, and, when Tobin departed, Pontbriant had not been harmed.

### a. Evidence Concerning Walter Gilliland

Jerry Gilliland, Walter Gilliland's son from his prior marriage, testified that a few minutes after he and his father stopped at the Jacob Street residence on the way to Modesto, he heard a woman yelling loudly, and what sounded like objects being thrown against the walls. Jerry Gilliland did not recall taking a dog when he and his father took that trip to Modesto.

Danny Mendoza testified Walter Gilliland told him that after the murder, Gilliland found defendants in an alley and fought with them, resulting in injuries to Gilliland's head and ribs. According to Mendoza, Gilliland had a very bad drinking problem, was drunk most of the time, and consistently lied.

Sandra Saulque, the custodian of records at Coast Savings and Loan, testified that during the period in which the murder occurred, Gilliland's bank account balances never exceeded $55, and a withdrawal in the amount of $40 on March 1 was the sole withdrawal made close in time to the murder.

Visalia Police Detective Richard Logan, the lead detective in this case, testified that Gilliland had provided several statements to the police that were somewhat inconsistent with his testimony at trial. For example, initially Gilliland did not mention his having given Pontbriant the rent money in defendants' presence, and in subsequent interviews when he did mention the money, he assertedly provided inconsistent accounts of the amount involved. Gilliland also said that he met Tobin in the garage, rather than in the house, and that Pontbriant normally left the keys to her car on the kitchen counter so that Gilliland could use the car whenever he needed it. Gilliland inconsistently identified the dates on which certain events transpired. Gilliland also told the police he wanted to kill defendants, and was reluctant to help the police because he wanted to catch defendants and punish them himself. Detective Logan testified in addition that several items of value, including a television and a videocassette recorder, a jar of coins, and just over $18 in cash found in Pontbriant's purse, remained in her house after the murder. Similarly, a watch, a ring, and a pair of earrings had not been removed from Pontbriant's body.

Investigator John Johnson of the Tulare County District Attorney's Office testified Gilliland told him that on Sunday, February 28, Tobin had waited in the garage while Letner brought the Kahlua and cigarettes inside the Jacob Street residence. Gilliland also stated to Johnson that Pontbriant had been asleep when Gilliland stopped by the house on his way to Modesto.

### b. *Evidence Concerning Earl Bothwell*

Letner's defense investigator, Cliff Webb, testified that Bothwell informed him investigator Johnson had provided him (Bothwell) with details of the murder prior to interviewing him. Tobin's investigator, James Dunham, testified that Bothwell said he intentionally avoided becoming involved after defendants were arrested, because he feared defendants and believed he might be held responsible for not promptly contacting the police regarding defendants' admissions. Bothwell also had refused to allow Dunham to record the interview. According to Dunham, Bothwell also told him that investigator Johnson had briefed Bothwell thoroughly regarding the facts of the case prior to taking his statement.

Detective Logan testified that on the day after the arrests, Bothwell checked out of the motel where he and defendants had been staying. When Logan arrived in Iowa he observed that the local media in Council Bluffs had provided some coverage of defendants' arrests.

In Tobin's case in surrebuttal, Mercedes Brasel testified that she wrote a check payable to Bothwell on March 28, 1988, as payment for work she had hired him to do on her house. A copy of the check was admitted into evidence. Part of the work included a painting project, which, according to Brasel, Tobin completed on the day she wrote the check. Brasel testified that after Bothwell dropped off Tobin at her house, Tobin started the work. Bothwell picked him up that evening when the work was completed.

During the prosecution's case, Bothwell had testified that Letner and Tobin confessed to the murder on March 28, 1988, and that Bothwell had told Tobin that Bothwell did not have any work for him that day—that is, according to Bothwell's testimony, Tobin would not have painted Brasel's house on that day.

### c. *Evidence Concerning Jeanette Mayberry*

Tobin's ex-wife, Cheryl Williams, testified that she traveled to Visalia on February 27, 1988, so that their daughter could visit with Tobin. When Jeanette Mayberry confronted Tobin and Williams at the park the following morning, Mayberry was extremely upset and was screaming and using foul

language. When Williams, Tobin, their daughter, and Williams's friend drove away from the park, Mayberry followed them in her car, driving in an unsafe manner, until Tobin got out of the car and walked. When Williams and Tobin met for the second time at a different park later that day, Mayberry arrived at the park and tried to attack Williams.

Visalia Police Officer Jeff McIntosh responded to the report of a disturbance involving Mayberry and Tobin at the Bridge Street apartment on Monday, February 29. He testified that Mayberry did not appear to be injured and, not wishing to file charges against Tobin, she said Tobin merely had slapped her face.

### d. *Evidence Concerning Flourene Gentry*

Visalia Police Officer Jay Frame testified that Gentry told him the telephone calls she received from Pontbriant on the night of the murder occurred at times other than the times given in her testimony. She told Frame that to the best of her recollection, the third telephone call, during which Pontbriant mentioned two men were then entering her house, occurred at approximately one o'clock in the morning. Detective Logan testified, however, that Gentry told him she was certain that the final telephone call was made between 9:00 p.m. and 10:00 p.m., and that Gentry had been very distraught during her earlier interview with Officer Frame.

### e. *Evidence Concerning Gregory Garrard*

Defense investigator Dunham testified that Garrard told him Tobin denied having participated in Pontbriant's murder. In the prosecution's case-in-chief, Garrard had testified he told a defense investigator that Tobin said he "had nothing to do with it." Investigator Johnson had testified, however, that when he interviewed Garrard, Garrard did not tell him that Tobin had said he had nothing to do with the murder.

### f. *Forensic Evidence*

Gary Cortner, a criminalist at the California Attorney General's office, was called as a witness for Letner, and testified that most of Pontbriant's sweater, "if not all," had been ripped, not cut with a knife. He could not determine whether the area near the neck had been cut or ripped; a hole in that area could have been made by a thumb or other object having poked through the fabric. Cortner also testified that he generally was unable to distinguish between the hair samples collected from Letner and Tobin because each defendant had a "tremendous range" of hair types on his head. That circumstance also accounted for his inability to match any of the hairs found at the

scene to defendants. Cortner agreed, however, that a person with more experience and a more powerful microscope than the one he had used might reach a different conclusion.

Letner also called as a witness Gary Sims, a criminalist hired by the defense, who testified he was present when Letner's buck knife was disassembled and examined. Tests for the presence of blood on the knife parts and debris found in the knife were negative.

In addition, Letner re-called Michael Malone, the prosecution's hair analysis expert, who testified that one of the hairs identified as belonging to Pontbriant had been broken in the laboratory while being mounted on a slide. Malone previously had testified that a break in a hair indicates that the hair has been removed by force from a person's body.

g. *Testimony Regarding Defendants' Plans to Leave California*

Burt Arnold, who for a period of time shared the apartment on Murray Street with defendants, testified that three weeks prior to the murder, defendants spoke of moving to the Midwest, where Letner had family. Jacklynn Tobin, Tobin's mother, also testified that prior to the murder, Tobin said he was thinking of going to Iowa with Letner. Following the murder, Jeanette Mayberry found, in the Murray Street apartment, an unmailed letter written by Letner to his grandparents, asking how they would feel if he moved to Iowa. Cheryl Williams, however, testified that she had not heard anything concerning Tobin's plans to leave California.

h. *Defendant Tobin's Testimony*

Tobin testified in his own defense. According to his testimony, on Monday, February 29 (the day after his fight with Jeanette Mayberry, arising from his visits with Cheryl Williams), he and Letner went to the Bridge Street apartment so that Tobin could attempt to reconcile with Mayberry. Finding the apartment unlocked, they went inside, and several minutes later Mayberry returned to the apartment. During the ensuing argument, Tobin merely slapped Mayberry, which he did because she had kicked him in the groin. Tobin admitted, however, that he broke a window in the apartment by throwing a hammer through it, and broke a window in Mayberry's car with his shotgun.

Tobin testified that Letner had been planning to go to Iowa for some time and, after his fights with Mayberry, Tobin decided to accompany him. Accordingly, the next day, Tuesday, March 1, Tobin returned to the Bridge

Street apartment to retrieve his clothing, but Mayberry refused to admit him. Later that day, Tobin saw Mayberry with another man at the Break Room Bar. The man was wearing Tobin's shirt, which angered Tobin somewhat. At that point, Tobin assumed that Mayberry had given away all of the belongings he had left at the Bridge Street apartment.

Tobin testified that at approximately 6:30 p.m. that night, he and Letner were at the Break Room when Letner received a telephone call. Letner said that Pontbriant had called and invited him over to her house. They left the bar and proceeded to her house, where they drank a number of beers. At some point, Tobin departed in order to purchase more beer. He rode his bicycle to the Oval Liquor Store—not Frank's Liquors—and purchased one six-pack each of Lowenbrau and Heineken beer. He did not purchase any wine or a bottle opener that night.

Tobin testified that Pontbriant was upset because Gilliland had left, taking with him their dog and all of their money. Later, she and Letner made a number of angry telephone calls to someone named "Ed."

According to Tobin's testimony, when the stock of beer again was depleted, he returned to the Oval Liquor Store and purchased another six-pack each of Lowenbrau and Heineken beer. When he returned to the house, Pontbriant and Letner were on the couch with their arms around each other. When they began to kiss, Tobin left and rode his bicycle to the Murray Street apartment, purchasing a quart of beer on the way. He fell asleep soon after he arrived at the apartment.

Tobin testified that sometime later, Letner woke him up and asked him to help load Letner's belongings into Pontbriant's car. Letner said he was taking the items to Pontbriant's house to store them there while Letner and Tobin were in Iowa. According to Tobin, earlier that night Letner had asked Pontbriant whether he could borrow her car to bring over his belongings. In addition to the items that were Letner's, Tobin put his sword and his shotgun in the car because he planned to try to sell them to Mike Kinnett, who Tobin believed still was living at the house on South Crenshaw Street. En route after leaving the apartment, however, Officer Wightman pulled them over. After the officer directed them to leave the car on the side of the highway, defendants walked to the bar at the Marco Polo Hotel, where they consumed more beer. Tobin testified he suggested that Letner telephone Pontbriant to advise her where the car was parked. Letner went to a telephone and appeared to place a call, but on returning Letner said no one had answered the telephone at Pontbriant's residence. After leaving the bar, defendants walked to the house on South Crenshaw Street. Finding it unoccupied, they forced open the back door and spent the night there, sleeping on the floor.

Tobin testified that the next morning, they went to Denise Novotny's house and asked her for a ride to the bus station in Goshen, not for a ride to work. After Novotny declined, they hitchhiked to the bus station. Tobin purchased bus tickets to Sacramento, and then tickets from Sacramento to Reno, using severance pay from his last job.

Tobin testified that he never told Earl Bothwell he had killed anyone in California. During the altercation at the Iowana Motel, Tobin took Bothwell's shotgun from him, angering and embarrassing Bothwell. Tobin denied ever having been in the residence on North Jacob Street prior to the night Pontbriant was killed, and asserted he never saw Gilliland give Pontbriant any money. Tobin testified he had nothing to do with Pontbriant's murder, and did not plan to take anything from her when he visited her house.

### 3. *Prosecution Rebuttal Evidence*

Terry Wood testified that in 1988, when he was incarcerated with Tobin at the Tulare County jail, Tobin told him that he (Tobin) and Letner had been at Pontbriant's house on the night of the murder. In contrast to Tobin's trial testimony that he had left Pontbriant's house on his own and Letner later arrived at their apartment with her car, Tobin told Wood he had borrowed Pontbriant's vehicle to move some items. Tobin did not say he had departed from Pontbriant's house prior to borrowing the car.

Investigator Johnson denied giving Bothwell any details concerning the Pontbriant murder before interviewing him. Johnson also testified that Wood informed him that Tobin told Wood he had borrowed Pontbriant's car at her residence.

Jeanette Mayberry testified she had spoken with Tobin when he was in jail following his arrest. Tobin told Mayberry that on the night of the murder, he left the house twice to buy beer, purchasing one six-pack of Heineken on the first trip, and one six-pack of Lowenbrau on the second trip. Tobin told her he later returned to the Murray Street apartment. Letner woke him up two or three hours later, telling him Pontbriant had loaned them the car to travel to Iowa. Tobin had advised Letner he wanted to sell Tobin's shotgun before departing for Iowa.

In his defense case, during direct examination, Tobin had testified that he did not make the foregoing statement to Terry Wood, and that Mayberry's statement was inaccurate, probably "because [she] heard it wrong."

## B. *Penalty Phase*

### 1. *Prosecution Evidence*

The prosecution's evidence in aggravation consisted of numerous instances of defendants' unadjudicated violent criminal conduct, admitted pursuant to section 190.3, factor (b). Evidence concerning two victims was admitted against both defendants; evidence concerning one other victim was admitted solely against Tobin, and evidence concerning five other victims was admitted solely against Letner.

#### a. *Incidents Involving Both Defendants*

David Bendowski testified that he knew defendants when he lived in Napa in 1978 and 1979. Bendowski dated Tobin's ex-girlfriend for a period of time. Bendowski and his sister, Julie Bryant, testified that approximately in June of 1978, defendants appeared at Bendowski's residence and entered by force. They confronted Bendowski in the hallway, and Tobin kicked Bendowski in the face, bloodying his nose. Tobin told Bendowski he was angry that Bendowski had been dating Tobin's ex-girlfriend.

Several months later, defendants, accompanied by Letner's brother John, returned to Bendowski's residence. John Letner asked Bendowski to come outside to talk, and promised there would be no trouble. When Bendowski went outside, however, defendants threatened to beat him up if he did not get into their car. Bendowski entered the vehicle, and Letner drove them out of town. Defendants demanded that Bendowski pay them for his dates with Tobin's ex-girlfriend. Tobin told Bendowski that "[i]f she was gonna act like a whore, [Tobin] was gonna treat [her] like one." Defendants told him they were taking him out of town so that they could hang him from a tree and beat him. Bendowski attempted to escape when the car stopped at a traffic light, but one of the defendants slammed the car door closed before he succeeded. Defendants eventually took Bendowski 10 to 15 miles out of town and left him on the side of the road.

On January 20, 1979, defendants again appeared at Bendowski's residence. When Julie, who then was 14 years of age, told them that Bendowski was not there, Tobin threatened to "work [her] over" if she did not check to make sure he was not in the house. She did so, and told them again that Bendowski was not at home. Defendants told her to tell Bendowski they were looking for him. Later that day, Bendowski was walking home when he saw defendants driving in a car. He tried to run away, but defendants followed him in their vehicle. Eventually, Bendowski decided to talk to defendants in an attempt to avoid being assaulted. After he entered their car, defendants again demanded

that Bendowski pay them for his dates with Tobin's ex-girlfriend, and on this occasion threatened to break his fingers if he did not pay them. Defendants eventually dropped off Bendowski near his home.

On November 29, 1986, William Healer was at a gas station in Napa, getting fuel for the pickup truck he was driving, when he was approached by defendants. Healer, who ran an auto body repair shop, had performed some repair work on a vehicle owned by Tobin's mother. Healer had not completed the work when he moved his repair shop, and defendants, apparently believing that Healer purposefully had attempted to avoid completing the work even though he already had been paid by Tobin's mother, were "going to take care of this in their . . . own way." Defendants ordered Healer to drive them in his truck to the store where Tobin's mother worked. On the way, defendants picked up their friend Dan Hlobick, who needed a ride in order to purchase drugs. When they arrived at the store, Tobin took the keys to the truck and ordered Healer to go with him inside. Learning that Tobin's mother was not there, defendants ordered Healer to drive to another store where she worked. During the drive, Letner threatened Healer, and said he should not have "burned" Tobin's mother. When they arrived at the store, Tobin entered to locate his mother, and while in the truck Letner continued to threaten Healer. When Tobin returned, Letner opened the truck door next to Healer and struck him in the face. After Healer begged defendants not to hurt him, defendants asked him whether he or his family had any money.

When Tobin's mother arrived, Healer, who was crying, apologized to her for any misunderstanding concerning her car. Mrs. Tobin said there was no misunderstanding and asked him why he was so upset. When Healer explained what had happened, Mrs. Tobin offered to drive him home in her car, but Healer declined because he was afraid defendants might steal valuable tools in the truck. Tobin intervened, denying that anyone had struck Healer, and stating they would let him leave. After Mrs. Tobin left and the men drove away, however, Letner again told Healer to give them money in order not to be hurt further, and he demanded Healer's wallet. When Healer said he did not have it with him, Tobin accused him of lying and ordered him to pull over and get out of the truck. Outside the truck, Letner kicked Healer in the chest and continued to demand the wallet. When Healer said he would give him money at his house, they all reentered the truck.

As Healer was driving, Letner said he needed to stop and pick up a gun because he was afraid Healer might do something when they reached his house. Letner ordered Healer to drive to the address where the gun was located. During the drive, Tobin grabbed the back of Healer's head and Letner began hitting him in the face. Tobin grabbed Healer's neck and choked him. When they arrived at the address, defendants again struck Healer

several times and discussed who would go inside to retrieve the gun. At this point Healer noticed his door was unlocked, exited the truck, and ran to a nearby car. Pounding on the hood of the car, he pleaded with the driver to let him in, saying, "Help me. Help me. They're going to kill me." The driver let him in and drove away. One of the defendants chased after the car on foot before the driver accelerated. Moments later, Healer realized that a house they were passing was occupied by persons he knew. The driver stopped the car and Healer ran to the house, whose occupants let him in and called the police. Healer was treated at the hospital for injuries to his throat and chest. His ribs were permanently "disfigured," and he had ongoing emotional problems arising from the incident.

### b. *Incident Involving Tobin*

Sometime in May 1981, Kenny Warren and a group of friends went to Letner's house to confront defendants concerning an altercation that had occurred earlier in the day. Warren's group had an ongoing dispute with defendants and previously had been involved in several fights with them. After a member of Warren's group knocked on and kicked Letner's door, someone inside the house fired a shotgun through the door. As he ran away, Warren heard one or two additional shots.

Approximately two weeks later, Warren was approached by Tobin and Robert Nance in an auto parts store. Tobin told Warren to come outside and attempted to punch him. Warren told Tobin they could talk inside because he was afraid he would be "jumped" if he went outside. After Tobin assured him nothing would happen if they went outside, Warren agreed. Once outside the store, Nance kicked Warren in the face. Tobin said Warren should fight Nance "one on one," but when Warren turned to confront Nance, Tobin kicked him in the back, saying, "It's two on one now, fucker." When Warren attempted to run away, Nance tackled him. Tobin and Nance kicked Warren repeatedly in the head and chest, and Tobin pulled handfuls of hair from the back of Warren's head. Nance took Warren's wallet, which contained $85 in cash. After allowing Warren to get up, Nance held out the wallet and dared Warren to take it. Warren snatched the wallet from Nance and tried to run away, but Nance again tackled him. Tobin and Nance resumed kicking him and again took his wallet, and Tobin began dragging him toward a nearby car. Richard Baker, an employee of the auto parts store, saw Tobin kicking Warren in the head and face, and heard him threaten to kill Warren if anyone ever shot at his house again. When Tobin stopped dragging Warren and returned to the car in which Nance was waiting, Tobin told Baker that Warren "got what he deserved" because he had shot at Tobin's house. Warren sustained a broken nose and several contusions and other injuries in the attack, and lost his wallet and money.

c. *Incidents Involving Letner*

In June 1978, Stephan Frame, who attended high school in Napa, received a telephone call from Letner, who said he was "after [Frame's] ass." The following Monday, in the school's parking lot, Letner approached him and inquired whether he was Steve Frame. When Frame responded affirmatively, Letner punched him in the face, rendering Frame momentarily unconscious. When Frame regained consciousness, Letner was kicking him in the face with his work boot. Letner ceased after Frame repeatedly asked him to stop. As a result of the attack, Frame was hospitalized for a concussion, a broken nose, and a broken cheekbone.

On July 21, 1983, at approximately 11:45 p.m., Andrew Emberton, an off-duty police officer, was driving on University Avenue in Berkeley when he noticed a person standing in the road who appeared to be hitchhiking. Emberton had to stop his vehicle because the person was blocking the lane. Emberton motioned for the person—who turned out to be Letner—to move out of the street. When Letner approached the car and became confrontational, Emberton decided to drive away. As he did so, Letner hit the side of his car. When Emberton stopped again, Letner, assuming a karate stance, challenged Emberton to fight him. Emberton said he did not want to fight, but merely wanted Letner to move onto the sidewalk. Letner continued to challenge Emberton, twice pushing him in the chest. An on-duty police officer then arrived, and Letner was arrested. During the arrest, Letner resisted to the extent that both Emberton and the other officer had to struggle with him in order to apply handcuffs.

On the afternoon of January 14, 1985, Alexander McAdams visited his girlfriend Susan Forsythe at a restaurant in Benicia. McAdams and Letner had a history of physical confrontations. Moments after leaving the restaurant in his pickup truck, McAdams saw Letner driving his pickup truck on the wrong side of the road straight toward McAdams's truck. McAdams attempted to avoid Letner, but Letner changed lanes and continued to drive directly at McAdams. Eventually, McAdams drove his truck in reverse to avoid Letner, but Letner hit McAdams's truck, bumper to bumper. When Letner exited his truck carrying a rifle, McAdams drove across an open field, hearing several shots as he drove away.

McAdams went to a police station to report the incident. Evidently possessing information concerning Letner's whereabouts, police officers went to Anthony Hockney's apartment. When the officers first arrived, Letner's truck was not there, but when they returned approximately one hour later, it was parked in front of the apartment. A woman who answered the door told the officers she was alone, but when they heard noises in the back of the

apartment they entered and found Hockney sitting on the bed next to a .44-caliber Ruger rifle. Hockney said the rifle belonged to Letner, who had been in the apartment when the police arrived, but departed as they entered. The officers went outside but did not find Letner. Approximately 15 minutes later, however, Letner returned to his truck and drove away without activating his headlights, although it was now dark. A police officer followed, arresting him a short distance away. Letner was verbally confrontational with the officers, and after his arrest said, "You think you got me because you've got my gun. But my gun's clean." The officers had not mentioned anything concerning a gun prior to Letner's comment. Letner also told the officers that "I'll be out of this soon, and then I'll get Alexander McAdams." At the police station, Letner admitted having a dispute with McAdams over a girl, and driving head on into McAdams's truck. Although Letner denied using, possessing, or owning the rifle, officers found a receipt for purchase of the rifle in Letner's pocket.

Sheila W. met and became romantically involved with Letner in July of 1987. On December 27, 1987, when they had an argument, Letner hit her in the back of her head and on her neck and back, and choked her until she became unconscious. On January 1, 1988, Sheila and Letner had another argument. Letner departed, but on returning he repeatedly made sexual advances to Sheila, which she rejected. Eventually, Letner forced her onto the floor and had nonconsensual sexual intercourse with her. Sheila did not report the incident to the police because she was afraid of Letner.

On April 16, 1988, Mike Mohrhauser was driving his pickup truck from El Paso, Texas, to Las Cruces, New Mexico, when he picked up a hitchhiker, who proved to be Letner. Letner recently had escaped from the custody of an extradition company that was charged with returning him to California. Mohrhauser invited Letner to stay at his house, and the two "partied" the next two nights at the homes of Mohrhauser's relatives. On the second evening, when returning to Mohrhauser's house, Letner, who was driving, pulled over so that Mohrhauser, who was intoxicated, could urinate. When Mohrhauser got out of the truck, Letner struck him on the head with an object, rendering him unconscious. When he awoke, Mohrhauser was lying facedown in a watery irrigation ditch approximately 30 feet from where he was hit by Letner. Mohrhauser's truck, wallet, and watch had been taken. When Mohrhauser recovered the truck, his tools, worth approximately $3,000, were missing.

## 2. *Defense Evidence*

### a. *Letner's Case in Mitigation*

Letner's younger brother John testified that their father was an alcoholic. Because of his alcoholism, their father frequently moved the family while the boys were growing up. Their parents fought over his drinking, eventually separating when Letner was 19 years of age. Alcoholic beverages always were present in the home, and Letner was drinking consistently by the time he was 15 years of age. Letner also smoked marijuana, but John was not aware of his using other drugs. When Letner was growing up, he constantly was teased by other children concerning his appearance. At one point, his parents considered having him undergo cosmetic surgery to improve the appearance of his face, but ultimately his father decided not to proceed. John believed that Letner acted suicidal on several occasions.

John testified that Letner assaulted Stephan Frame because Frame and two other boys previously had confronted John in school and threatened to beat him up. John did not inform Letner of the incident, because he knew their father would expect Letner to do something to protect John, and would beat Letner if he did nothing. Letner found out, however, and John overheard a telephone call during which Letner told Frame to leave John alone. According to John's testimony, Frame told Letner that if Letner confronted him, Frame would shoot Letner once he had the chance.

John testified that he was present during the first incident when David Bendowski was with defendants in their car. John testified that no one forced Bendowski into the vehicle—he willingly joined them in order to drink beer and smoke marijuana. Tobin and Letner did not discuss money other than to remind Bendowski that he owed them money for marijuana. According to John, no one threatened or abandoned Bendowski; he simply chose not to ride back to town with them.

John also testified that Letner and Tobin met in 1977 and became close friends. After they began to engage in frequent fights and other types of trouble, John told Letner he should stay away from Tobin. Eventually, John told Letner that he no longer wanted to be around Letner unless Letner ended his friendship with Tobin.

Other witnesses testified on Letner's behalf along similar lines concerning the relationship between Letner and Tobin. Earl Bothwell's preliminary hearing testimony, which was read to the jury, was to the effect that Letner bought various things for Tobin and appeared to idolize him. Sheila W. also testified that Letner idolized Tobin. Burt Arnold testified that defendants

sometimes had physical confrontations with each other, and it was Letner who usually would back down. In addition, the jury heard Bothwell's preliminary hearing testimony indicating that during the fight in the motel room prior to defendants' being arrested, Tobin had threatened to shoot Bothwell with his shotgun, but Letner removed the ammunition from the gun. Bothwell believed that had Letner not done so, Tobin might have shot him.

John Letner testified that defendant Letner telephoned him in late 1987 and said he wanted to leave Visalia because Tobin was "acting crazy" and was scaring him. In April 1988, after Pontbriant's murder, Letner telephoned John and their mother several times and said he had "done nothing wrong" but doubted he would be acquitted of Pontbriant's murder. John told Letner not to contact them again unless he was willing to turn himself in to the authorities.

Derrin Clenny testified he was hitchhiking with Letner at the time of the incident involving Officer Emberton. According to Clenny, Emberton was the aggressor—Letner did not hit Emberton's car and merely was acting defensively throughout the confrontation. Clenny stated that Letner did not resist the officers at the time of his arrest.

Letner testified on his own behalf. Regarding the incident with Stephan Frame, Letner testified he assaulted Frame because Letner's father had told him that he either must confront Frame to protect John, or find a new place to reside. Letner testified he was not present when Tobin entered David Bendowski's house and kicked him in the face. According to Letner, he and Tobin never forced Bendowski to enter their vehicle, and never threatened him or demanded money because Bendowski had dated Tobin's ex-girlfriend. Moreover, Letner testified, they did not abandon him outside of town; Bendowski had said he wanted to walk back.

Similarly, Letner testified that he merely slapped William Healer once while they were driving him to meet Tobin's mother, and Letner may have hit him on one other occasion because he did not like Healer. Letner asserted he did not attempt to obtain money from Healer by threatening to harm him.

Letner testified that Officer Emberton nearly hit Derrin Clenny when Emberton pulled his car over to the side of the road. Letner claimed that when Emberton left his vehicle, he was very aggressive and grabbed Clenny's arm. When Letner slapped Emberton's arm away, Emberton swung at him. Letner hit him back, knocking Emberton to the ground. Then two police cars arrived, and Letner was arrested.

According to Letner, on the day of the incident involving Alexander McAdams, Letner drove Susan Forsythe to work at a restaurant. On the way,

he saw McAdams drive through a red traffic signal. To avoid a collision, Letner was forced to accelerate, despite the red signal. Later, when he saw McAdams, Letner drove toward him in order to scare him. Letner asserted he did not have a rifle with him and did not shoot at McAdams. Letner explained he had left his rifle with a neighbor of Anthony Hockney named Rodney, and since had learned that the rifle was in Hockney's apartment. Letner did not know why the police were searching for him at the time he left Hockney's apartment.

Letner testified that on the night of December 27, 1987, he became intoxicated and lost consciousness. At some point while he slept, Sheila W. poked Letner in the eye. Letner was startled and reacted by punching her, not realizing exactly what he was doing. Letner admitted having sexual intercourse with Sheila on January 1, 1988, but believed it was consensual.

Letner testified concerning the incident with Mike Mohrhauser. Mohrhauser, who had consumed heroin that night, had been beaten up by Mohrhauser's brother and was unable to drive. When Letner drove Mohrhauser home, he punched Letner for not having helped Mohrhauser during the fight with his brother. According to Letner, when Mohrhauser told Letner to leave the truck, Letner stopped and instead pulled Mohrhauser out of the truck and drove away. Letner did not hit Mohrhauser or remove Mohrhauser's wallet or watch from his person; those items already were in the truck when he left Mohrhauser on the side of the road.

Letner also testified that Tobin alone killed Pontbriant. Letner and Tobin went to Pontbriant's house on the night of the murder to drink beer with her, and he and Pontbriant made several telephone calls to Ed Burdette. After Tobin left to buy more beer, Letner and Pontbriant sat on the couch and hugged and kissed each other. Letner and Pontbriant had had sexual intercourse on three occasions prior to the night of the murder, but that night Letner merely acted to console Pontbriant.

Letner testified that he, not Tobin, went to the liquor store on the second occasion to buy more beer. When Letner returned, Pontbriant asked him to tell Tobin to go outside and remain there for approximately one hour. Tobin took several beers and went outside to the front yard. Letner and Pontbriant disrobed and were "intimate" on the couch, but did not have sexual intercourse. After approximately 35 minutes, while Letner and Pontbriant were dressing, Tobin reentered. Pontbriant became angry because Tobin had not been invited to come back inside the house. Tobin told her that he knew what she and Letner were doing, and then asked Letner whether he already had

asked to borrow Pontbriant's car.[4] Pontbriant became angrier and slapped Letner, who reflexively slapped her back, knocking her onto the couch. When Letner went to use the bathroom, he heard Pontbriant threatening to call the police. After Letner returned to the living room, he observed Tobin kicking Pontbriant's arm as she sat on the couch. Letner attempted to pull Pontbriant to safety by grabbing her hair.

According to Letner, Tobin tried to remove Pontbriant's sweater. Tobin somehow had obtained Letner's buck knife, which may have fallen out of Letner's pants pocket when he sat on the couch. Tobin cut the collar of the sweater and ripped off the remainder of the garment. Tobin removed Pontbriant's pants and observed that she had defecated. Pontbriant laughed at Tobin, who then pulled out some of Pontbriant's hair and forced her down upon the floor. He then removed a telephone cord from his pocket and tied it around her wrists and neck. Tobin had his foot on Pontbriant and was strangling her with the cord when Letner intervened by wrestling with Tobin. Tobin bit Letner on the top of his head, and Letner hit his head against Tobin's nose, causing it to bleed. Letner noticed that his buck knife was stuck in the table and retrieved it. Tobin went into the kitchen, returned with a butcher's knife, and threatened to kill Letner if he interfered again. Letner then watched Tobin repeatedly stab the back of Pontbriant's neck.

After Pontbriant was dead, Tobin forced Letner to help clean up the house and remove their fingerprints. At some point, Tobin put the beer bottle in Pontbriant's buttocks and kicked the bottle. Tobin retrieved the car keys from Pontbriant's purse and said, "Well, we don't have to steal the car now." The two men, departing with the remaining beer and the murder weapon, proceeded to the Murray Street apartment. After they disposed of the knife and loaded their belongings into Pontbriant's car, they drove off but soon afterward were stopped by Officer Wightman.[5]

The final witness on Letner's behalf was Dr. Richard Blak, a psychologist. Dr. Blak interviewed Letner and several members of his family, and performed a number of psychological examinations. In Dr. Blak's opinion, Letner, who was average to above average in intelligence, suffered from chronic depression, alcohol dependence, and polysubstance dependence, resulting from a "borderline personality disorder" (BPD) that Letner had developed at a very early age. Dr. Blak testified that symptoms of BPD

---

[4] Letner testified he had planned to ask to borrow Pontbriant's car to transport and sell some beauty products he had stolen.

[5] During cross-examination, the prosecution questioned Letner concerning several letters, describing the murder, that he had written to Danny Payne, another inmate at the Tulare County jail. Certain letters contradicted his trial testimony, although others were more consistent with his testimony. The letters are discussed in greater detail, *post*, in part II.C.2.

include unstable interpersonal relationships, self-damaging impulsiveness, mood swings, aggressive behavior with an absence of anger control, suicidal or self-mutilating behavior, an unstable self-image, chronic feelings of emptiness and boredom, and extreme fear of abandonment. In Dr. Blak's experience, a person with BPD also may have a distorted sense of reality and may act upon imagined threats with an inappropriate sense of right and wrong. In Dr. Blak's opinion, Letner exhibited all of these symptoms. Dr. Blak observed that Letner had suffered a head injury in a car accident when he was seven years of age, but Blak was unable to form an opinion concerning any resulting effect upon Letner's brain functioning, because no records existed of any testing performed following the accident. In response to a hypothetical question describing a murder similar to that recounted in Letner's testimony, Dr. Blak testified that a person's failure to intervene during such an event would be consistent with such a person's having BPD.

### b. *Tobin's Case in Mitigation*

Dan Hlobick testified that he accompanied Letner, Tobin, and William Healer on their excursion to discuss with Tobin's mother the repair work Healer had performed on her car. According to Hlobick, Letner slapped Healer a "few times" on the way to meet Tobin's mother. Tobin did not hit or choke Healer. After they left Tobin's mother, Healer simply stopped the truck and ran away for no apparent reason. Letner and Tobin did not threaten Healer or attempt to obtain money from him. Tobin's mother also testified that Healer did not appear to be upset when they met that day. She testified that Healer told her during a subsequent telephone call that the reason he had told the police Tobin had assaulted him was to teach Tobin a lesson, but that Healer would be dropping the charges. Raymond Dudley, Tobin's brother-in-law, testified that he overheard a similar conversation between Healer and Tobin's sister, in which Healer again said he had complained to the police in order to teach Tobin a lesson, but would be dropping the charges because Tobin had not done anything improper. According to Dudley, Healer said Letner had hit Healer, but Tobin had told him to stop.

John Dean testified he was driving the car when Letner and Tobin picked up David Bendowski. According to Dean, no one struck, threatened, or demanded money from Bendowski.

Robert Hernandez, an inmate at the Tulare County jail, testified that Letner told him that he and a person named Christopher went to Pontbriant's house to steal $300 in cash and other items. Letner said he had killed Pontbriant to keep her quiet, and he demonstrated to Hernandez how he had used the knife on her neck. Leo Pike, another inmate at the jail, testified that, contrary to Letner's testimony, Letner and Hernandez occasionally spoke with each other.

Tobin's father, mother, and sister each testified that they loved him and hoped the jury would reach a verdict of life imprisonment without the possibility of parole.

## II. DISCUSSION

### A. *Pretrial Issues*

#### 1. *Failure to Set Aside the Burglary Charges and Special Circumstance Allegations (Letner, Tobin)*

Following the filing of the complaints and amended complaints, a preliminary hearing was held. At the conclusion of the hearing, the magistrate declined to hold defendants to answer on the burglary charges and the burglary special circumstance allegations, finding the evidence did not establish that defendants intended to commit a felony when they entered Pontbriant's house. The magistrate held defendants to answer on the remaining charges of murder, robbery, attempted rape, and theft of a vehicle, and the remaining special circumstance allegations.

The information subsequently filed in the superior court, however, included the burglary charges and burglary special circumstance allegations, despite the earlier ruling. Defendants each filed a motion under section 995, seeking to set aside the burglary charges and special circumstance allegations in the information on the ground the magistrate's determination was a factual finding that precluded the refiling of the burglary charges. The trial court denied their motions, finding "there was sufficient evidence to hold the defendants to answer on all charges, and on all special allegations." Tobin challenged the trial court's denial of his motion by seeking a writ of prohibition from the Court of Appeal, but that court denied the petition. Letner did not file such a petition. On appeal, defendants contend the magistrate's ruling precluded the prosecution from refiling the burglary charges.[6] We do not reach the merits of the question whether the trial court erred by denying the section 995 motions, because defendants cannot establish that any error in this regard was prejudicial.

---

[6] In the present claim and in most of their others on appeal, defendants contend the asserted error or misconduct denied them various state and federal constitutional rights. As we stated in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17 [42 Cal.Rptr.3d 677, 133 P.3d 581] (*Boyer*), and subsequent cases: "In most instances, insofar as defendant[s] raised the issue at all in the trial court, [they] failed explicitly to make some or all of the constitutional arguments [they] now advance[]. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant[s'] substantial rights) that required no trial court action by the defendant[s] to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional

■ In *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519 [165 Cal.Rptr. 851, 612 P.2d 941] (*Pompa-Ortiz*), we reconsidered the rule announced in *People v. Elliot* (1960) 54 Cal.2d 498 [6 Cal.Rptr. 753, 354 P.2d 225], which we described as "advanc[ing] the broad proposition that if the defendant has not been 'legally committed' and the trial court nonetheless erroneously denies the motion to set aside the information and permits the action to proceed to judgment, the resulting conviction must be reversed." (*Pompa-Ortiz, supra,* 27 Cal.3d at p. 527.) We observed that the *Elliot* rule was based upon the notion that the absence of a legally proper commitment deprived the trial court of "jurisdiction" over the defendant, and therefore reversal on appeal was warranted even in the absence of a showing of prejudice at trial. We further explained, however, that the "source of the difficulty in *Elliot* is the uncritical use of the term 'jurisdiction' when assessing the effect of an illegal commitment on the trial in superior court." (*Pompa-Ortiz,* at p. 528.) We therefore discarded the *Elliot* rule, and held the following: "Henceforth irregularities in the preliminary examination procedures *which are not jurisdictional in the fundamental sense* shall be reviewed under the appropriate standard of prejudicial error and shall require reversal only if defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination. The right to relief without any showing of prejudice will be limited to pretrial challenges of irregularities." (*Pompa-Ortiz,* at p. 529, italics added; see also *People v. Stewart* (2004) 33 Cal.4th 425, 461–462 [15 Cal.Rptr.3d 656, 93 P.3d 271].)

■ We acknowledge that our statement of the rule in *Pompa-Ortiz* reflects the circumstance that we were addressing an alleged irregularity that occurred during the preliminary hearing itself, whereas in the present case we are concerned with an alleged error that occurred in the trial court subsequent to the preliminary hearing. We conclude the rule nonetheless should apply in these circumstances as well. The error complained of in the present case— that the trial should not have proceeded on charges the magistrate ruled were unfounded—is not "jurisdictional in the fundamental sense," as we have defined that term. As we recently explained, "[a] lack of jurisdiction in its fundamental or strict sense results in ' "an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties." [Citation.] On the other hand, a court may have jurisdiction in the strict sense but nevertheless lack " 'jurisdiction' (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites." [Citation.] When a court fails

*legal consequence* of violating the Constitution. To that extent, defendant[s'] new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none."

to conduct itself in the manner prescribed, it is said to have acted in *excess* of jurisdiction.' [Citations.]" (*People v. Lara* (2010) 48 Cal.4th 216, 224–225 [106 Cal.Rptr.3d 208, 226 P.3d 322].) " '[F]undamental jurisdiction cannot be conferred by waiver, estoppel, or consent . . .' [whereas] 'an act in excess of jurisdiction is valid until set aside, and parties may be precluded from setting it aside by such things as waiver, estoppel, or the passage of time.' " (*Id.* at p. 225.) Defendants' claims, which they were required to raise at trial by way of their section 995 motions in order to preserve them (see § 996), cannot be considered as raising a challenge to the trial court's fundamental jurisdiction over the case. (Cf. *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 990–991 [47 Cal.Rptr.3d 467, 140 P.3d 775] ["Errors in the denial of a section 995 motion claiming insufficiency of the evidence are not jurisdictional in the fundamental sense."]; *People v. Mattson* (1990) 50 Cal.3d 826, 873 [268 Cal.Rptr. 802, 789 P.2d 983].) Indeed, we observe that a magistrate's ruling pursuant to section 871 that certain charges have not been sustained, even if that decision is properly supported by the facts and the law, does not absolutely deprive the prosecution of the opportunity to bring the charges at issue. As long as the restrictions of section 1387 on the number of times charges may be dismissed and refiled are satisfied, the prosecution may move to dismiss the case and either file a new complaint that includes all the charges, which would lead to a second preliminary hearing, or seek an indictment by the grand jury. (See, e.g., *Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1019 [22 Cal.Rptr.3d 876, 103 P.3d 276]; *Ramos v. Superior Court* (1982) 32 Cal.3d 26, 29 [184 Cal.Rptr. 622, 648 P.2d 589].)

Accordingly, pursuant to the rule we set forth in *Pompa-Ortiz*, on appeal defendants are required to establish not only that the denial of their section 995 motions was erroneous, but also that they were prejudiced by such error. Letner and Tobin cannot do so, because the jury convicted them of the burglary charges and found the burglary special circumstance allegations true after a trial in which, as discussed, *post*, in part II.B.2.c., the prosecution presented sufficient evidence as to those matters. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 137 [36 Cal.Rptr.2d 474, 885 P.2d 887] ["Even ' " '[i]f there is insufficient evidence to support the commitment, the defendant cannot be said to be prejudiced where sufficient evidence has been introduced at . . . trial' " ' to support the jury's finding as to the charge or as to the truth of the allegation."].) We therefore conclude defendants' claims are without merit.

### 2. *Failure of the Information to Charge First Degree Felony Murder (Letner, Tobin)*

Defendants were charged with murdering Pontbriant willfully and unlawfully and with malice aforethought, in violation of section 187. Defendants were not charged specifically with first degree murder in violation of

section 189, that is, murder committed in the course of committing an enumerated felony. Defendants raise on appeal a number of familiar claims related to the failure separately to charge felony murder pursuant to section 189, in addition to charging murder with malice, pursuant to section 187. We previously have rejected claims identical to defendants' claims, and discern no reason to reconsider those decisions. (See *People v. Morgan* (2007) 42 Cal.4th 593, 616–617 [67 Cal.Rptr.3d 753, 170 P.3d 129] [holding "a defendant may be convicted of first degree murder even though the indictment or information charged only murder with malice in violation of section 187," in rejecting claims that the trial court lacked jurisdiction, that the court improperly instructed the jury regarding theories of first degree murder, and that defendant received inadequate notice of the prosecution's theory of the case]; *People v. Hughes* (2002) 27 Cal.4th 287, 369–370 [116 Cal.Rptr.2d 401, 39 P.3d 432] (*Hughes*) [rejecting the claim that *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] implicitly overruled *People v. Witt* (1915) 170 Cal. 104 [148 P. 928], which held that murder with malice and felony murder are not separate crimes].)

### 3. *Denial of Motions to Suppress Evidence (Letner, Tobin)*

Prior to trial, defendants moved to suppress all evidence obtained as the result of the vehicle stop conducted by Officer Wightman on the night of the murder, when defendants were driving in Pontbriant's vehicle. Defendants asserted that Officer Wightman lacked a reasonable suspicion of criminal activity, and therefore his seizure of defendants was unreasonable under the Fourth Amendment of the United States Constitution. The trial court denied the motions, finding that Officer Wightman's observations gave rise to a reasonable suspicion of criminal activity. On appeal, defendants contend that the trial court erred in finding the traffic stop was supported by reasonable suspicion, and that the court's failure to suppress evidence obtained as a result of the stop violated their rights under the Fourth Amendment. We are not persuaded.[7]

---

[7] The Attorney General contends that Tobin, as a mere passenger in the car, was not "seized" when Officer Wightman made the traffic stop, and therefore Tobin is not entitled to challenge the constitutionality of the stop. This assertion fails in light of the United States Supreme Court's decision in *Brendlin v. California* (2007) 551 U.S. 249 [168 L.Ed.2d 132, 127 S.Ct. 2400].

a. *Background*

The evidence considered in ruling upon the motions to suppress was as follows.[8] Officer Wightman was patrolling the downtown area of Visalia on the night of Tuesday, March 1, 1988, in a marked police vehicle. At approximately midnight, Officer Wightman was traveling westbound on Main Street, approaching its intersection with Garden Street. As Officer Wightman drove to the corner of Main Street, he saw a red Ford Fairmont traveling southbound on Garden Street also approaching the intersection. Officer Wightman's attention was drawn to the Fairmont because its exterior was beaded with water. Although it had rained heavily earlier that night, the rain stopped at approximately 9:30 p.m., and other vehicles traveling on the roads were not beaded with water, whereas the exteriors of cars parked nearby in a car lot and on the street were still wet. Officer Wightman testified he became "somewhat suspicious" because the beaded water on the Fairmont indicated to him that it had been driven only a short distance from where it had been parked when it had been raining hours earlier, and he was aware that during the past three months there had been "heavy" criminal activity within that area of downtown. This area included approximately 10 car dealerships that had filed numerous reports of a "considerable amount of vehicle tamperings and stolens [sic] and vehicle burglaries in the general car lot areas of downtown." Indeed, a Ford dealership with several car lots and a body-repair shop in the immediate area had reported "quite a few" incidents, including the theft of a vehicle from one of its lots about one week earlier. The reports of criminal activity in the area were summarized in daily bulletins that Officer Wightman received at work. Officer Wightman testified that "there was a used Ford car lot at Center, between Garden and Bridge, that we've had numerous problems with as far as vehicle tamperings and burglaries," and his "first thought was this car was being removed from that lot because all the other cars that were traveling on the roadway at the time were free of moisture."

After the Fairmont turned in front of Officer Wightman into the eastbound lane of Main Street, he made a U-turn and followed as it proceeded to turn south on Bridge Street and then west on Mineral King Avenue, before entering the on-ramp to westbound State Highway 198. The Fairmont traveled "consistent with" the speed limit and made appropriate stops at the stop signs and traffic signals on the city streets. Despite the circumstance that the on-ramp was, as Officer Wightman testified, "quite long enough to build proper speed to enter the freeway, [so as not to] make a danger to oncoming traffic that is going faster," upon entering the highway the Fairmont proceeded at 40 miles per hour, well below the posted speed limit of 55 miles

---

[8] The parties agreed that in ruling upon the motions, the trial court would consider testimony and other evidence presented at the suppression hearing, as well as Officer Wightman's testimony from the preliminary hearing.

per hour. Although Officer Wightman also noticed that the Fairmont's engine sounded as though it was "running rough," he testified he did not believe that the sound of the engine indicated mechanical problems accounting for the vehicle's slow speed on the highway. Officer Wightman testified the "main reason" he was becoming more suspicious about the occupants of the vehicle was that "they turned onto [Highway] 198 and were traveling only forty miles an hour with no other vehicles in sight, except for my own." Officer Wightman further testified his suspicions also were aroused because, based upon his experience, the Fairmont's slow speed possibly indicated that the driver was intoxicated. During his years of service as a patrol officer, which involved "hundreds" of "DUI" traffic stops, he became familiar with common signs and symptoms of intoxicated drivers, one of which was driving at an abnormally slow speed for no apparent reason.

As he followed the Fairmont, Officer Wightman radioed a police dispatcher to check its registration, and was informed that Pontbriant was the registered owner and that the vehicle had not been reported stolen. After the Fairmont had traveled on the highway at 40 miles per hour for approximately one mile, Officer Wightman initiated a traffic stop by activating his patrol vehicle's emergency lights, and the Fairmont pulled over. When questioned by the prosecutor at the hearing on the motions to suppress, Officer Wightman agreed that his suspicion that the driver was intoxicated was the "main reason for the stop," but it was "[a]bsolutely" the case that his "suspicions concerning the possible theft of that vehicle [were] part of the reason why" he stopped it.

Officer Wightman identified the driver and the passenger as Letner and Tobin, respectively. During his subsequent inquiries concerning why defendants were in possession of the car, and whether Letner had been driving while under the influence of alcohol or a drug, Officer Wightman conducted a brief search of defendants and the car, which uncovered items belonging to defendants, beer bottles of the same brands later found at the murder victim's house, and Letner's buck knife, which Letner was carrying in his pants pocket. Letner told Officer Wightman that the Fairmont belonged to Ivon Pontbriant, and that she had given him permission to drive it. Letner said that Pontbriant lived on Jacob Street, but he claimed he did not know the exact address or her telephone number. In addition, defendants each made inconsistent and apparently untruthful statements concerning their destination. When the car subsequently was impounded and more thoroughly searched, a rag with blood on it consistent with Tobin's blood, and a hat belonging to Letner, also were found in the car.

The trial court denied defendants' motions to suppress, finding "there was reasonable suspicion, based on the totality of the circumstances testified to by

the officer. [¶] First of all, the Court believes that the officer had a right to be suspicious about the movement of cars in that area, in which he first encountered the Ford Fairmont in which the defendants were riding." The court noted that the daily bulletins issued by the police department reported "numerous car thefts" in the area. Although it was not part of the record, the court noted its own personal knowledge that various car lots were in the area, and that it was "obvious that this is in downtown Visalia, that this is not an area in which there is housing in which you expect people to be leaving their residences and going to other places. [¶] There are no supermarkets, and the—so what you are left with is the downtown area in which there are probably a couple bars in the vicinity, and some car lots." In the trial court's view, "that in itself wouldn't have given the officer any right to stop this car. But he certainly had every right to follow it." The court stated that Officer Wightman, however, "did develop a reasonable suspicion based on slow speed. [¶] The—we have had a lot of testimony and diagrams [regarding the area], and this Court has come onto the freeway at the location which these defendants went on it, and which the officer followed. [¶] That is a rather long descending ramp onto the freeway. There's adequate opportunity to accelerate from that point, up through the Mooney overcrossing, and the—the speed, plus the location [at] which these defendants were originally observed, plus the fact that in my opinion the opportunity that they would have had to get this car up to speed but didn't, and the—the fact that the officer was aware of thefts in the area, . . . all gave the officer reasonable opportunity— reasonable suspicion to stop this car. [¶] And once stopped, then the observations he made of the driver gave more than adequate grounds to proceed as he did."

### b. *Discussion*

■ As an initial matter, we observe that the evidence and arguments presented by defendants at the pretrial proceedings attempted to establish primarily that the reasons Officer Wightman offered for the stop were merely pretextual—essentially defendants contended that Officer Wightman had a grudge against them from prior encounters, recognized them when the Fairmont first turned in front of the patrol car at the intersection, decided to stop them at the beginning of the encounter, and that the officer emphasized the possibility that the car had been stolen and the driver had been intoxicated as pretexts to justify his conduct. The United States Supreme Court, however, has since made clear that Fourth Amendment challenges based upon a claim that a seizure or search was "pretextual" are without merit. (See *Whren ·v. United States* (1996) 517 U.S. 806, 813 [135 L.Ed.2d 89, 116 S.Ct. 1769].) Defendants, properly, do not on appeal renew their contentions of a pretextual

stop.[9] To the extent, however, that they contend that Officer Wightman subjectively had abandoned the notion the car was stolen before stopping it, and that therefore we must evaluate the reasonableness of the stop solely on the basis of whether there was reasonable suspicion the driver of the Fairmont was intoxicated, this contention is without merit both as a matter of fact and of law. First, Officer Wightman ultimately testified that when he initiated the traffic stop, he harbored suspicions of *both* an intoxicated driver and a stolen car. Second, "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' [Citation.] The officer's subjective motivation is irrelevant." (*Brigham City v. Stuart* (2006) 547 U.S. 398, 404 [164 L.Ed.2d 650, 126 S.Ct. 1943]; see also *Whren, supra*, 517 U.S. at p. 814 ["the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent" of the officer]; *People v. Sanders* (2003) 31 Cal.4th 318, 334 [2 Cal.Rptr.3d 630, 73 P.3d 496].)

■ "In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. We review the court's resolution of the factual inquiry under the deferential substantial-evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review." (*People v. Saunders* (2006) 38 Cal.4th 1129, 1133–1134 [45 Cal.Rptr.3d 66, 136 P.3d 859].) On appeal we consider the correctness of the trial court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision. (*People v. Zapien* (1993) 4 Cal.4th 929, 976 [17 Cal.Rptr.2d 122, 846 P.2d 704] [if the trial court's ruling is correct " ' "upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion" ' "]; *People v. Braeseke* (1979) 25 Cal.3d 691, 700–701 [159 Cal.Rptr. 684, 602 P.2d 384].)

■ "The Fourth Amendment protects against unreasonable searches and seizures. [Citations.] 'A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity.' [Citation.] Ordinary traffic stops are treated as investigatory detentions for which the officer must be able to articulate specific facts justifying the suspicion that a crime is being committed. [Citations.] [¶] . . . [¶] Law

---

[9] The trial court, in rejecting defendants' claim that the stop was pretextual, found that Officer Wightman had not recognized defendants when they turned in front of the patrol car, and consequently did not know who was in the Fairmont until he stopped the vehicle.

enforcement officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." [Citations.]' [Citation.]" (*People v. Hernandez* (2008) 45 Cal.4th 295, 299 [86 Cal.Rptr.3d 105, 196 P.3d 806].)

As the United States Supreme Court has stated: "The reasonableness of a seizure under the Fourth Amendment is determined 'by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests.' [Citation.]" (*Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.* (2004) 542 U.S. 177, 187–188 [159 L.Ed.2d 292, 124 S.Ct. 2451].) This court has recognized that "[t]he level of intrusion of personal privacy and inconvenience involved in a brief vehicle stop is considerably less than [an] 'embarrassing police search' on a public street," and that " 'in light of the pervasive regulation of vehicles capable of traveling on the public highways, individuals generally have a reduced expectation of privacy while driving a vehicle on public thoroughfares.' [Citation.]" (*People v. Wells* (2006) 38 Cal.4th 1078, 1087 [45 Cal.Rptr.3d 8, 136 P.3d 810].)

■ Even in a general sense, the reasonable suspicion standard of *Terry v. Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868] is not a particularly demanding one, but is, instead, "considerably less than proof of wrongdoing by a preponderance of the evidence." (*United States v. Sokolow* (1989) 490 U.S. 1, 7 [104 L.Ed.2d 1, 109 S.Ct. 1581].) "In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." (*Illinois v. Wardlow* (2000) 528 U.S. 119, 124–125 [145 L.Ed.2d 570, 120 S.Ct. 673].) Further, as the high court repeatedly has explained, the possibility of innocent explanations for the factors relied upon by a police officer does not necessarily preclude the possibility of a reasonable suspicion of criminal activity. (*United States v. Arvizu* (2002) 534 U.S. 266, 274 [151 L.Ed.2d 740, 122 S.Ct. 744] (*Arvizu*) ["Although each of the series of acts [in *Terry*] was 'perhaps innocent in itself,' we held that, taken together, they 'warranted further investigation.' "]; *Sokolow, supra,* 490 U.S. at p. 9 [holding that factors that by themselves were "quite consistent with innocent travel" collectively gave rise to reasonable suspicion]; see also *People v. Glaser* (1995) 11 Cal.4th 354, 373 [45 Cal.Rptr.2d 425, 902 P.2d 729] ["that a person's conduct is consistent with innocent behavior does not necessarily defeat the existence of reasonable cause to detain. [Citation.] What is required is not the *absence* of innocent explanation, but the *existence* of 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that

intrusion.' "].) In determining whether a search or seizure was supported by a reasonable suspicion of criminal activity, " 'the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.' " (*Sokolow*, *supra*, 490 U.S. at p. 10.) Indeed, the United States Supreme Court has acknowledged that by allowing the police to act based upon conduct that was "ambiguous and susceptible of an innocent explanation," the court in *Terry* "accept[ed] the risk that officers may stop innocent people." (*Wardlow*, *supra*, 528 U.S. at pp. 125–126; see, e.g., *In re Raymond C.* (2008) 45 Cal.4th 303, 306–308 [86 Cal.Rptr.3d 110, 196 P.3d 810] [police officer had reasonable suspicion to conduct a traffic stop on a vehicle displaying no rear license plate or a temporary operating permit in the rear window, despite the circumstances that the vehicle otherwise was being driven in a lawful manner and there was a temporary permit in the front window].)

In the present case, the relevant facts—that is, setting aside the irrelevant issue of Officer Wightman's subjective beliefs concerning the justification for the stop—are as follows. When Officer Wightman first observed the Ford Fairmont at the intersection of Main and Garden Streets, its exterior, unlike other cars traveling in the area, was beaded with water, although it had stopped raining hours before. A reasonable officer could suspect from this circumstance that the car had been parked nearby until fairly recently. Officer Wightman knew that in the immediate area were a number of car dealerships that had reported vehicle tamperings, burglaries, and thefts in the preceding months. Indeed, the Ford dealership adjacent to that intersection had reported the theft of a vehicle approximately one week earlier. It was midnight on a Tuesday, when relatively few persons are working or otherwise away from home and hence when vehicle thefts from a car dealership more readily might be committed. Officer Wightman, following the Fairmont in his marked patrol car, observed that after the vehicle entered the highway (at that point a freeway), it accelerated to a speed of only 40 miles per hour, well below the speed limit, and traveled at that speed for approximately one mile, that is, for more than one minute. In these circumstances, a reasonable officer might suspect the driver of the car was attempting to avoid contact with the police. (See *U.S. v. Villalobos* (5th Cir. 1998) 161 F.3d 285, 291 ["noticeable deceleration in the presence of a patrol car can contribute to reasonable suspicion, even though drivers often slow when they see law enforcement personnel"]; *U.S. v. Lopez-Martinez* (10th Cir. 1994) 25 F.3d 1481, 1486 ["maintaining a noticeably slow speed in the presence of a police officer may suggest nervousness . . ."]; *People v. Gibson* (1963) 220 Cal.App.2d 15, 20 [33 Cal.Rptr. 775] ["The fact that a driver proceeds at a speed slower than the speed limit under circumstances where he might normally proceed at the higher speed also is a factor appearing to justify an officer's investigation."].) We therefore conclude Officer Wightman pointed to

specific articulable facts that, considered in light of the totality of the circumstances, provided "some objective manifestation" that one or both of the individuals in the Fairmont may have been involved in criminal activity, including theft of the automobile, and were attempting to avoid apprehension.

■ Defendants point to various details that, they contend, diminish the suspicious nature of the articulable facts listed above. For example, Officer Wightman had learned prior to the traffic stop that the Fairmont had not been reported stolen and was registered to a private person (not a dealership). Defendants also assert that the car might have been traveling on the highway at a slow speed because of mechanical difficulties, made apparent to the officer by the sound of the engine "running rough," possibly unsafe road conditions because of the rain that had fallen earlier that night, or because the driver was anticipating an upcoming reduction in the speed limit when the freeway ended. As mentioned above, however, such possible innocent explanations for an officer's observations do not preclude the conclusion that it was reasonable for the officer to suspect that criminal activity was afoot. " 'Indeed, the principal function of [police] investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal . . . .' [Citation.]" (*People v. Souza* (1994) 9 Cal.4th 224, 233 [36 Cal.Rptr.2d 569, 885 P.2d 982]; see also *Arvizu, supra,* 534 U.S. at p. 274 [the totality-of-the-circumstances standard precludes a "divide-and-conquer analysis" under which factors that are "readily susceptible to an innocent explanation [are] entitled to 'no weight' "].) Moreover, in the present case several of the cited circumstances do not undercut the suspicion of criminal activity. A reasonable officer in Officer Wightman's circumstances might surmise that the Fairmont had been stolen within the previous minutes, at a time when the dealerships were. closed and most persons were asleep, and that therefore it would be unlikely the owner had discovered the theft, let alone reported it to the police. The circumstance that the Fairmont was registered to a private person did not signify that it could not have been taken from a dealership—the dealer might have recently purchased it and not yet updated the ownership records, or the car could have been at the dealership for repairs. There was no evidence presented at the hearing suggesting that the roads (as opposed to cars parked in the downtown area) were wet or unsafe to the point where it would be necessary or prudent for a driver to travel on the freeway at a significantly reduced speed. Similarly, as to the performance of the Fairmont's engine, Officer Wightman testified that its sound did not indicate to him that the vehicle was incapable of achieving a speed greater than the 40 miles per hour it was traveling on the highway, and defendants presented no evidence to the contrary. In addition, although it might not appear that the driver of the Fairmont had been trying to avoid the officer when driving on the city streets before entering the freeway, a reasonable officer in these circumstances

nonetheless might suspect that traveling at a slow speed on the freeway reflected an attempt by the driver to avoid contact with the police.

 For these reasons, we conclude the trial court properly found that Officer Wightman was aware of specific articulable facts that, viewed in their totality, supported a reasonable suspicion that the occupants of the Fairmont might be engaged in criminal activity, justifying his action in stopping the vehicle. As the United States Supreme Court has stated, "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." (*Adams v. Williams* (1972) 407 U.S. 143, 146 [32 L.Ed.2d 612, 92 S.Ct. 1921].) The trial court correctly denied defendants' motions to suppress the evidence obtained as a result of the vehicle stop.

### 4. *Denial of Motions to Sever Defendants' Trials at the Guilt Phase (Letner, Tobin)*

 Each defendant filed a pretrial motion to sever his trial at the guilt phase from that of the other defendant, arguing that their defenses would be antagonistic and that their constitutional rights to confrontation would be violated by the admission of their statements incriminating each other. (See *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] [a nontestifying codefendant's extrajudicial statement that incriminates both himself or herself and the other defendant is inadmissible]; *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].) As defendants observed, Tobin made statements to his mother and Jeanette Mayberry admitting he was at Pontbriant's house on the night of the murder, but asserting he left before Letner and at a time when Pontbriant was unharmed, whereas Letner asserted in the letters written to inmate Danny Payne, and in statements made to investigator Johnson, Robert Hernandez, and Leo Pike, that Letner was present when Tobin killed Pontbriant. The trial court denied the severance motions, with the understanding the prosecutor would not be permitted to introduce statements that posed an *Aranda/Bruton* problem. Defendants contend on appeal that the denial of their motions was an abuse of discretion that violated their statutory rights, as well as their state and federal constitutional rights.[10]

 "Section 1098 provides in pertinent part: 'When two or more defendants are jointly charged with any public offense, whether felony or

---

[10] Tobin also filed a pretrial motion to sever his penalty phase trial from that of Letner, and renewed that motion at several points during the penalty phase. During the presentation of penalty phase witnesses, Letner also made an oral motion to sever the remainder of the penalty phase trial. Defendants' appellate challenges to the trial court's denial of those motions is discussed, *post*, in part II.C.1.

misdemeanor, they must be tried jointly, unless the court order[s] separate trials.' Our Legislature has thus 'expressed a preference for joint trials.' [Citation.] But the court may, in its discretion, order separate trials 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' [Citations.] [¶] We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared at the time the court ruled on the motion. [Citation.] If the court's joinder ruling was proper at the time it was made, a reviewing court may reverse a judgment only on a showing that joinder ' "resulted in 'gross unfairness' amounting to a denial of due process." ' " (*People v. Avila* (2006) 38 Cal.4th 491, 574–575 [43 Cal.Rptr.3d 1, 133 P.3d 1076] (*Avila*).)

 To the extent defendants contend the trial court abused its discretion by finding the defense cases were not so conflicting as to require a severance, they are incorrect. Initially, it must be observed that this was a " ' "classic case" ' " for a joint trial, because defendants mutually were charged with the same crimes arising from the same events. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 [17 Cal.Rptr.3d 710, 96 P.3d 30] (*Coffman*).) The circumstance that Letner and Tobin might attempt to fix blame on each other did not by itself require separate trials.[11] "If the fact of conflicting or antagonistic defenses *alone* required separate trials, it would negate the legislative preference for joint trials and separate trials 'would appear to be mandatory in almost every case.' " (*People v. Hardy* (1992) 2 Cal.4th 86, 168 [5 Cal.Rptr.2d 796, 825 P.2d 781].) Accordingly, we have concluded that a trial court, in denying severance, abuses its discretion only when the conflict between the defendants *alone* will demonstrate to the jury that they are guilty. If, instead, "there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance." (*Coffman, supra,* 34 Cal.4th at p. 41; see also *People v. Carasi* (2008) 44 Cal.4th 1263, 1297–1298 [82 Cal.Rptr.3d 265, 190 P.3d 616] ["a joint trial is prohibited only where ' "the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both [defendants] are guilty" ' "]; *Avila, supra,* 38 Cal.4th at pp. 575–576.)

---

[11] We observe, however, that Tobin's defense did not rely upon establishing the guilt of Letner, but instead asserted that the victim was unharmed when Tobin departed and that Tobin had no knowledge of what subsequently happened to her.

We also observe that the circumstance that Letner ultimately chose not to testify at the guilt phase of the trial—and therefore did not accuse Tobin of the murder, but instead attacked the sufficiency of the prosecution's evidence—does not affect our resolution of the contention that the trial court abused its discretion in denying the pretrial severance motions. The court properly and necessarily based its ruling upon the record before it, which clearly left open the possibility that Letner might accuse Tobin of having committed the murder.

When the trial court ruled in the present case on the motions to sever, the evidence before it—the testimony presented at the preliminary hearing—demonstrated that the conflict between the potential defenses alone was not likely to lead the jury to reach guilty verdicts. The evidence established that both defendants knew Pontbriant was alone at her house and possessed a car and cash for the rent. Both defendants were found traveling out of town in the victim's car on the night of the murder, and their belongings were found in the trunk. They both provided conflicting accounts of where they were going. They subsequently abandoned the car, leaving their possessions inside, and fled. Moreover, forensic evidence discovered at the scene and in the victim's car pointed toward each defendant's involvement in the murder. Finally, both defendants made statements that were self-incriminating (apart from the excluded portions of the statements that incriminated the other defendant). As in *People v. Turner* (1984) 37 Cal.3d 302, 313 [208 Cal.Rptr. 196, 690 P.2d 669], in which we found no abuse of discretion in permitting a joint trial of the defendants, when the trial court ruled on the motions to sever in the present case, "the court was faced with two men charged with [a] murder[] under circumstances in which all the events surrounding the crimes and ultimate arrests involved them jointly." For these reasons, the trial court did not abuse its discretion by denying their motions to sever.

To the extent defendants assert that additional grounds not presented to the trial court demonstrate the joint trial resulted in gross unfairness amounting to a denial of due process of law, we are not persuaded.

Both defendants urge that severance was required because the prosecution employed the joint trial to join a strong case with a weak one, and to take advantage of a "prejudicial association" between the two defendants. We disagree. Notably, each defendant asserts the evidence against him was weak compared to the stronger evidence against his codefendant. We conclude, however, that the evidence presented against each defendant at trial was, in general, of similar weight. The strengths and weaknesses of the prosecution's case—considering its circumstantial nature, the credibility of the witnesses, and the force of the physical evidence—for the most part were the same for both defendants. We cannot say that the quantity and quality of the evidence implicating one defendant compared to the other was so dissimilar that the jury likely convicted both defendants based upon the strength of the evidence against only one of them.

Similarly, we do not discern any inappropriate reliance upon the prejudicial nature of the association between the two defendants. Defendants observe that the prosecutor acknowledged to the jury it was difficult to point to evidence that definitively established the role of each defendant in the crimes committed against Pontbriant, but the prosecutor nonetheless argued that the

evidence, including defendants' history of close friendship, demonstrated they were equally culpable. We reject defendants' contention that this argument improperly appealed to the jury to consider "guilt by association"—an improper consideration that could have been avoided by severance of defendants' trials.[12] A prejudicial association justifying severance will involve circumstances in which the evidence regarding one defendant might make it likely the jury would convict that defendant of the charges and, further, more likely find a codefendant guilty based upon the relationship between the two rather than upon the evidence separately implicating the codefendant. (See *People v. Chambers* (1964) 231 Cal.App.2d 23, 29 [41 Cal.Rptr. 551] [concluding that the defendant "was probably fastened with vicarious responsibility for the long-continued brutality of [the codefendant]," and that the jury likely convicted the defendant based upon a "notion of joint moral responsibility" rather than personal guilt]; *People v. Massie* (1967) 66 Cal.2d 899, 917 & fn. 19 [59 Cal.Rptr. 733, 428 P.2d 869] [citing *Chambers* concerning "prejudicial association with codefendants" warranting severance]; *People v. Biehler* (1961) 198 Cal.App.2d 290, 298 [17 Cal.Rptr. 862] ["the vices inherent in a mass trial such as was had in the instant case are the danger that the jury will find one or more defendants guilty as charged because of his association with evil men . . ."]; see also *People v. Cummings* (1993) 4 Cal.4th 1233, 1286 [18 Cal.Rptr.2d 796, 850 P.2d 1] ["Since defendants were crime partners in several of the robberies and in the murder, prejudicial association with a codefendant is not a factor."].) The prosecution's argument in the present case—that it was probable Letner and Tobin acted in concert, because they had a history of doing so—was not an appeal to find guilt by association, but rather was a proper argument based upon reasonable inferences the jury could draw from the evidence it had heard. (Cf. *People v. Champion* (1995) 9 Cal.4th 879, 921 [39 Cal.Rptr.2d 547, 891 P.2d 93] [the prosecution's introduction of evidence of defendants' membership in a criminal street gang was not an attempt to prove "guilt by association"; evidence of gang membership "formed a significant evidentiary link in the chain of proof tying them to the crimes"].) Moreover, the jury repeatedly was instructed at the conclusion of the guilt phase that it must consider separately the evidence against each defendant and reach a verdict as to each based solely upon the evidence admitted against him. Although Letner asserts the "reality of trial practice" is that such instructions are ineffective, we presume the jury followed these instructions. (*Coffman, supra,* 34 Cal.4th at pp. 43–44.) The prosecutor's argument did not result in gross unfairness that would warrant setting aside the verdict rendered following the joint trial.

---

[12] We also observe that during the trial, defendants did not object to the prosecutor's argument or request an admonition—for example, a reminder that the jury was required to consider separately the question of each defendant's guilt. (As noted, *post,* however, the jury ultimately was so instructed).

Letner also asserts that severance was required because Tobin acted as a "second prosecutor," thereby reducing the prosecution's burden to prove its case against Letner, as well as adversely affecting Letner's ability to present his own defense. For the most part, this claim appears to be a variation of the claim we already have rejected, concerning the necessity for severance because of defendants' allegedly conflicting defenses. Tobin's presentation of evidence tending to incriminate Letner did not lessen the prosecution's burden, or result in gross unfairness amounting to a denial of due process. As we have explained, because there was sufficient independent evidence of guilt, the conflict between defendants did not lead by itself to Letner's conviction, and therefore severance was not required.

■ Further, the record does not confirm Letner's contention on appeal that he chose not to testify at the guilt phase because of a concern related to his joint trial; Letner and his attorney offered ambiguous explanations for this decision.[13] In addition, the assertion that Letner chose not to testify because he was jointly tried with Tobin is contradicted by Letner's penalty phase testimony that the reason he did not testify at the guilt phase was that he did not want to have a "rat jacket" in prison. Even if the record established that Letner chose not to testify because of some concern related to his joint trial with Tobin, Letner does not offer any authority supporting his claim that, despite proper joinder of the trial, the strategic decision he was required to make between testifying and remaining silent resulted in a gross unfairness amounting to a denial of due process and in other respects denied him his constitutional rights. As we have observed, " 'The criminal process . . . is replete with situations requiring the "making of difficult judgments" as to which course to follow. [Citation.] Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.' " (*People v. Caro* (1988) 46 Cal.3d 1035, 1056 [251 Cal.Rptr. 757, 761 P.2d 680] [quoting *McGautha v. California* (1971) 402 U.S. 183, 213 [28 L.Ed.2d 711, 91 S.Ct. 1454]].) Similarly, Letner's contention that the jury held against him his failure to testify at the guilt phase, even though the trial court instructed the jury not to do so, lacks any support in the record.

---

[13] According to his counsel, Letner's decision not to testify "is the decision reached by the defendant as a result of the state of the evidence, and the evaluation and with regard to possible impeachment testimony which might be brought before the Court. [¶] His rights with regard to testifying have been explained to him. [¶] He feels uncomfortable testifying at this stage, due to the fact that it is a joint trial. Due to the fact some evidence may or may not be admissible in this trial that may have been admissible in a single trial. [¶] He wishes—he's always moved for that purpose, so that he could testify. [¶] But the way things have turned out in this case he's chosen not to testify."

Letner stated, "the reason I didn't testify was because they promoted all these liars. [¶] And I get up there, and they're just going to hear all this stuff."

In sum, defendants have failed to demonstrate that the trial court abused its discretion by denying their motions to sever their joint trial on the issue of guilt. Nor have they shown that any aspects of the joint trial, when considered separately or cumulatively, resulted in gross unfairness amounting to a denial of due process or a violation of their constitutional rights to a reliable and individualized verdict.

### 5. Use of Leg Brace Restraints During Jury Voir Dire (Letner)

On Monday, November 20, 1989, the trial court, having concluded individual voir dire of the prospective jurors, began group voir dire of those prospective jurors who had not been excused. Before the proceedings began, however, defendants objected that, for the first time during the proceedings, the sheriff's deputies had required the two defendants to wear leg brace restraints under their pants. A sergeant with the sheriff's office told the court that the deputies had security concerns because Letner, while wearing normal restraints, had attempted to assault another inmate, and both defendants had been seen practicing martial arts kicks in the jail's exercise yard. (We also note that, as described above, Letner had escaped from custody while being extradited to California to face the present charges.) The trial court found that the leg braces did not appear to be unduly restrictive, could not be easily seen, and were "not likely to create any possibility of prejudice." The court stated it therefore would "defer" to the deputies' decision to apply the restraints.

The following day, after the jury had been empanelled, the trial court noted for the record that after its ruling the previous day permitting the use of restraints, Tobin's leg brace had been damaged and was unusable. The court stated it had determined that no other restraints should be imposed, and therefore defendants would not be restrained for the remainder of the trial.

Letner contends on appeal that requiring him to wear the leg brace on November 20, 1989, violated his rights under the state and federal Constitutions to due process, to the assistance of counsel, and to present a defense. His contention is unpersuasive. The applicable rule is that " '[a] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints.' [Citation.] 'The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion' under state law. [Citation.] Under the federal Constitution, where a court ordered a defendant, without adequate justification, to wear restraints that were seen by the jury, the state must prove beyond a reasonable doubt that the unjustified shackling did not contribute to the verdict.

[Citation.] 'The trial court may not delegate to law enforcement personnel the decision whether to shackle a defendant.' [Citation.]" (*People v. Ervine* (2009) 47 Cal.4th 745, 773 [102 Cal.Rptr.3d 786, 220 P.3d 820] (*Ervine*).)

Despite Letner's speculation to the contrary, there is no evidence in the record that any of the prospective jurors were able to see his leg brace. Indeed, the trial court, during record settlement proceedings, found that the leg brace was not visible to the prospective jurors. In addition, Letner was restrained on the day prior to that on which the jury was empanelled, and it is unclear how many, if any, of the jurors who ultimately served on the jury would have seen the brace that day.

Letner contends, however, that under the high court's decision in *Deck v. Missouri* (2005) 544 U.S. 622 [161 L.Ed.2d 953, 125 S.Ct. 2007], respondent must establish beyond a reasonable doubt that the prospective jurors did *not* see the leg brace. *Deck* does not support his contention. In that case, the high court observed that the record "makes clear that the jury was aware of the shackles" (*id.* at p. 634), and held that "where a court, without adequate justification, orders the defendant to wear shackles *that will be seen by the jury*, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained' " (*id.* at p. 635, italics added). In *Deck* there was no dispute that the restraints were visible to the jury—a circumstance that courts consistently have viewed as inherently prejudicial. In the present case, we do not presume the prospective jurors viewed the restraint, and there is no evidence in the record demonstrating they did observe it.

There also is no evidence in the record that the leg brace was so physically restrictive or uncomfortable that Letner's ability to assist his attorney in conducting voir dire of the prospective jurors was impaired. Letner's reliance upon our decision in *People v. Mar* (2002) 28 Cal.4th 1201 [124 Cal.Rptr.2d 161, 52 P.3d 95] (*Mar*), in support of this aspect of his claim, is unavailing. First, that case concerned the use of a "stun belt," a device worn around the defendant's waist, capable of delivering " 'an eight-second, 50,000-volt electric shock if activated by a remote transmitter which is controlled by an attending officer. The shock contains enough amperage to immobilize a person temporarily and cause muscular weakness for approximately 30 to 45 minutes. The wearer is generally knocked to the ground by the shock and shakes uncontrollably. Activation may also cause immediate and uncontrolled defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal. An electrical jolt of this magnitude causes temporary debilitating pain and may cause some wearers to

suffer heartbeat irregularities or seizures.' " (*Id.* at p. 1215.) There is no evidence that the leg brace worn by Letner created a remotely comparable level of potential pain, injury, and humiliation, such that Letner's ability to concentrate and participate in the trial proceedings similarly might have been affected. The sole evidence in the record concerning any possible adverse physical effect of the brace was Tobin's statement to the trial court that the brace he wore was "very" uncomfortable.

Second, in *Mar* the credibility of the witnesses, including the defendant, was a key issue, and the defendant stated on the record that wearing the stun belt "made it difficult for him to think clearly and that it added significantly to his anxiety, and the trial transcript confirm[ed] that defendant was nervous while testifying at trial." (*Mar, supra,* 28 Cal.4th at p. 1224.) In *Mar,* therefore, use of the stun belt could have affected a critical aspect of the defense case: the jury's perception concerning whether the defendant was truthful in his testimony. In the present case, there is no evidence in the record demonstrating that Letner's ability to participate was affected in any manner by his wearing the leg brace, and the proceeding in question (a single day of jury voir dire) was not of the same critical importance to Letner's participation as was the defendant's testimony in his own defense in *Mar.*

Accordingly, even were we to conclude that the trial court erred by choosing to "defer" to the sheriff's deputies in permitting the use of the leg brace for one day of the proceedings, any error was plainly harmless. (*Ervine, supra,* 47 Cal.4th at pp. 773–774 [the unjustified shackling of a defendant is harmless when the jury did not see the restraint and there was no impairment of the defendant's ability to communicate with counsel or participate in his or her defense].)

B. *Guilt Phase Issues*

1. *Assertedly Erroneous Evidentiary Rulings*

a. *Admission of Letner's Statements Against Tobin As Adoptive Admissions (Tobin)*

Tobin contends the trial court abused its discretion by admitting against him the statement made by Letner to Officer Wightman, when the officer conducted the vehicle stop of Pontbriant's car, that Letner was "taking [my] friend home." Tobin asserts, as he did in the trial court, that the statement was hearsay under section 1200 of the Evidence Code,[14] and that there was an

---

[14] Evidence Code section 1200 provides that hearsay evidence—defined as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated"—is inadmissible except as provided by law.

insufficient foundation for admitting it under the exception applicable to "adoptive admissions" under Evidence Code section 1221.[15] As the prosecutor and the trial court observed at the trial, however, the statement was not hearsay, and therefore whether or not it constituted an "adoptive admission" under the statute is of no moment. Letner's statement that he was "taking [my] friend home" was not offered to demonstrate that Tobin "adopted" the truth of the matter asserted, but rather, because the statement was a lie, to demonstrate consciousness of guilt. This false statement was relevant because it was made (and the jury could infer its falsity from other evidence), and not because it was a true statement. Because the statement was not inadmissible under the hearsay rule, it was unnecessary to establish whether it fell within the adoptive-admission exception to the hearsay rule. (See, e.g., *People v. Curl* (2009) 46 Cal.4th 339, 362 [93 Cal.Rptr.3d 537, 207 P.3d 2] [the inconsistent-statement hearsay exception under Evid. Code, § 1202 does not apply to a statement admitted for the nonhearsay purpose of showing consciousness of guilt]; *People v. Noguera* (1992) 4 Cal.4th 599, 624–625 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) The trial court did not err by overruling Tobin's objection.

Although Tobin has failed to articulate the point adequately either in the trial court or on appeal, arguably the statement should have been admitted as evidence only of Letner's, and not Tobin's, consciousness of guilt. The trial court touched on the subject, noting that in its view, the statement's admissibility against Tobin was a "question of fact," and the court offered to instruct concerning "when somebody can be deemed to adopt or not adopt an admission like that if you want one." No such instruction was given during Officer Wightman's testimony or at the conclusion of the guilt phase. Even assuming Tobin did not forfeit the claim that the trial court erroneously failed to instruct the jury that the statement could be considered only as to Letner, we conclude that any possible error was harmless. Officer Wightman also testified that Tobin himself told Wightman they were taking Tobin home to the house on South Crenshaw where he resided with a woman named Jeanette, although it was established at trial that Tobin had not resided there for some time. Accordingly, the jury had before it similar evidence from Tobin himself revealing potential consciousness of guilt.

b. *Cross-examination of Tobin Regarding Stolen Property (Letner, Tobin)*

Prior to trial, the prosecution informed the trial court it intended to present evidence indicating that Letner had stolen from a local beauty parlor the bags

---

[15] Evidence Code section 1221 provides that "[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

of beauty products found in Pontbriant's car after the murder. The prosecutor argued that the theft of the items was relevant to establish that defendants had brought the items with them in the car in order to attempt to sell them to raise money for their escape. Defendants objected to the admission of this evidence on the ground it constituted irrelevant "other-crimes" evidence that improperly would imply defendants were the type of individuals who committed burglaries, such as the offense charged in the present case. The trial court ruled that the evidence would be admissible to demonstrate, as the prosecutor argued, consciousness of guilt reflected in a plan to facilitate defendants' escape. The court found that the possible prejudicial effect of admitting this evidence was slight in view of the nature of the charges, and advised that it would instruct the jury that the evidence was admitted for a limited purpose.[16]

During the prosecution's case-in-chief, Jeanette Mayberry testified that the bags of beauty products belonged to Letner, and that he told her he stole the items from a store in Visalia. Upon a defense objection, the trial court refused to strike the testimony but admonished the jury that "as to whether he stole these, or didn't steal them is not an issue before you, and you shouldn't consider that as to whether [defendants] are guilty or not guilty of the crimes with which they are charged." The prosecution presented no other evidence concerning the stolen beauty products during its case-in-chief.

During his direct examination, Tobin testified that he knew the bags of beauty products had been placed in Pontbriant's car. He also testified on direct examination that after defendants spent the night in the house on South Crenshaw, Letner wanted to return to the car but Tobin "didn't want to go near the car." On cross-examination, the prosecutor asked Tobin a number of questions concerning the beauty products. In response to an initial question regarding whether Letner had said he had stolen the items, Tobin answered, "He may have," but after several more questions he stated Letner had told him only that the items were "hot," meaning they had been stolen. Neither defendant objected to the prosecutor's questions. Later, on cross-examination by Letner's attorney, Tobin testified that when Letner drove onto the highway, Letner was hoping—because of his concern regarding the stolen items inside

---

[16] The court gave such an instruction at the conclusion of the guilt phase: "Evidence has been introduced showing that a defendant committed a crime other than that for which he is on trial. [¶] Such evidence, if believed, was not received, and may not be considered by you to prove that defendant is a person of bad character, or he or she had a disposition to commit crimes . . . . [¶] Such evidence was received, and may be considered by you only for the limited purpose of determining if it tends to show, one, motive for flight, or two, to facilitate flight from crime."

the vehicle—that the police car would stop following them.[17] Tobin also testified that the "major reason" he did not wish to return to Pontbriant's car was because the stolen beauty products were still inside, and thus he and Letner decided to abandon the vehicle.

On appeal, defendants contend that the trial court erred by permitting the prosecutor to question Tobin concerning the beauty products having been stolen, and that the admission of this testimony violated defendants' constitutional rights. Initially, defendants incorrectly assert that defense counsel objected to the questions seeking to elicit Tobin's knowledge that the beauty products had been stolen. To the contrary, both defense attorneys objected only when—after moving on from the issue of Tobin's knowledge that the items were stolen, and questioning Tobin regarding the toolbox that also was found in Pontbriant's car—the prosecutor asked, "Would Richard Letner take stolen items to the swap meet and sell them regularly?" The trial court sustained this objection. Defense counsel again objected when the prosecutor later inquired where the tools sold by defendants at the swap meets came from, and those objections again were sustained. Defendants therefore forfeited their appellate challenges regarding the stolen beauty products by failing to object during the prosecutor's examination. (*People v. Ledesma* (2006) 39 Cal.4th 641, 714 [47 Cal.Rptr.3d 326, 140 P.3d 657].) Moreover, even assuming that defendants' pretrial objections to the prosecutor's offer of proof concerning the stolen beauty products constituted an in limine motion to exclude evidence of this nature, defendants were required to renew their objection at trial, when the trial court would have the opportunity to evaluate their objections in light of the actual evidence presented. (*People v. Brown* (2003) 31 Cal.4th 518, 547 [3 Cal.Rptr.3d 145, 73 P.3d 1137] ["[t]he general rule is that 'when an *in limine* ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal . . .' "].) The requirement of a contemporaneous objection is especially applicable in the present case, because prior to trial defendants objected to the prosecution's presentation of the evidence in its case-in-chief, and the testimony challenged on appeal was elicited in the course of cross-examining Tobin during his own defense case, following (1) his testimony on direct examination establishing that he knew the beauty products had been placed in the car, (2) Jeanette Mayberry's testimony indicating that the items were stolen, and (3) the trial court's admonition to the jury not to consider Mayberry's testimony with regard to the identity of the thief. (*People v. Morris* (1991) 53 Cal.3d 152, 190 [279

---

[17] Counsel also asked Tobin, "Now, as to whether or not [Letner] stole those, that's not an issue today. [¶] But . . . you believed that they were stolen property?" After Tobin answered, "Yes," counsel asked him, "And [Letner], at least, believed they were stolen property, as far as you knew?" Tobin again answered, "Yes."

Cal.Rptr. 720, 807 P.2d 949] [an in limine motion, without a contemporaneous objection at trial, is sufficient to preserve an objection for appeal only when "(1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context"].) Indeed, one reasonably might conclude Letner and Tobin purposefully chose not to object to the prosecutor's cross-examination, in the hope of using evidence of the stolen character of the items to explain why defendants drove onto the highway (rather than to Pontbriant's house, where they purportedly were to store their belongings) when the officer followed them, and why they abandoned the car (and their belongings) on the side of the road after the traffic stop. Because on appeal defendants challenge the admissibility of Tobin's testimony based primarily upon their *pretrial* arguments and the trial court's ruling, and because their failure to object to the testimony during the cross-examination denied the prosecutor an opportunity to justify its admission in light of the state of the evidence *at that point in the trial,* and denied the trial court an opportunity to decide this issue in the first instance, their claims are forfeited. In any event, based upon the record before us, we cannot conclude the trial court abused its discretion by allowing the prosecutor to question Tobin concerning a subject that Tobin brought up in his own testimony. (*People v. Mayfield* (1997) 14 Cal.4th 668, 754 [60 Cal.Rptr.2d 1, 928 P.2d 485] (*Mayfield*) [cross-examination can explore a defendant's testimony in greater detail than the direct testimony, and, in general, the permissible scope of cross-examination is very wide].)

### 2. *Assertedly Insufficient Evidence*

At the close of the prosecution's case-in-chief, defendants moved pursuant to section 1118.1 to dismiss the charges of attempted forcible rape, robbery, and burglary and the related special circumstance allegations, based upon the alleged insufficiency of the evidence. The trial court denied the motions. On appeal, defendants renew their challenges to the sufficiency of the evidence. As discussed below, we conclude the evidence is sufficient to support the convictions and the findings regarding the special circumstance allegations. Because there was sufficient evidence to sustain all of the convictions and findings, defendants' contention that their death sentences must be vacated if any one of the convictions or special circumstance findings is reversed also fails.[18]

---

[18] To the extent defendants contend on appeal that the trial court erred by denying their motions for acquittal made at the conclusion of the prosecution's case-in-chief, this contention is without merit. As we shall explain, based upon our review solely of the evidence presented in the prosecution's case-in-chief, that evidence is sufficient to support the jury's verdicts on all of the charges and allegations. Accordingly, the trial court properly denied the motions for

■ Defendants initially contend that because they have been sentenced to death, we are required by the Eighth Amendment to the United States Constitution to apply a "heightened" standard of review to their claims, rather than the standard we routinely apply in both capital and noncapital cases, which is "review [of] the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt" (*People v. Cole* (2004) 33 Cal.4th 1158, 1212 [17 Cal.Rptr.3d 532, 95 P.3d 811]), "presum[ing] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68]).[19] Defendants are mistaken. As the United States Supreme Court has held in a similar context, "the standard of federal [constitutional] review for determining whether a state court has violated the Fourteenth Amendment's guarantee against wholly arbitrary deprivations of liberty is equally applicable in safeguarding the Eighth Amendment's bedrock guarantee against the arbitrary or capricious imposition of the death penalty." (*Lewis v. Jeffers* (1990) 497 U.S. 764, 782 [111 L.Ed.2d 606, 110 S.Ct. 3092] [applying the standard established in *Jackson v. Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781], to federal constitutional review of the state court's finding of an aggravating circumstance in a capital case].) As the high court observed in *Jeffers*, the application of the facts to the law at a state court trial—that is, the determination of whether the evidence is sufficient to sustain the charges—is a question of state law, except to the extent that the determination of sufficiency at issue was arbitrary or capricious under the federal due process or cruel and unusual punishment clause. The application of state law in determining the sufficiency of the evidence will be considered arbitrary and capricious, and therefore a federal constitutional violation, "if and only if no reasonable sentencer [or fact finder] could have so concluded." (*Jeffers, supra*, 497 U.S. at p. 783.) Accordingly, we apply the standard of review set forth above to ensure that defendants' state and federal rights are protected.

We also observe that, for the most part, defendants dispute the persuasive value of the evidence that was admitted against them, pointing to various inconsistencies and inadequacies in the testimony of several witnesses and the physical evidence. In our limited role on appeal, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal

---

acquittal. (See *People v. Harris* (2008) 43 Cal.4th 1269, 1286 [78 Cal.Rptr.3d 295, 185 P.3d 727] ["On a motion for judgment of acquittal under section 1118.1, the trial court applies the same standard as an appellate court reviewing the sufficiency of the evidence."].)

[19] In capital cases, we apply this same standard in reviewing the sufficiency of the evidence supporting both the convictions and the special circumstance findings. (*People v. Rowland* (1992) 4 Cal.4th 238, 271 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 403 [133 Cal.Rptr.2d 561, 68 P.3d 1].) Further, "if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Farnam* (2002) 28 Cal.4th 107, 143 [121 Cal.Rptr.2d 106, 47 P.3d 988].) Accordingly, we need not—and do not—address all of defendants' assertions of conflicts in the evidence, or their alternative theories regarding the inferences that should have been drawn from the evidence.

In general, the evidence presented was sufficient for a rational trier of fact to find that Ivon Pontbriant was murdered in her residence during the evening hours of Tuesday, March 1, 1988, and that defendants arrived at her home together that night while she was alive and departed from the house together in her car after she was murdered. Defendants' challenges focus upon the adequacy of the evidence (or the asserted lack of evidence) to establish what occurred while they were at the victim's house—that is, whether the evidence was sufficient to enable the jury to find that each of the two defendants intended to and did commit, or aid and abet in the commission of, the charged offenses, and to find true the related special circumstance allegations as to each defendant.

### a. Attempted Rape (Letner, Tobin)

Defendants contend that the evidence presented in the prosecution's case-in-chief was insufficient to establish that an attempted forcible rape was committed and, even if the crime was committed, which of the defendants participated either as a perpetrator or an aider and abettor. We disagree.

█ "Conviction of the crime of attempted forcible rape requires proof the defendant formed the specific intent to commit the crime of rape and performed a direct but ineffectual act, beyond mere preparation, leading toward the commission of a rape. [Citations.] The elements of the crime of forcible rape are 'an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . [¶] . . . [¶] . . . [w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of another.' (§ 261, subd. (a)(2).)" (*People v. Rundle* (2008) 43 Cal.4th 76, 138 [74 Cal.Rptr.3d 454, 180 P.3d 224], fns. omitted (*Rundle*).) █ The felony-murder special circumstance, section 190.2, subdivision (a)(17), requires that "[t]he murder was committed while the defendant was engaged in, or was an

accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit" one or more of the enumerated felonies. At the time Pontbriant was murdered, the law provided that, as to the actual killer, "intent to kill [was] not an element of the felony-murder special circumstance; but when the defendant [was] an aider and abett[o]r rather than the actual killer, intent must be proved before the trier of fact can find the special circumstance to be true." (*People v. Anderson* (1987) 43 Cal.3d 1104, 1138–1139 [240 Cal.Rptr. 585, 742 P.2d 1306] (*Anderson*).)[20]

To summarize the evidence (drawing all reasonable inferences in favor of the prosecution), Pontbriant's body was found unclothed except for her brassiere, which was around her waist, and her socks. Her sweater had been cut at the neck and ripped the rest of the way down to the bottom, but the sleeves were intact. Because her hands were tied behind her back, the condition of her sweater indicated she was bound after having been undressed. Her pants and underwear had fecal matter on them. Pontbriant had been severely beaten, and several clumps of her hair had been pulled from her head. Several of Letner's hairs, which had been pulled out of his head, and several hairs that could have been pubic hairs from an unidentifiable donor, were found on Pontbriant's chest when her body was rolled over. Semen that could have been deposited by Tobin, but not Walter Gilliland, and blood consistent with Tobin's, were found in the bedroom, along with a baseball cap that contained several of Letner's hairs. A beer bottle was tightly wedged between Pontbriant's legs, near her genitals. This evidence was sufficient for the jury to find that defendants attempted to rape Pontbriant. The jury also reasonably could have found the murder was committed for the purpose of preventing Pontbriant from reporting the attempted rape to the authorities, and accordingly had occurred while defendants were engaged in the commission of the attempted rape, or their immediate flight after committing the crime. (§ 190.2, subd. (a)(17); *People v. Guzman* (1988) 45 Cal.3d 915, 952 [248 Cal.Rptr. 467, 755 P.2d 917].)

Defendants point out that there was no evidence of sexual activity or trauma on Pontbriant's genitals. Defendants, of course, were charged with an *attempted* rape, not a completed rape, and thus the absence of evidence that Pontbriant actually was raped does not preclude a finding of guilt. Furthermore, contrary to defendants' suggestion, there is no requirement that the

---

[20] In 1990, subsequent to Pontbriant's murder, the voters adopted Proposition 115, modifying aider-and-abettor liability under the felony-murder special circumstance to provide that "a person other than the actual killer is subject to the death penalty or life without parole if that person was a major participant in the underlying felony . . . and *either* intended to kill *or* acted with reckless indifference to human life." (*People v. Cleveland* (2004) 32 Cal.4th 704, 752 [11 Cal.Rptr.3d 236, 86 P.3d 302]; see § 190.2, subds. (c) & (d).)

prosecution establish *why* an attempted rape was unsuccessful.[21] Nonetheless, a rational trier of fact could have found that the plan to have sexual intercourse with Pontbriant was abandoned because she had defecated in her clothing and had fecal matter on her body. Thus the lack of evidence of sexual activity on Pontbriant's body reasonably may be explained, in contrast to those prior cases in which we have considered the lack of evidence of a sexual assault as an indication that an attempted rape or rape did not occur. (Cf. *Rundle, supra,* 43 Cal.4th at p. 139 [recognizing that the absence of evidence of a sexual assault may rebut other inferences suggesting that the perpetrator intended to have sexual contact with the victim, but holding that, in that case, the inconclusive nature of the evidence (because of the decomposition of the victim's body) concerning whether a sexual assault had occurred did not rebut such inferences].)

Defendants observe that we previously have held that the unclothed state of a murder victim is, by itself, insufficient to prove that a rape or attempted rape has occurred. (See *People v. Johnson* (1993) 6 Cal.4th 1, 41 [23 Cal.Rptr.2d 593, 859 P.2d 673].) In the present case, however, a number of other circumstances, considered in conjunction with Pontbriant's nearly total nudity, support the jury's verdict. The jury reasonably could have found Pontbriant had been bound after defendants forcibly undressed her, supporting the inference that they planned to do something to her that would be facilitated by her being unclothed, and in which she would not be a willing participant. In addition, the presence of sperm in the bedroom that could have been deposited by Tobin (but not Gilliland), the hairs found on Pontbriant's chest, and the bottle that was wedged between her legs near her genitals reasonably could be viewed as evidence of a sexual component of defendants' actions.

Defendants are correct in asserting that there is no *direct* evidence establishing which one of them performed which act against Pontbriant (other than Tobin's testimony that he had nothing to do with what happened to her, which the jury clearly rejected). The jury's reliance upon circumstantial evidence and the reasonable inferences to be drawn from that evidence, in determining whether both defendants were guilty, does not demonstrate, as defendants urge, that the verdict was the result of speculation. Rather, the evidence and the ensuing inferences adequately support the jury's finding that defendants *both* were guilty of attempting to rape Pontbriant and of intentionally killing her while they were engaged in committing that crime.

---

[21] Indeed, the prosecution also need not prove that the attempt failed. (*Rundle, supra,* 43 Cal.4th at p. 138, fn. 28 ["Under section 663, a defendant can be convicted of an attempt to commit a crime even though the crime, in fact, was completed."].)

 The evidence established that defendants had a history of acting in concert. They had been friends for several years, they resided together in various dwellings during their time in Visalia, and they engaged together in activities such as selling items at the local swap meet, practicing karate, and drinking and conversing at the Break Room Bar. There was, in fact, evidence demonstrating that they supported each other in criminal activities: Jeanette Mayberry testified that while Tobin assaulted her at the apartment on Bridge Street two days before Pontbriant's murder, Letner, in addition to yelling insults at Mayberry, encouraged Tobin to continue striking her. The evidence together with reasonable inferences established that defendants went together to Pontbriant's house on the night of the murder, left together in her car after she was killed, both lied to Officer Wightman regarding where they were going, fled to Iowa together, and eventually were arrested together. Neither of them had steady jobs or employment prospects in Visalia, and both of them had tenuous living arrangements: they were soon to be evicted from the Murray Street apartment for failing to pay the rent, and Jeanette Mayberry had just thrown Tobin out of the Bridge Street apartment after a dramatic fight between them. Forensic evidence reasonably could be viewed as indicating that both defendants directly were involved in attempting to rape the victim: Letner's hairs, which had been forcefully removed from his head, were found on Pontbriant's body, and semen and blood, consistent with having come from Tobin, were found in the bedroom. Although defendants attack the significance of the evidence and offer alternative explanations for its existence, we cannot say that no rational trier of fact could have determined that the evidence supported the finding that defendants, acting according to a common plan to attack Pontbriant and steal her car in order to leave town, committed an attempted rape, that Pontbriant's murder occurred during the course of the attempted rape, and that defendants shared an intent to kill her in order to facilitate their escape. (See § 31 [defining as principals in a crime all persons who commit the crime or aid and abet in its commission]; *People v. Richardson* (2008) 43 Cal.4th 959, 1023 [77 Cal.Rptr.3d 163, 183 P.3d 1146] (*Richardson*) [" 'An aider and abettor is one who acts with both knowledge of the perpetrator's criminal purpose and the intent of encouraging or facilitating commission of the offense.' "]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1130 [36 Cal.Rptr.2d 235, 885 P.2d 1] [the evidence was sufficient for the jury to infer that the attackers' actions were coordinated pursuant to a joint plan].)

### b. Robbery (Letner, Tobin)

 Defendants' challenges to the robbery convictions and special circumstance findings proceed along lines similar to their challenges to the attempted rape charges: they dispute the credibility of the witnesses, minimize the significance of the physical evidence, and contest the inferences that may be drawn from the evidence to establish their guilt. But, as we have

observed, on appeal we do not judge the trustworthiness of witnesses, reweigh the evidence, or assess for ourselves which interpretation of the evidence is the "right" one. Resolving the conflicts in the evidence was the province of the jury, and we cannot say that no rational trier of fact reasonably could have found defendants guilty of having robbed Pontbriant. Moreover, even were we to discount the testimony of Walter Gilliland and Earl Bothwell, as defendants urge us to do, we still would conclude a rational trier of fact could find defendants guilty of robbing Pontbriant and intentionally murdering her while engaged in that robbery.

"Robbery is 'the felonious taking of personal property in the possession of another, from [her] person or immediate presence, and against [her] will, accomplished by means of force or fear.' (§ 211.) The intent to steal must be formed either before or during the commission of the act of force." (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077 [81 Cal.Rptr.3d 651, 189 P.3d 911] (*Wallace*).)

 The jury reasonably could find that defendants were in possession of Pontbriant's car, shortly after she was violently murdered. Based upon this evidence—by itself—the jury reasonably could infer that defendants removed Pontbriant's car against her will by killing her, thus committing a robbery and an intentional murder while engaged in a robbery. (*Hughes, supra,* 27 Cal.4th at p. 357 ["We have stated that 'when one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery.' "]; *People v. Navarette* (2003) 30 Cal.4th 458, 499 [133 Cal.Rptr.2d 89, 66 P.3d 1182] ["While it may be true that one cannot rob a person who is already dead when one first arrives on the scene, one can certainly rob a living person by killing that person and then taking his or her property."].) For the same reasons expressed above regarding defendants' challenges to the attempted rape findings, it was reasonable for the jury to find that both defendants intended to rob and kill Pontbriant, and aided and abetted each other in doing so. Defendants argue that it was possible they decided to take Pontbriant's car only after they killed her. "The existence of this possibility [of after-formed intent to steal], however, does not render the evidence insufficient." (*Wallace, supra,* 44 Cal.4th at p. 1078; see *Hughes, supra,* 27 Cal.4th at pp. 357–358 [circumstances that the defendant left other items of value in victim's home, and that there was "slim" evidence suggesting when the intent to steal was formed, did not render unreasonable a finding that the defendant committed a robbery].) We therefore conclude the evidence was sufficient to support the jury's verdicts and findings on the robbery charges and the related special circumstance allegations.

Tobin urges that the jury could not reasonably have found the taking of Pontbriant's property was against her will and accomplished by force or fear,

because she might have been intoxicated to the point of unconsciousness at the time of the theft. We disagree. A rational trier of fact clearly could have found that, had Pontbriant been unconscious from drinking, defendants would not have needed to severely beat her, pull out her hair, and bind her arms behind her back. Further, had she lost consciousness at some point, a rational juror could find that she could not have remained in that condition during such an assault. As mentioned above, the circumstance that defendants might have rendered Pontbriant unconscious or killed her prior to actually taking the keys to her car did not preclude a finding that they committed the offense of robbery, so long as they previously formed the intent to steal. (See also *People v. Frye* (1998) 18 Cal.4th 894, 956 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

In presenting his claim of insufficient evidence, Letner additionally asserts that the prosecutor's presentation of Walter Gilliland's testimony establishing that he gave the rent money to Pontbriant in defendants' presence constituted prosecutorial misconduct, because the prosecutor knew or should have known this testimony was false. Even if Letner had not forfeited this contention by failing to raise it in the trial court, it lacks merit. The prosecutor properly could have concluded that the various inconsistencies in Gilliland's testimony and pretrial statements created a credibility issue for the jury to resolve. "When . . . the prosecution has doubts as to the truth of a statement it intends to present at trial, it must disclose to the defense any material evidence suggesting that the statement in question is false. But, notwithstanding those doubts, the prosecutor may still present the statement to the jury . . . ." (*People v. Harrison* (2005) 35 Cal.4th 208, 242 [25 Cal.Rptr.3d 224, 106 P.3d 895].)

c. *Burglary (Letner, Tobin)*

Similar to their other challenges to the sufficiency of the evidence, defendants point to evidence that assertedly contradicts the finding that they entered Pontbriant's home with the intent to commit a felony and committed the murder while engaged in the commission of the burglary. (See § 459 ["Every person who enters any house . . . with intent to commit grand or petit larceny or any felony is guilty of burglary."].) As discussed above, however, we have concluded there was sufficient evidence for the jury to find that defendants robbed and attempted to rape Pontbriant. As the prosecution argued to the jury, it is reasonable to infer from the circumstance that defendants committed these crimes that they possessed the intent to do so at the time they entered Pontbriant's house. A rational juror reasonably could find that a purely social visit to a friend's house did not spontaneously lead to the attempted rape, robbery, and brutal murder of the hostess. The circumstance that Pontbriant may have willingly invited defendants into her house is of no consequence. (*Wallace, supra,* 44 Cal.4th at p. 1060 ["The crime of

burglary, however, requires only an entry with the requisite intent; the entry need not be accomplished by force." (italics omitted)].) The circumstance that defendants apparently waited some period of time prior to attacking Pontbriant, during which the three of them consumed alcoholic beverages, could be viewed as an attempt to make defendants' task easier by reducing the possibility that Pontbriant would be able to resist. Further, Letner's participation in the telephone calls to Edward Burdette and Kathy Coronado could indicate he was not concerned whether they in turn eventually would inform the police he had been present in Pontbriant's house, because he believed either that the person with whom Pontbriant was speaking on the telephone when defendants first arrived knew that Letner was there, or that, if the police were to begin looking for him, he nonetheless would be able to escape to Iowa. Alternatively, the jury reasonably could find that Letner simply joined in the telephone calls in anger or on impulse, without reflecting upon the possible consequences. In sum, as we recently observed regarding a similar challenge, "possession . . . of goods stolen from the victim's home shortly after the crimes is strong circumstantial evidence that [defendant] harbored the intent to commit larceny when he entered her home. [Citation.] Moreover, '[t]here is no better proof that [defendant] entered the [victim's house] with intent to commit robbery than a showing he did in fact commit robbery after his entry.' [Citation.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 508 [61 Cal.Rptr.3d 526, 161 P.3d 58] (*Abilez*).) Accordingly, we conclude the evidence was sufficient to support the jury's finding that defendants committed a burglary and intentionally killed Pontbriant while engaged in the burglary.

#### d. *Premeditation and Deliberation*

Defendants also challenge the sufficiency of the evidence supporting the jury's first degree murder verdicts, to the extent these verdicts were based upon a theory of premeditated and deliberated murder.[22] " 'We need not consider this claim since reversal is not necessary when the court can determine from the record that the verdict rested on a theory which is supported by sufficient evidence. [Citation.]' [Citation.] We properly can, and do, make that determination here." (*Rundle, supra,* 43 Cal.4th at p. 141.) As discussed, *ante,* the evidence was sufficient to support a finding that defendants entered Pontbriant's residence with the intent to commit a felony therein, robbed her and attempted to rape her, and that, pursuant to section 189, Pontbriant was murdered in the course of these crimes. The jury also found true the special circumstance allegations that defendants murdered Pontbriant while engaged in committing or attempting to commit each of the underlying felonies, which indicates the jury necessarily found the elements of first

---

[22] The jury's verdict did not specify whether it found defendants guilty of first degree premeditated and deliberated murder or felony murder.

degree felony murder had been proved. Therefore, we need not decide whether, in addition, there was sufficient evidence to prove that Pontbriant's murder was the result of premeditation and deliberation. (43 Cal.4th at p. 141.)

Defendants also contend that even if there was sufficient evidence of premeditation and deliberation, their first degree murder convictions should be reversed because the jury may have relied upon the felony-murder theory of liability, which, they assert, was not supported by sufficient evidence. We have concluded, however, that felony-murder liability was established by sufficient evidence.

### e. *Mental State for Special Circumstances (Tobin)*

Tobin contends that as a matter of California law, there can be no special circumstance finding based upon a defendant's having killed the victim during an attempted rape. He asserts that such a killing cannot further the purpose of committing a rape, because it is legally impossible to rape a dead person. We recently rejected the identical claim in *Rundle, supra,* 43 Cal.4th at pages 155–156, and have no reason to revisit that conclusion.

### 3. *Asserted Prosecutorial Misconduct*

Defendants claim several instances of asserted guilt phase prosecutorial misconduct denied them their rights under both the state and federal Constitutions. As we shall explain, no misconduct by the prosecutor warrants reversing their convictions and sentences. "Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citation.]" *(People v. Riggs* (2008) 44 Cal.4th 248, 298 [79 Cal.Rptr.3d 648, 187 P.3d 363] *(Riggs).)*

Defendants did not object to all of the instances of asserted misconduct they raise on appeal. " ' "[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" ' [Citation.]"

(*Riggs, supra,* 44 Cal.4th at p. 298.) We previously have rejected the notion, advanced by defendants, that the trial court had a responsibility to intervene on their behalf, such that the failure to object and request an admonition regarding each alleged act of misconduct is excused. (*Ibid.*) Defendants present no compelling reason to revisit that decision. We shall address on a claim-by-claim basis defendants' contentions that their failure to object to a particular instance of asserted misconduct and to request an admonition is excused because their having done so would have been futile or ineffective. "Because, as discussed below, we conclude that the prosecutor committed no prejudicial misconduct, it follows there was no pervasive misconduct that otherwise excused defendant[s'] failure to object to the individual instances of misconduct" they raise on appeal. (*Ibid.*)

> a. *Cross-examination of Tobin Regarding the Term "Instant Death" (Letner, Tobin)*

During the prosecution's case-in-chief, the prosecutor notified the trial court that she intended to call as witnesses two persons who knew defendants in Napa in the late 1970's. These witnesses would testify that defendants spoke of and were seen practicing a martial arts technique causing the "instant death" of a victim by stabbing the sides and base of the victim's neck. The prosecutor contended this testimony should be admitted as circumstantial evidence tending to demonstrate that defendants murdered Pontbriant, because her wounds could have been inflicted by someone attempting to cause this manner of "instant death." Defendants objected on the ground that, pursuant to section 352 of the Evidence Code, the probative value of the testimony on the subject of "instant death" would be grossly outweighed by the risk of undue prejudice and the consumption of time, because of (1) the prejudicial nature of the testimony indicating that defendants practiced such acts, (2) the remoteness of the events to which the witnesses would testify, and (3) the circumstance that these witnesses were "enemies" of defendants and therefore were of questionable credibility, necessitating essentially a trial within a trial concerning the various incidents that caused the rifts between them and defendants. The trial court sustained defendants' objections to the testimony, finding that the evidence would tend to establish defendants had "a murderer's disposition," and that the method was not so sufficiently unique that the evidence was of particularly compelling probative value in establishing the identity of Pontbriant's killer.

Later, during Tobin's defense case, after he had testified he knew nothing concerning Pontbriant's murder, the prosecutor asked two questions during cross-examination regarding the term "instant death." The following exchange occurred:

"Q [by prosecutor]: There is a term in karate that is known as instant death, isn't there?

"[Objection by Tobin's attorney]: Your Honor, I'm going to object to the question.

"The Court: Overruled.

"[Tobin]: I don't know if there is or not.

"Q [by prosecutor]: You have never heard of instant death being caused by sticking someone in the side of their neck at or near major arteries or veins?"

Counsel for both defendants again objected, and the trial court recessed the proceedings to discuss the matter outside the presence of the jury.

Defense counsel argued that the prosecutor was engaging in "subterfuge," in an attempt to render admissible the previously excluded testimony from the two witnesses concerning defendants' familiarity with the instant death technique, by eliciting a denial from Tobin that then would be impeached by the witnesses. The prosecutor argued that the trial court's prior ruling concerned evidence proposed to be presented as part of the prosecution's case-in-chief, and that the context in which the admissibility of the evidence would be determined had shifted once Tobin testified he had nothing to do with the murder. The trial court, however, restated its finding that Pontbriant's wounds were not particularly unusual, and that therefore questions concerning "instant death" would not be permitted. At the conclusion of the short recess, the trial court admonished the jury that the statements of the attorneys, including their questions, were not evidence, that the jury should not assume the truth of anything insinuated in a question, and that if an objection to a question was sustained, the jury should not guess at what the answer might have been. The trial court, however, did not strike Tobin's answer to the first question—there was no request by defendants that it do so. The prosecutor then moved on to a different subject.

During the prosecution's opening argument at the conclusion of the guilt phase, in the course of asserting that the nature of the wounds to Pontbriant's neck showed that the murder was "a calculated killing," the prosecutor stated: "The location of these stab wounds, as testified to through Dr. Walter, were placed very strategically, almost over vital blood vessels and arteries that supply blood and take away blood from the head. That is something known to cause what's called 'instant death,' if the arteries are actually stricken. [¶] And then we had the testimony about the spinal cord. At that location in the

neck it's—it's a very vital, vital area. And one that can also cause death very quickly." Neither defendant objected to the prosecutor's statements.

On appeal, defendants contend the prosecutor committed misconduct in questioning Tobin concerning the "instant death" technique and then mentioning that term during argument to the jury. We conclude there was no misconduct warranting reversal of the judgments.

Assuming that defendants' assertions during trial that the prosecutor was engaging in "subterfuge" were sufficient to preserve for appeal a claim of misconduct regarding the prosecutor's cross-examination, defendants have failed to establish that any misconduct occurred. We do not view as unreasonable, even though it was rejected by the trial court, the prosecutor's contention that Tobin, by taking the stand and denying his involvement in the murder, opened the door to being cross-examined concerning the possibility that Pontbriant's wounds reflected a particular martial arts technique with which he was familiar. (*Mayfield, supra*, 14 Cal.4th at p. 754 [the permissible scope of the cross-examination of a testifying defendant generally is very wide]; *People v. Freeman* (1994) 8 Cal.4th 450, 495 [34 Cal.Rptr.2d 558, 882 P.2d 249] ["merely asking a question to which an objection is sustained does not itself show misconduct"].) Indeed, in their briefs, defendants mischaracterize the record. The trial court never ruled that the prosecutor's questions were improper, as asserted by defendants. The court excluded evidence concerning the subject of the "instant death" technique from the prosecution's case-in-chief, but overruled the objection to the prosecutor's first question and permitted Tobin's answer (that he had not heard of the term "instant death") to stand. What the court made clear in its subsequent ruling outside the presence of the jury was that the prosecution would not be permitted to attempt to impeach Tobin's answer by demonstrating that he *did* know of the term "instant death." Therefore, because Tobin had testified he had no knowledge of the "instant death" technique, there simply was no further area of inquiry regarding that subject open to the prosecutor. The trial court also informed the jury that it was not to rely upon the prosecutor's question as evidence that the "instant death" technique existed or that Tobin was aware of it.

For these same reasons, even if we were to conclude that the prosecutor had engaged in misconduct, any such misconduct could not have been prejudicial. The only evidence admitted at the trial on this issue was that Tobin had not heard of the term "instant death." Contrary to defendants' assertions that the jury would have been unable to follow the trial court's admonition not to consider the prosecutor's questions as evidence that there *was* such a technique and that Tobin was familiar with it, we presume the jury followed the court's instructions not to do so. (*Avila, supra*, 38 Cal.4th at

p. 610.) There is no reasonable probability that, had the prosecutor not broached this subject with Tobin, the jury would have reached a different verdict, nor can we conclude that these two brief questions (which were followed by a negative response by Tobin and the trial court's proper admonition concerning the applicable law) denied defendants a fair trial.

■ In arguing that the jury was prejudiced by the prosecutor's questions, Letner's reliance upon our decision in *People v. Wagner* (1975) 13 Cal.3d. 612, 619–620 [119 Cal.Rptr. 457, 532 P.2d 105], is misplaced. That case involved a situation in which a prosecutor attempted to impeach the defendant's testimony regarding his good moral character by asking a series of highly detailed questions concerning asserted specific criminal activities (not felony convictions) by the defendant for which the prosecutor offered no independent evidence. The defendant answered in the negative to each question. (*Id.* at pp. 616–617.) We concluded that attempting to rebut the defendant's character evidence in such a manner was improper, and that the impropriety was not cured by the circumstance that the defendant had answered "no" to each question and the trial court later had admonished the jury not to view the attorneys' statements as evidence. As we observed, a prosecutor may not "interrogate witnesses solely 'for the purpose of getting before the jury the facts inferred therein, together with the insinuations and suggestions they inevitably contained, rather than for the answers which might be given.' " (*Id.* at p. 619.) In addition, we noted that the subject matter at issue in *Wagner* (the defendant's credibility) was crucial to resolving the charges, and that the evidence in favor of and against a finding of guilt was closely balanced. (*Id.* at p. 621.)

The extent and possible effect of any prosecutorial impropriety in the present case was in no way comparable: the questioning was not part of an attempt to impeach Tobin's asserted good moral character; the subject matter of the questions (whether Tobin knew of the "instant death" technique) did not focus upon specific instances of unproved criminal activity or involve a critical aspect of the trial; the extent of the questioning was quite limited; the evidence of defendants' guilt or innocence was not closely balanced; and it does not appear that the prosecutor asked the questions without regard to what Tobin's answers might be. Accordingly, we discern no reasonable probability that the questions were prejudicial. The possibility that Letner was prejudiced is even more remote, in light of the circumstance that the prosecutor never asked any questions concerning Letner's knowledge of the technique.

Turning next to the prosecutor's observation during argument to the jury that stabbing someone in a way that cuts the blood vessels in the victim's neck "is something known to cause what's called 'instant death,' " we note

that defendants did not object at trial to this comment. An objection on the ground that, for example, the argument referred to facts not in evidence (e.g., defendants' knowledge of the "instant death" technique), together with a request for an admonition, would not have been futile or ineffective. Therefore, defendants have forfeited their appellate claim of misconduct. In any event, no misconduct occurred.

The prosecution's pathology expert did, in fact, testify that had both of Pontbriant's carotid arteries been severed by the stab wounds in her neck, "a loss of consciousness would have been very quick, almost immediate. [¶] A death depends on how you define death. [¶] But the actual cessation of brain function and the heart action may have taken several minutes to occur." The expert also agreed that the severing of the spinal cord in the area in which Pontbriant was cut could cause death to occur "basically, instantly." The prosecutor reasonably could argue from this testimony that the wounds inflicted upon Pontbriant could have caused what *the expert* called an instant death, and that this was evidence of a calculated murder rather than of merely haphazard actions. Even were we to conclude the prosecutor improperly was attempting to refer the jury back to the cross-examination of Tobin regarding the subject of the "instant death" technique, and to argue facts not in evidence (that there was a martial arts technique called "instant death" with which Tobin was familiar), there is no possibility of prejudice. Such an oblique reference to a subject that had been mentioned very briefly in the midst of trial more than a week earlier was not likely even to attract the jury's notice. Moreover, as mentioned above, we presume that, even had the jury recognized the reference, it would have followed the trial court's instructions not to consider the attorneys' statements and questions as evidence of any fact. Accordingly, there is no reasonable possibility that in the absence of the prosecutor's comment the jury would have reached a verdict more favorable to defendants, nor were they deprived of a fair trial.

b. *Failure to Provide Defendants with Criminal History of Prosecution Witness Jeanette Mayberry (Letner, Tobin)*

On January 25, 1990, during the presentation of penalty phase witnesses, Letner's attorney notified the trial court that the defense had discovered that prosecution witness Jeanette Mayberry had an outstanding warrant for her arrest on a misdemeanor petty theft charge from a neighboring county, and had two criminal matters pending in the Tulare County court. The arrest warrant stemmed from a misdemeanor charge of petty theft filed in 1986 in Fresno County. In May 1989, prior to the commencement of defendants' trial, Mayberry separately was charged in Tulare County with a felony for writing bad checks, and a misdemeanor for the theft of clothing from a department store. In July of that year she pleaded guilty to the Tulare theft charge and

was sentenced to 30 days in jail. Also in July, the bad check charge was reduced to a misdemeanor, to which she pleaded guilty in August. She received an additional sentence of 30 days' incarceration. In August, execution of both sentences was stayed until January 3, 1990, and on that date was further stayed to February 6, 1990.

Letner moved for a mistrial on the basis that he had been deprived of the opportunity to cross-examine Mayberry concerning these pending criminal matters and any influence they might have had upon her guilt phase testimony. The trial court observed it was impossible at that point in the trial to remedy the failure to disclose these matters, and therefore the court would revisit the issue after conclusion of the trial. Both defendants in their subsequent motions for new trial raised the prosecution's failure to disclose these matters. The trial court denied the motions, finding that Mayberry's testimony "was not terribly material" to establishing defendants' guilt, and further that the undisclosed matters were "of extremely questionable character as to impeachment value." On appeal, defendants contend the prosecutor's failure to disclose these matters to the defense violated their federal constitutional rights under *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194] (*Brady*) and the parallel state constitutional provisions. Defendants, however, have failed to establish that their constitutional rights were violated.

"In *Brady*, the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' [Citation.] The high court has since held that the duty to disclose such evidence exists even though there has been no request by the accused [citation], that the duty encompasses impeachment evidence as well as exculpatory evidence [citation], and that the duty extends even to evidence known only to police investigators and not to the prosecutor [citation]. Such evidence is material ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' [Citation.] In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.' [Citations.]" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042 [29 Cal.Rptr.3d 16, 112 P.3d 14] (*Salazar*).)

" '[T]he term *"Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called *"Brady* material"—although, strictly speaking, there is never a real *"Brady* violation" unless the nondisclosure was so

serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' [Citation.] Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt and innocence.' [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation]. A defendant instead 'must show a "reasonable probability of a different result." ' [Citation.]" (*Salazar, supra,* 35 Cal.4th at pp. 1042–1043.) We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence. (*Salazar,* at p. 1042.)

Defendants have satisfied the first two components of the *Brady* analysis. As the prosecutor herself admitted at the hearing on the new trial motions, there was an obligation to disclose to the defense the information concerning the pending matters, even if she and the investigators were unaware of them or inadvertently failed to disclose them. And the circumstance that a prosecution witness faced pending criminal matters, some of which were being prosecuted by the same district attorney's office prosecuting the defendant, constitutes evidence "favorable" to the defense, in that a jury could view this circumstance as negatively impacting the credibility of testimony by the witness that was helpful to the prosecution. Like the trial court, we are not convinced, however, that the evidence was material.

█ The parties dispute the significance of Mayberry's testimony in view of the total sum of the evidence presented at the guilt phase of the trial. Defendants assert her testimony was very significant, whereas the Attorney General urges that the testimony primarily was cumulative of other evidence before the jury. A correct assessment lies somewhere between these two extremes. As the trial court observed, Mayberry's testimony provided some evidence establishing motive—that defendants were ready to leave Visalia because of their unemployment, and because of the fights that took place between Tobin and Mayberry on the day and night preceding the murder. Mayberry also provided evidence concerning defendants' relationship with each other, including, as mentioned above, the circumstance that Letner encouraged Tobin to continue striking her during the fight at the apartment, and testimony establishing that defendants lied when they told Officer Wightman where they were going when they were stopped in the victim's car.

Although Mayberry's testimony had some significance at the trial, its importance is not comparable to those circumstances in which we have acknowledged that the suppression of possible impeachment evidence would be material under *Brady*. " 'In general, impeachment evidence has been found to be material where the witness at issue "supplied the only evidence linking the defendant(s) to the crime," [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case, [citation].' " (*Salazar, supra,* 35 Cal.4th at p. 1050.) Neither of these circumstances applies to Mayberry's testimony.

Further, even were we to conclude that Mayberry's testimony concerned a critical element of the prosecution's case, we would agree with the trial court's assessment that the undisclosed information concerning her pending criminal matters would not have undermined her credibility to any significant degree. The inference defendants would draw from the circumstances that (1) Mayberry's felony charge was reduced to a misdemeanor, (2) the execution of her sentences was postponed until after her testimony, and (3) she was not arrested on the misdemeanor warrant from the neighboring county, is that in order to receive those (and possibly other) benefits from the prosecution, she chose to testify untruthfully.

Initially, we observe that none of the charges against Mayberry was particularly serious, and therefore the jury might not have found compelling the theory that Mayberry perjured herself at defendants' capital trial in order to obtain some relatively minor benefit in her own pending matters. In addition, the possibility that the charges would have had material impeachment value is contradicted by Mayberry's declaration submitted with the opposition to defendants' motions for new trials, in which she stated she did not speak with the prosecutor about the pending charges, did not expect or receive any benefits for testifying, did not alter her testimony as a result of the pending matters, and had requested (and the court had ordered) that her jail sentence be suspended so she would not be in the jail while defendants also were incarcerated there. We presume that had she been questioned before the jury concerning these matters, her testimony would have been to the same effect.

More importantly, the notion that Mayberry altered her testimony in return for favorable treatment in her criminal matters is belied by the circumstance that her preliminary hearing testimony, given several months prior to the theft and bad check charges filed in Tulare County, was consistent with her trial testimony. Indeed, had defendants attempted to impeach Mayberry by introducing her then pending matters, the prosecution could have presented her preliminary hearing testimony (and possibly other statements she gave to the police) as a prior consistent statement made before any motive to lie arose,

pursuant to sections 1236 and 791, subdivision (b) of the Evidence Code—a strategy that actually might have bolstered, rather than impeached, her credibility. Finally, the jury already had before it evidence that might have negatively impacted Mayberry's credibility: as the trial court observed, her personal bias against Letner was obvious, and defendants presented evidence demonstrating that the account of her fight with Tobin that she provided to the responding police officer was somewhat inconsistent with her trial testimony.

Defendants, in a summary fashion, urge for the first time on appeal that Mayberry's convictions for petty theft and writing bad checks directly bear upon her credibility as a witness, because those offenses were "traditional examples of *crim[i]n[a] falsi*[]" (the crime of falsifying). At the time of defendants' trial, we had not yet decided in *People v. Wheeler* (1992) 4 Cal.4th 284 [14 Cal.Rptr.2d 418, 841 P.2d 938] that Proposition 8's truth-in-evidence provision eliminated the proscription against the use of misdemeanor offenses as impeachment evidence. (*Wheeler*, at p. 295.) Assuming, nonetheless, that this holding had applied in defendants' trial, we also take note of our conclusion in *Wheeler* that misdemeanor *convictions* are inadmissible under the hearsay rule and furthermore, with reference to the underlying *facts* of misdemeanor offenses, that trial courts retain the authority to exclude such evidence under section 352 of the Evidence Code if presentation of those facts would create undue prejudice, delay, or confusion, substantially outweighing their probative value. (*Wheeler*, at pp. 296–300.) In the present case, because defendants failed to raise this issue in the trial court, that court was not called upon to exercise its discretion to determine whether any part of such evidence should have been admitted, and the record fails to provide us with any information concerning the facts underlying Mayberry's offenses. Therefore, defendants' bare allegation that the offenses themselves would have had value in impeaching Mayberry's testimony is unsupported. In addition, as we observed in *Wheeler*, "a misdemeanor—or any other conduct not amounting to a felony—is a less forceful indicator of immoral character or dishonesty than is a felony." (*Id.* at p. 296.)

In sum, defendants have failed to demonstrate that there is a reasonable probability that had the prosecutor disclosed to defendants the then pending criminal matters facing Mayberry before the prosecution called her as a witness, the jury would have reached a result more favorable to defendants. Accordingly, defendants have not established that their constitutional rights were violated.

c. *Guilt Phase Closing Argument (Letner, Tobin)*

Defendants contend the prosecutor committed several instances of miscon-duct during her guilt phase argument to the jury. Neither defendant objected

to any of the alleged misconduct, nor would such objections have been futile or ineffective. Accordingly, defendants have forfeited their claims of misconduct. In any event, no prejudicial misconduct occurred.

We have rejected defendants' claims that the prosecutor's mention of the term "instant death" was prejudicial misconduct, *ante*, in part II.B.3.a. Defendants also contend the prosecutor "slandered" them by arguing, in responding to defense counsel's attacks upon the credibility of Earl Bothwell's testimony, that although Bothwell was an admitted criminal, the jury could not expect that witnesses associated with defendants would be upstanding citizens, because defendants could be expected "to be hanging around with other criminals." Defendants contend there was no evidence presented at the guilt phase to establish they were criminals. To the contrary, the evidence demonstrated that Tobin assaulted Jeanette Mayberry, and that Letner possessed stolen property. Moreover, of course, evidence was presented establishing that defendants murdered Pontbriant and stole her car, and then fled to Iowa to escape prosecution. The prosecutor's argument was a permissible comment upon the evidence.

Similarly without merit are defendants' contentions that the prosecutor improperly "embellished the evidence" by arguing that Walter Gilliland's testimony was "essentially backed up by other evidence," and that the blood found in the bedroom and on the rag from Pontbriant's car was fresh. These statements, too, were permissible arguments putting forth a reasonable view of the evidence. "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide." (*People v. Dennis* (1998) 17 Cal.4th 468, 522 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

Tobin also contends the prosecutor improperly "dwelled" upon the evidence concerning his fight with Mayberry, because that evidence assertedly was irrelevant in the determination whether Tobin was involved in Pontbriant's murder, but instead was designed to "portray appellant as a violent man who beats up on women." This contention is without merit. The prosecutor commented upon the fight in the context of attacking the credibility of Tobin's testimony that he and Letner had been planning for several days prior to the murder to move to Iowa but, for largely unexplained reasons, did not decide to leave until the night of the murder. The prosecutor's argument was permissible and in no way asserted that the fight with Mayberry established Tobin's propensity for committing violence against women.

### 4. *Asserted Instructional Error*

#### a. *Aiding and Abetting (Letner, Tobin)*

Defendants raise three related challenges to the instructions given by the trial court to the jury concerning the criminal liability of an aider and abettor: (1) the instructions did not inform the jury that in order to find the special circumstance allegations true as to a defendant whom it found to be an aider and abettor, the jury must find that the particular defendant intended Pontbriant would be killed; (2) the instruction regarding the "natural-and-probable-consequences" theory of aider-and-abettor liability failed to identify the applicable "target offenses"; and (3) the natural-and-probable-consequences theory of aider-and-abettor liability is unconstitutional.[23] Although we agree that, with regard to the first two challenges, the instructions given were ambiguous, we conclude there was no reasonable likelihood the jury misunderstood or misapplied them. We already have rejected defendants' third challenge, and do so again here.

■■■ With regard to the special circumstance allegations, the trial court instructed the jury with a modified version of CALJIC No. 8.80, as follows: "If you find that a defendant in this case is guilty of murder in the first degree, you must then determine if one or more of the following special circumstances are true or not true: [¶] Whether the murder was done during the commission or attempted commission of robbery, or burglary, or rape. [¶] The People have the burden of proving the truth of the special circumstance. [¶] If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true. [¶] *If you find beyond a reasonable doubt that defendant was either the actual killer, or an aider and abettor, but you are unable to decide which, then you must also find beyond a reasonable doubt that the defendant intended to either kill a human being, or to aid another in the killing of a human being in order to find the special circumstance to be true.* [¶] *On the other hand, if you find beyond a reasonable doubt that the defendant was the actual killer, you need not find that the defendant intended to kill a human being in order to find the special circumstance to be true.*"[24] (Italics added.) The flaw in this instruction, as

---

[23] Because of the error, mentioned, *post,* in part II.B.5., in failing to transcribe all of the trial proceedings—including the conference concerning the guilt phase jury instructions—we shall assume defendants preserved all of the instructional challenges they raise on appeal. To the extent that defendants contend these asserted instructional errors violated their substantial rights, we also review their claims pursuant to section 1259, even if these claims were forfeited.

[24] The trial court earlier gave an instruction concerning aiding-and-abetting liability for the substantive charges that included similar language highlighting the requirement that to be liable, pursuant to the natural-and-probable-consequences theory, an aider and abettor need not share the same intent as the perpetrator of the crime, but "[t]his rule of law is not applicable to

defendants observe, is that it failed to instruct the jury explicitly that, under then existing law, an aider and abettor must have had the intent that the victim be killed in order for the special circumstance allegation to be true. (*Anderson, supra*, 43 Cal.3d at pp. 1138–1139.) The jury was told that if it determined one of the defendants was the actual killer, intent to kill was not required, and that if it could not decide whether one of the defendants was the actual killer or an aider and abettor, it must find intent to kill in order to make a true finding. The jury, however, was not informed what was required in the event the jury determined that a particular defendant was an aider and abettor.[25] The omission of this third alternative made the instruction ambiguous. Accordingly, we disagree with the Court of Appeal's conclusion in *People v. Snead* (1993) 20 Cal.App.4th 1088, 1097 [24 Cal.Rptr.2d 922], that the same instruction made it "unmistakable" that an aider and abettor must have the intent to kill, because the instruction compares the requirement applicable when the jury cannot decide between actual killer and aider and abettor, with—"on the other hand"—the situation when the jury *does* decide upon an actual killer. In this circumstance, there are three "hands," not merely

---

the special circumstances charged. [¶] In other words, if you find that a defendant was an aider and abettor or the actual killer, but you're unable to decide which, then you must also find beyond a reasonable doubt that defendant intended either to kill a human being, or to aid another in the killing of a human being in order to find the special circumstance to be true."

[25] The standard unmodified CALJIC instruction applicable to murders that were committed prior to June 6, 1990, CALJIC No. 8.80, is as follows:

"If you find [the] [a] defendant in this case guilty of murder of the first degree, you must then determine if [one or more of] the following special circumstance[s]: [is] [are] true or not true: _____, _____, _____, [_____ and _____].

"The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.

"[If you find beyond a reasonable doubt that the defendant was [a co-conspirator] [or] [an aider or abettor] [either [the actual killer] [a co-conspirator] or an aider or abettor, but you are unable to decide which], then you must also find beyond a reasonable doubt that the defendant with intent to kill [participated as a co-conspirator with] [or] [aided [and abetted]] an actor in commission of the murder in the first degree, in order to find the special circumstance to be true.] [On the other hand, if you find beyond a reasonable doubt that the defendant was the actual killer, you need not find that the defendant intended to kill a human being in order to find the special circumstance to be true.]"

The deficiency in the pattern instruction is that there should be an "[, or]" in the third paragraph between "[an aider or abettor]" and "[either [the actual killer] [a co-conspirator] or an aider or abettor, but you are unable to decide which]," so that in a case such as the present one, the trial court would instruct the jury, "If you find beyond a reasonable doubt that the defendant was an aider or abettor, or either the actual killer or an aider or abettor, but you are unable to decide which, then you must also find beyond a reasonable doubt that the defendant with intent to kill aided and abetted an actor in the commission of the murder in the first degree, in order to find the special circumstance to be true." We observe that the language of the corresponding CALCRIM instruction, No. 701, is significantly different, and makes clear that intent to kill must be proved when the jury finds the defendant was an aider and abettor, as well as when the jury cannot decide whether the defendant is the actual killer or an aider and abettor.

two, and the instruction left the jury to surmise what intent an aider and abettor was required to have. We disapprove *People v. Snead, supra*, 20 Cal.App.4th 1088 to the extent it is inconsistent with this opinion.

■ "With regard to criminal trials, 'not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is " 'whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.' " [Citation.] " '[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' " [Citation.] If the charge as a whole is ambiguous, the question is whether there is a " 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' [Citation.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 192 [41 Cal.Rptr.3d 593, 131 P.3d 995]; see also *Mayfield, supra*, 14 Cal.4th at p. 777 ["For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction."].) We conclude, based upon our review of the record, that there is no reasonable likelihood the jury misunderstood or misapplied this instruction. Although we conclude the instruction's meaning concerning the intent of an aider and abettor was not "unmistakable," certainly the jury *could* draw from the instruction as a whole the inference that an aider and abettor was required to have an intent to kill. In addition, the prosecutor presented a correct and complete statement of the law in her arguments following the trial court's instructions. Indeed, the prosecutor discussed a hypothetical bank robbery involving a robber and a getaway driver, properly contrasting the special-circumstance intent-to-kill requirement for each participant (essentially, that no intent to kill was required as to the robber who shoots someone in the bank, but that intent to kill *was* required with respect to the driver who merely is waiting in the car when the shooting occurs).

Moreover, there is no reasonable likelihood the jury was confused in the present case, because it is unlikely the jury felt compelled to resolve any possible ambiguity with regard to the intent required for an aider and abettor. The best evidence supporting a finding beyond a reasonable doubt that one of the defendants was the actual killer (and, therefore, the other merely was an aider and abettor) was Tobin's testimony that he was uninvolved in robbing, attempting to rape, and murdering Pontbriant, thus pointing to Letner as the actual killer. The jury obviously rejected this testimony. There was scant remaining evidence that could have sufficiently proved that one particular defendant of the two was the actual killer. Indeed, the prosecutor did not identify one defendant as having killed Pontbriant, but instead argued exclusively that the evidence demonstrated that *both* defendants had the intent to kill Pontbriant. The prosecutor never argued that the jury, pursuant to that part of the instruction addressing an actual killer, need not find intent to kill as to one of the two defendants. The jury, therefore, received sufficient

instruction concerning the law applicable to the evidence: "If you find beyond a reasonable doubt that defendant was either the actual killer, or an aider and abettor, but you are unable to decide which, then you must also find beyond a reasonable doubt that the defendant intended to either kill a human being, or to aid another in the killing of a human being in order to find the special circumstance to be true." Accordingly, despite the ambiguity in the instruction, there is no reasonable likelihood that the jury found one defendant was the actual killer, and then based its special circumstance findings as to the other defendant upon an erroneous notion that an aider and abettor need not possess the intent to kill.

With regard to the "natural-and-probable-consequences" instruction concerning an aider and abettor's liability for the substantive offenses, we similarly conclude the instructions given by the trial court in the present case were ambiguous, but there is no reasonable likelihood the jury misunderstood or misapplied the law. The trial court instructed the jury: "One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating, but he is also liable for the natural and probable consequences of any criminal act that he knowingly and intentionally aided and abetted. [¶] You must determine whether the defendant is guilty of the crimes originally contemplated and if so, whether the crimes charged in counts one, two, three, four and five, and the lesser included offenses were natural and probable consequences of such originally contemplated crimes."[26] The trial court never identified which offenses might have been "originally contemplated." As defendants observe, the second sentence of this instruction could be interpreted as meaning that the "crimes originally contemplated" (often referred to as the "target offenses") were not the charged crimes, but were some other undefined crimes that might have given rise to the charged crimes. It appears the instruction may have been intended to convey the notion that the jury could find that one of the charged crimes—for example, murder—was the natural and probable consequence of another of the charged crimes—for example, robbery—and therefore, if, for example, one of the defendants intended only to rob Pontbriant, that defendant still could be liable for her murder.[27]

The prosecutor in the present case, contrary to defendants' assertions, did not rely upon the natural-and-probable-consequences doctrine; rather, she repeatedly argued the evidence established that both defendants

---

[26] Defendants incorrectly state in their opening briefs that the trial court's oral instruction varied from the written instruction. The trial court, in fact, realized it had made an error and reread the entire instruction to the jury.

[27] We observe that the current instructions concerning this subject, CALCRIM Nos. 402 and 403 and CALJIC No. 3.02, require that the trial court explicitly inform the jury which originally contemplated crime or crimes might form the basis of liability for a particular charged offense.

intended to commit all of the charged crimes, and both intended to kill Pontbriant. The prosecutor never argued that one defendant intended only to commit one particular crime, but that the other defendant committed a different crime, which was the natural and probable consequence of the commission of the first, thereby making both defendants guilty of the second offense. Accordingly, an instruction concerning the natural-and-probable-consequences doctrine actually was not required. (*People v. Prettyman* (1996) 14 Cal.4th 248, 270 [58 Cal.Rptr.2d 827, 926 P.2d 1013] (*Prettyman*).) Nonetheless, as we also observed in *Prettyman*, "once the trial court . . . chose to instruct the jury on the 'natural and probable consequences' rule, it had a duty to issue instructions identifying and describing each potential target offense supported by the evidence." (*Ibid.*) Accordingly, we conclude that giving the ambiguous instruction was error. (Cf. CALJIC No. 3.02; CALCRIM Nos. 402, 403 [directing the trial court to define the target offenses].)

For many of the same reasons as in *Prettyman*, however, we conclude the error was harmless, because there is no reasonable likelihood the jury misunderstood or misapplied the law. To point out, as defendants do, that the ambiguous instruction *could* have led the jury to " 'indulge in unguided speculation' " (*Prettyman, supra*, 14 Cal.4th at p. 267) concerning the unspecified target offenses, does not establish a reasonable likelihood that the jury did so. As mentioned above, the prosecutor did not rely upon the natural-and-probable-consequences doctrine, but argued that both defendants intended to commit all of the charged offenses. (See *id.* at p. 273 ["[b]ecause the parties made no reference to the 'natural and probable consequences' doctrine in their arguments to the jury, it is highly unlikely that the jury relied on that rule when it convicted defendant . . ."].) There also is little doubt that the jury determined that each defendant intended to kill Pontbriant, because, as the prosecution conceded, there was no clear evidence establishing which defendant was the actual killer, and, as discussed above, the trial court's instructions required in such circumstances that in order to sustain the special circumstance allegations, the jury must find each defendant intended to kill Pontbriant. Thus, the jury's true findings on the special circumstance allegations essentially negate the possibility that the jury relied upon the natural-and-probable-consequences doctrine in convicting defendants of murder, which reliance—absent such findings—otherwise would have been the most likely application of that doctrine under the circumstances of the present case. In sum, there is no reasonable likelihood the jury misunderstood or misapplied the instruction.

Finally, defendants contend the application of the natural-and-probable-consequences doctrine in a capital case is a violation of due process because it permits the jury to convict the defendant of the substantive charges and special circumstance allegations "without a need to decide if he had the

otherwise requisite intent," and would authorize "a death sentence based on a vicarious negligence theory of liability," in violation of the Eighth Amendment. We have rejected these contentions, and decline to revisit our prior decisions. (*Richardson*, *supra*, 43 Cal.4th at p. 1021; see also *Coffman*, *supra*, 34 Cal.4th at p. 108; *People v. Garrison* (1989) 47 Cal.3d 746, 777–778 [254 Cal.Rptr. 257, 765 P.2d 419].)

### b. *Accomplice Testimony (Letner)*

Letner contends the trial court erred under state law and violated his state and federal constitutional rights by failing to instruct on its own motion concerning accomplice testimony to guide the jury in evaluating Tobin's guilt phase testimony. Primarily, Letner urges the trial court should have instructed the jury to view accomplice testimony with distrust, and examine it with care and caution in light of all the evidence presented in the case.[28] Although the trial court was required to give accomplice instructions in the present case to the extent that Tobin's testimony tended to incriminate Letner (*Coffman*, *supra*, 34 Cal.4th at pp. 104–105), the error in failing to do so was harmless under any standard. The jury was aware that Tobin "had every motivation to shift blame" to Letner (*People v. Box* (2000) 23 Cal.4th 1153, 1209 [99 Cal.Rptr.2d 69, 5 P.3d 130]), and in fact the jury evidently rejected the part of Tobin's testimony harmful to Letner (to the effect that when Tobin left, Pontbriant was unharmed, and that subsequently Letner appeared at the Murray Street apartment with the victim's car) without having been instructed to view Tobin's version of events with distrust. Moreover, there is no dispute that Letner was at Pontbriant's house on the night of the murder, and that he was detained while driving her car at midnight that night. This evidence provides sufficient corroboration of Tobin's testimony that Letner was present at the scene of the murder on the night in question.

Letner contends in his reply brief that the corroborating evidence was inadequate because "the facts are entirely consistent with appellant's status as a bystander during the homicide." The corroboration required of accomplice testimony, however, need only connect the defendant to the crime sufficiently that we may conclude the jury reasonably could have been

---

[28] Letner's primary focus is upon the trial court's failure to instruct pursuant to CALJIC No. 3.18: "You should view the testimony of an accomplice with distrust. This does not mean that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the evidence in the case." Letner also contends the court was required to give related accomplice instructions—CALJIC Nos. 3.10 (defining an accomplice), 3.11 (requiring that accomplice testimony be corroborated), 3.12 (describing the sufficiency of corroborating evidence), and 3.16 (instructing that Tobin was an accomplice as a matter of law)—to provide context for the instruction requiring that Tobin's testimony be viewed with caution.

satisfied that the accomplice was telling the truth. Moreover, the corroborating evidence may be circumstantial, of little weight by itself, and related merely to one part of the accomplice's testimony. (*People v. Miranda* (1987) 44 Cal.3d 57, 100 [241 Cal.Rptr. 594, 744 P.2d 1127].) Tobin's testimony placing Letner at the scene of the murder on the night in question was sufficiently corroborated; indeed, there was no dispute that Letner was present. The jury obviously *rejected* Tobin's testimony to the extent this testimony implicitly placed all blame for the murder upon Letner by relating that Tobin left Letner and Pontbriant alive and well and went home. Therefore we conclude that, with regard to *that* part of Tobin's testimony, the absence of accomplice instructions was harmless; the jury apparently found it incredible even in the absence of the accomplice instructions, and there is no need for us to evaluate whether there was adequate corroboration for the testimony in question.

In sum, there is no likelihood that the absence of instructions directing the jury to view with distrust the portion of Tobin's testimony that incriminated Letner, and requiring it to find corroboration of Tobin's testimony, could have affected the jury's decision concerning Letner's guilt.

#### c. *Voluntary Intoxication (Letner, Tobin)*

Defendants contend the trial court's instructions concerning the significance of voluntary intoxication were inadequate because they failed to explain to the jury how that condition could affect the mental state of an aider and abettor. Defendants rely upon our decision in *People v. Mendoza* (1998) 18 Cal.4th 1114 [77 Cal.Rptr.2d 428, 959 P.2d 735] (*Mendoza*), in which we concluded that (1) evidence of voluntary intoxication is relevant to the extent it establishes whether an aider and abettor knew of the direct perpetrator's criminal purpose and intended to facilitate achieving that goal, even in cases in which the perpetrator intended to commit a "general intent" crime (*id.* at pp. 1130–1133); and (2) any instructions to the jury concerning voluntary intoxication should inform the jury of the possible effect of voluntary intoxication upon the aider and abettor's mental state (*id.* at p. 1134 ["a trial court has no sua sponte duty to instruct on the relevance of intoxication, but if it does instruct, as the court here did, it has to do so correctly"]). In the present case, the trial court instructed the jury that it could consider evidence of defendants' voluntary intoxication in deciding beyond a reasonable doubt whether they (1) possessed the required mental states for the murder charges and the lesser included homicide offenses, (2) formed the specific intent to commit robbery, burglary, and rape that is required in order to convict them of those offenses, and (3) with regard to the special circumstance allegations, formed the specific intent to commit robbery, burglary, and rape, and the specific intent to kill. The trial court separately instructed the jury concerning

the elements required in order to find each defendant guilty as an aider and abettor of the crimes. Thus, the trial court's instructions in the present case, which predated *Mendoza*, did not explicitly inform the jury of the points we subsequently noted in that case.

Assuming for the sake of argument that the trial court's instructions on this subject were inadequate, any error was harmless. (See *Mendoza, supra*, 18 Cal.4th at p. 1134 ["If the court gives any instruction at all on the relevance of intoxication [citation], it might simply instruct that the jury may consider intoxication in determining whether a defendant tried as an aider and abettor had the required mental state."].) In these circumstances, we "review the instructions as a whole to determine whether it is 'reasonably likely the jury misconstrued the instructions as precluding it from considering' the intoxication evidence in deciding aiding and abetting liability. [Citation.] Any error would have the effect of excluding defense evidence and is thus subject to the usual standard for state law error: 'the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant.' [Citation.]" (*Id.* at pp. 1134–1135.) Although the voluntary intoxication instructions did not specifically mention aiding and abetting, they did not *preclude* the jury's use of evidence of intoxication in evaluating whether defendants aided and abetted, that is, whether, pursuant to the trial court's other instructions, one defendant knew of the other defendant's criminal purpose and intentionally aided the commission of the crime. Nor did the prosecutor argue that the jury could not consider voluntary intoxication in determining whether a defendant who was an aider and abettor of the crimes formed the mental state required for aiding and abetting. There is nothing in the record to indicate the jury would not have understood that the mental states set forth in the voluntary intoxication instructions could apply both to the mental states required of a direct perpetrator and to those required of an aider and abettor. Moreover, neither defendant actually argued a voluntary intoxication defense to the jury. For these reasons, any error in the instructions did not preclude the jury's consideration of defense evidence, nor is it reasonably probable that different instructions would have resulted in a verdict more favorable to defendants.

Defendants also challenge the use of the singular "defendant" in this and other instructions, because assertedly this "erroneously encouraged the jury to treat them as fungible entities." The trial court, however, specifically instructed the jury that the word "defendant" was used in the instructions in order to emphasize that "each of these defendants . . . is entitled to your individual consideration, and that is why [the instructions] apply to each of them individually." The trial court also separately reminded the jury that it was required to weigh the evidence for and against each defendant individually and to reach an independent verdict as to each of them. There is no

reasonable likelihood that the jury misunderstood or misapplied the instructions because of the use of the word "defendant" in the singular.

### d. *Adoptive Admissions (Tobin)*

Tobin contends the trial court was required, on its own motion, to instruct the jury pursuant to CALJIC No. 2.71.5 concerning adoptive admissions, for the purpose of evaluating Officer Wightman's testimony regarding Letner's statement as to where Letner was taking Tobin in Pontbriant's car.[29] As discussed, *ante*, in part II.B.1.a., Letner's statement was not hearsay, and it was not offered to prove that Tobin believed and admitted that Letner's statement was true. Accordingly, instructing the jury pursuant to CALJIC No. 2.71.5 would have been inappropriate and confusing.[30]

### e. *Possession of Recently Stolen Property (Letner, Tobin)*

Defendants challenge the trial court's instruction to the jury, pursuant to CALJIC No. 2.15, that it could infer from defendants' possession of recently stolen property that they committed a robbery, but that such an inference was not sufficient to establish defendants' guilt of that offense in the absence of corroborating evidence of guilt. Defendants contend the instruction violated their constitutional rights because it constituted an improper pinpoint instruction that was beneficial to the prosecution and shifted the burden of proof to defendants, and promoted an irrational inference because the possession of stolen property, by itself, does not establish whether the property was obtained by a robbery or merely by a theft. We previously have rejected similar claims, and do so again for the same reasons expressed in our prior decisions. The instruction did not shift the burden of proof and was not an improper pinpoint instruction for the prosecution's benefit—the instruction benefited defendants in that it notified the jury that it could not convict them

---

[29] This standard CALJIC instruction presently reads: "If you should find from the evidence that there was an occasion when [a] [the] defendant (1) under conditions which reasonably afforded [him] [her] an opportunity to reply; (2) [failed to make a denial] [or] [made false, evasive or contradictory statements,] in the face of an accusation, expressed directly to [him] [her] or in [his] [her] presence, charging [him] [her] with the crime for which this defendant now is on trial or tending to connect [him] [her] with its commission; and (3) that [he] [she] heard the accusation and understood its nature, then the circumstance of [his] [her] [silence] [and] [conduct] on that occasion may be considered against [him] [her] as indicating an admission that the accusation was true. Evidence of an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the [silence] [and] [conduct] of the accused in the face of it. Unless you find that [a] [the] defendant's [silence] [and] [conduct] at the time indicated an admission that the accusatory statement was true, you must entirely disregard the statement." (CALJIC No. 2.71.5; see also CALCRIM No. 357.)

[30] We also concluded, *ante*, in part II.B.1.a., that the absence of a limiting instruction concerning Letner's statement was not prejudicial, because the jury could find that Tobin, himself, told a similar lie to Officer Wightman.

of robbery based solely upon the evidence establishing their possession of Pontbriant's property. The instruction did not invite the irrational inference that the jury could find defendants had robbed Pontbriant without finding that they used force or fear to obtain her property, because the jury separately was instructed regarding the elements of both robbery and theft, and there was no suggestion in the challenged instruction that the jury need not find that all of the elements of robbery (or theft) had been proved beyond a reasonable doubt. (*People v. Holt* (1997) 15 Cal.4th 619, 677 [63 Cal.Rptr.2d 782, 937 P.2d 213]; see also *People v. Parson* (2008) 44 Cal.4th 332, 355–356 [79 Cal.Rptr.3d 269, 187 P.3d 1]; *People v. Prieto* (2003) 30 Cal.4th 226, 248 [133 Cal.Rptr.2d 18, 66 P.3d 1123] (*Prieto*); *People v. Smithey* (1999) 20 Cal.4th 936, 975–978 [86 Cal.Rptr.2d 243, 978 P.2d 1171] (*Smithey*).)

### f. *Consciousness of Guilt (Letner, Tobin)*

Defendants contend the instructions informing the jury that evidence of defendants' consciousness of guilt may give rise to an inference of their guilt (but that it is insufficient by itself to prove guilt) violated their constitutional rights, because the instructions were impermissibly overbroad and argumentative.[31] Defendants assert the instructions failed to state that evidence of consciousness of guilt must be considered as to each defendant individually. As we previously mentioned, however, the trial court gave instructions emphasizing that each defendant was entitled to the jury's separate consideration of the evidence against him. Defendants also urge that the instruction concerning false statements was improper because the statements at issue did not "concern" or "relate" to Pontbriant's murder, and therefore it was irrational to draw an inference of defendants' guilt of the crimes based upon their unrelated lies. The untrue statements made by defendants to Officer Wightman and to Denise Novotny regarding defendants' travels "concerned" the crimes committed against Pontbriant in the sense they tended to establish that defendants were attempting to conceal those crimes and to flee before they were apprehended. This inference drawn from the evidence was not irrational.

We have rejected defendants' remaining contentions in numerous prior cases, and perceive no reason to reconsider those decisions. The consciousness-of-guilt instructions did not improperly permit the jury to find that defendants possessed a specific mental state, nor did these instructions by themselves allow the jury to find defendants guilty of all of the charged offenses. The instructions were not impermissibly argumentative. (*Rundle*, *supra*, 43 Cal.4th at pp. 152–154.)

---

[31] The trial court instructed the jury pursuant to CALJIC Nos. 2.03 (willfully false statements) and 2.06 (attempt to suppress evidence).

g. *Other Crimes As Motive for, or to Facilitate, Flight (Letner, Tobin)*

The trial court instructed the jury, pursuant to a modified version of CALJIC No. 2.50, that evidence concerning defendants' commission of crimes other than those charged in this case had been admitted for the limited purpose of demonstrating either motive for flight or facilitation of flight. The jury was not permitted to consider that evidence for any other purpose, such as defendants' predisposition to commit crimes. Defendants contend the giving of this instruction was constitutional error. Again without considering the trial court's instruction that the case against each defendant was to be considered separately, defendants initially reiterate the claim we have found meritless—that the instruction failed to distinguish between them.

Second, defendants contend that the instruction was erroneous because it failed to identify precisely which other-crimes evidence had been admitted. This contention is misplaced. We have held that in order to avoid confusion in a case in which evidence of a defendant's criminal activity includes not only convictions admitted to impeach the defendant's own testimony, but also other-crimes evidence admitted under section 1101, subdivision (b) of the Evidence Code, the trial court must specify which evidence is referred to in the CALJIC No. 2.50 instruction given to the jury. (*People v. Catlin* (2001) 26 Cal.4th 81, 148 [109 Cal.Rptr.2d 31, 26 P.3d 357]; *People v. Rollo* (1977) 20 Cal.3d 109, 123, fn. 6 [141 Cal.Rptr. 177, 569 P.2d 771] ["CALJIC instructions are properly neutral and objective, but in certain circumstances clarity requires that they be made to refer specifically to the facts of the case before the court."].) There was no possibility of such confusion in the present case, because no criminal impeachment evidence was offered. Therefore, the trial court's instruction remained "properly neutral and objective" by not referring to particular crimes.

Finally, defendants attack the propriety of giving the instruction at all. Letner argues in a conclusory fashion that the instruction was not "logical" or "permissible." To the contrary, evidence establishing that, for example, Tobin—with Letner's encouragement—assaulted Jeanette Mayberry and vandalized her apartment and car only the day before Pontbriant was murdered, and that defendants were found driving Pontbriant's car on a highway leading out of town, tended to demonstrate that defendants had a reason to leave Visalia (that is, the possibility of criminal charges being filed against them), and that they had robbed and murdered Pontbriant in order to facilitate their departure. Similarly, a rational juror could find that the circumstance that Letner was in possession of stolen property, which defendants took with them in the victim's car, was evidence tending to demonstrate they were fleeing town after robbing and murdering Pontbriant, because they

brought this merchandise with them in order to sell it to pay their travel expenses. Tobin's argument—that the other-crimes evidence should not have been admitted because it was not similar to the charged offenses—is entirely off the mark. The requirements we acknowledged in *People v. Ewoldt* (1994) 7 Cal.4th 380, 402–403 [27 Cal.Rptr.2d 646, 867 P.2d 757] (upon which Tobin relies) concerning the degree of similarity between the charged offenses and the other crimes evidence required to prove intent, identity, or a common design or plan, are inapplicable in the present case, because the evidence at issue was not admitted for any of those purposes. (See *People v. Demetrulias* (2006) 39 Cal.4th 1, 15 [45 Cal.Rptr.3d 407, 137 P.3d 229] ["the probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus"].)

### h. *Motive (Letner, Tobin)*

Defendants raise two familiar challenges to the constitutionality of the trial court's instruction, pursuant to CALJIC No. 2.51, concerning the significance of motive in the jury's determination of defendants' guilt or innocence: that the instruction shifted the burden of proof to defendants to prove their innocence, and failed to explain clearly that motive alone is insufficient to establish guilt. We previously have rejected these claims (*Riggs, supra,* 44 Cal.4th at p. 314) and discern no reason to revisit their merits.

### i. *Asserted "Dilution" of Reasonable Doubt Standard (Letner, Tobin)*

As with the previous contention, defendants again raise a claim that we repeatedly have rejected—that several of the trial court's instructions unconstitutionally "diluted" the reasonable doubt standard.[32] This claim remains without merit. (*Riggs, supra,* 44 Cal.4th at p. 315.)

### j. *Mental State of an Actual Killer Required to Establish Special Circumstance Allegations (Letner, Tobin)*

In defendants' final challenge to the guilt phase jury instructions, they contend that, under the Eighth and Fourteenth Amendments to the federal Constitution and the United States Supreme Court's decisions in *Tison v. Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127, 107 S.Ct. 1676] (*Tison*) and *Enmund v. Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368] (*Enmund*), the trial court was required to instruct the jury that, to support a

---

[32] Defendants take issue with instruction of the jury pursuant to CALJIC Nos. 1.00, 2.01, 2.02, 2.21.2, 2.22, 2.51, 8.83, and 8.83.1.

true finding regarding the felony-murder special-circumstance allegations, the evidence at trial must establish beyond a reasonable doubt that a defendant who was the actual killer of the victim was, at a minimum, a major participant in the underlying felony and acted with a "reckless indifference to human life." In other words, defendants claim that although it was permissible for the trial court to instruct the jury that it need not find that an actual killer had the intent to kill the victim, it was error not to further instruct the jury that the jury must, however, find that the actual killer was a major participant in the underlying felony and acted with reckless disregard of human life, that is, that he acted with a "culpable mental state" with regard to the killing.

██ Defendants assert that we have "never squarely confronted the question." We held a decade ago, however, that "[e]vidence that the defendant is the actual killer and guilty of felony murder . . . establishes 'a degree of culpability sufficient under the Eighth Amendment to permit defendant's execution.' " (*Smithey, supra,* 20 Cal.4th at p. 1016; see also *People v. Hayes* (1990) 52 Cal.3d 577, 632 [276 Cal.Rptr. 874, 802 P.2d 376]; *People v. Belmontes* (1988) 45 Cal.3d 744, 794 [248 Cal.Rptr. 126, 755 P.2d 310] ["The United States Supreme Court has made clear that felony murderers who personally killed may properly be subject to the death penalty in conformance with the Eighth Amendment—after proper consideration of aggravating and mitigating circumstances—even where no intent to kill is shown." (italics omitted)].) More recently, in *People v. Young* (2005) 34 Cal.4th 1149, 1204 [24 Cal.Rptr.3d 112, 105 P.3d 487], we rejected the claim that "CALJIC No. 8.80 is constitutionally defective under the Eighth and Fourteenth Amendments because it permits a finding of death eligibility in the absence of a jury finding that the defendant either intended to kill the victim or, as a major participant in the underlying felony, exhibited a reckless indifference to human life." (See also *People v. Taylor* (2010) 48 Cal.4th 574, 661 [108 Cal.Rptr.3d 87, 229 P.3d 12] [citing *Young* and *Hayes*].) To the extent there could be any continuing doubt concerning this issue, we reiterate that the jury should not be instructed that, in order to find a felony-murder special-circumstance allegation true, it must find that a defendant who it determines actually killed the victim was a major participant in the felony, or possessed any culpable mental state specifically related to the killing of the victim, including "reckless indifference to human life."

Defendants' assertion to the contrary, in reliance upon the high court's decisions in *Tison* and *Enmund,* is misplaced. Those cases concerned the application of the death penalty to aiders and abettors who were not the actual killers of the victims. (*Tison, supra,* 481 U.S. at p. 138 ["The question presented is whether the petitioners' participation in the events leading up to and following the murder of four members of a family makes the sentences of death imposed by the Arizona courts constitutionally permissible although

neither petitioner specifically intended to kill the victims and neither inflicted the fatal gunshot wounds."]; *Enmund, supra,* 458 U.S. at p. 787 ["We granted Enmund's petition for certiorari, [citation], presenting the question whether death is a valid penalty under the Eighth and Fourteenth Amendments for one who neither took life, attempted to take life, nor intended to take life."].) The court stated its ultimate holding in *Tison* as follows: "[W]e simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." (*Tison, supra,* 481 U.S. at p. 158.) *Enmund,* in turn, held as follows: "Enmund did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the Kerseys. This was impermissible under the Eighth Amendment." (*Enmund, supra,* 458 U.S. at p. 798.) The circumstance that the court concluded in *Tison* that major participation in the underlying crime coupled with reckless indifference to human life was *sufficient* culpability for the death penalty to be imposed upon an aider and abettor does not signify that the high court concluded—or even implied—such circumstances are *necessary* in *all* cases to establish death eligibility, such as, for example, when the defendant is the actual killer. As our past decisions have observed, it long has been the law that proof that a defendant who is guilty of felony murder was the actual killer of the victim—by itself—establishes the degree of culpability required to impose the death penalty. *Tison* and *Enmund,* which addressed different concerns, do not alter that established principle. Indeed, those cases, viewed properly, reinforce that rule. (See, e.g., *Tison, supra,* 481 U.S. at pp. 149–150 ["*Enmund* explicitly dealt with two distinct subsets of all felony murders . . . : [(1)] the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state . . . [and (2)] the felony murderer who actually killed, attempted to kill, or intended to kill."].)

Defendants' reliance upon our decision in *People v. Estrada* (1995) 11 Cal.4th 568 [46 Cal.Rptr.2d 586, 904 P.2d 1197] likewise is misplaced. In that case, we "granted review . . . to resolve a conflict in the Courts of Appeal over whether a trial court has a sua sponte duty to define the phrase 'reckless indifference to human life' when instructing a jury regarding a felony-murder special-circumstance allegation against a defendant who is not the actual killer." We concluded the trial courts have no such duty. (*Id.* at p. 572.) Our recognition that the California death penalty law had been amended to satisfy the *Tison* requirement for nonkillers (*Estrada,* at pp. 575–576) did not reflect a view that the death-eligibility requirements applicable to actual killers had been changed. We had no occasion to—and did not—address in *Estrada* the question whether, under *Tison,* it must be proved that an actual killer acted with reckless indifference to human life.

Similarly, in relying upon the high court's decision in *Hopkins v. Reeves* (1998) 524 U.S. 88 [141 L.Ed.2d 76, 118 S.Ct. 1895], defendants view that case out of context, extracting from it a rule the court did not adopt. In *Reeves*, the court "consider[ed] whether [*Beck v. Alabama* (1980) 447 U.S. 625 [65 L.Ed.2d 392, 100 S.Ct. 2382]] requires state trial courts to instruct juries on offenses that are not lesser included offenses of the charged crime under state law." (*Reeves, supra,* 524 U.S. at p. 90.) The United States Supreme Court criticized the Eighth Circuit Court of Appeals, which had answered that question in the affirmative, for failing to distinguish *Beck* on the grounds that in the circumstances at issue in *Reeves*, the state had not created an "artificial barrier" to the jury's consideration of a noncapital option, and that the trier of fact never was placed in the position of an "all-or-nothing" choice regarding whether to convict the defendant (in which case he automatically would be sentenced to death), or to acquit him of all charges. (*Reeves,* at pp. 97–98.) The high court also disagreed with the Eighth Circuit's conclusion that *Tison* and *Enmund* required that the jury make the decision concerning whether the culpability requirements set forth in those cases have been satisfied, and therefore whether lesser included offense instructions establishing some culpable mental state (other than simply the intent to commit the underlying felony) were required. The high court stated, "*Tison* and *Enmund* do not affect the showing that a State must make at a defendant's trial for felony murder, so long as their requirement is satisfied at some point thereafter." (*Reeves,* at p. 100.) As we have explained above, *Tison* and *Enmund* do not require that there be proof that an actual killer had any culpable mental state regarding the murder—and the court's subsequent decision in *Reeves* said nothing that changes that principle. Accordingly, no error resulted in the present case from the absence of an instruction to the jury that, in order to sustain the special circumstance allegations as to a defendant it found guilty of felony murder and who was the actual killer, the jury also must find proof beyond a reasonable doubt that such defendant was a major participant in the underlying felony and acted with a reckless indifference to human life.

### 5. *Sufficiency of the Appellate Record (Letner, Tobin)*

 Defendants contend their rights under state law and the federal Constitution were violated by the trial court's failure to order transcriptions made of all trial proceedings. Defendants point out that a total of 62 discussions between the court and counsel were made "off the record" during the trial, including a conference concerning the guilt phase jury instructions. Defendants are correct that the failure to record these discussions violated section 190.9, subdivision (a)(1), which requires that all conferences and proceedings in a death penalty case must be conducted " 'on the record with a court reporter present.' We previously have held, however, that such an error is not reversible per se; instead the defendant must demonstrate prejudice.

[Citations.]" (*Rundle, supra,* 43 Cal.4th at p. 110.) Defendants have not presented a compelling reason to revisit that holding.

" '[S]tate law entitles a defendant only to an appellate record "adequate to permit [him or her] to argue" the points raised in the appeal. [Citation.] Federal constitutional requirements are similar. The due process and equal protection clauses of the Fourteenth Amendment require the state to furnish an indigent defendant with a record sufficient to permit adequate and effective appellate review. [Citations.] Similarly, the Eighth Amendment requires reversal only where the record is so deficient as to create a substantial risk the death penalty is being imposed in an arbitrary and capricious manner. [Citation.] The defendant has the burden of showing the record is inadequate to permit meaningful appellate review. [Citation.]' [Citation.]" (*Rundle, supra,* 43 Cal.4th at pp. 110–111.)

Defendants have not established that the failure to transcribe the discussions at issue has prevented adequate and effective appellate review or created a substantial risk the judgment was arbitrary and capricious. Moreover, the violation of section 190.9, subdivision (a)(1), by itself, did not deprive defendants of a "liberty interest" under *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 100 S.Ct. 2227]. (*Rivera v. Illinois* (2009) 556 U.S. 148, ___ [173 L.Ed.2d 320, 129 S.Ct. 1446, 1454] ["The Due Process Clause, our decisions instruct, safeguards not the meticulous observance of state procedural prescriptions, but 'the fundamental elements of fairness in a criminal trial.' "]; *Engle v. Isaac* (1982) 456 U.S. 107, 121, fn. 21 [71 L.Ed.2d 783, 102 S.Ct. 1558] ["We have long recognized that a 'mere error of state law' is not a denial of due process. [Citation.] If the contrary were true, then 'every erroneous decision by a state court on state law would come [to this Court] as a federal constitutional question.' [Citations.]"].) Accordingly, defendants have not established that their federal constitutional rights were violated. Nor have they demonstrated they suffered prejudice from violation of the statute under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], which specifies that for prejudice to be shown, it must be reasonably probable a result more favorable to defendants would have been reached in the absence of the error. (See also *Rundle, supra,* 43 Cal.4th at pp. 111–112 [error in failing to transcribe conferences concerning jury instructions was harmless].)

### C. *Penalty Phase Issues*

#### 1. *Denial of Motions to Sever Defendants' Penalty Phase Trials (Letner, Tobin)*

Defendants contend the trial court erred by denying their motions to sever the penalty phases of their trials. They present essentially two reasons why

the trial court's decision was erroneous: (1) the joint penalty trials allowed the prosecution to conflate the evidence against each defendant so that the prosecutor's arguments that both defendants deserved the death penalty deprived them of the constitutionally required "individualized consideration" of the appropriate penalty; and (2) in the course of the joint trial, each defendant presented evidence in mitigation that was potentially harmful to the other defendant, but which would not have been properly admitted as aggravating evidence had they been tried separately. In a similar vein, Letner also argues that the greater amount of aggravating evidence that was presented against Tobin had an improper "spillover" effect that prejudiced the jury's consideration of Letner's punishment.

 As we previously have observed, there is an "undisputed statutory preference for a joint penalty trial following a similar trial of guilt (§ 190.4)." (*People v. Roberts* (1992) 2 Cal.4th 271, 328 [6 Cal.Rptr.2d 276, 826 P.2d 274] (*Roberts*).) The trial court must exercise its broad discretion to resolve motions to sever the penalty phases of jointly tried codefendants (*People v. Ervin* (2000) 22 Cal.4th 48, 96 [91 Cal.Rptr.2d 623, 990 P.2d 506] (*Ervin*)) in a manner consistent with "the need for individualized consideration as a constitutional requirement in imposing the death sentence" (*Lockett v. Ohio* (1978) 438 U.S. 586, 605 [57 L.Ed.2d 973, 98 S.Ct. 2954]; see *Ervin, supra*, 22 Cal.4th at pp. 95–96). We conclude for the following reasons that the trial court's decision in the present case not to sever the penalty phase of defendants' trial was not an abuse of discretion, and did not deprive defendants of the required individualized consideration of the appropriate penalty to which each was entitled.

 The prosecutor did not improperly argue that the jury need not separately consider the sentence for each defendant; instead she properly argued that each defendant was equally culpable in the crimes committed against Pontbriant, and that those crimes warranted the death penalty for each defendant. To the extent either defendant's evidence might have portrayed the other defendant in a bad light, the prosecutor did not improperly exploit the defendants' respective cases in mitigation. In addition, the trial court instructed the jury that it must consider separately the evidence concerning each defendant, must not consider evidence admitted for a limited purpose in favor of or against one defendant in deciding the penalty for the other defendant, and must reach a separate verdict as to each defendant. The trial court also specifically set forth in the instructions exactly which criminal activity of each defendant could be considered in aggravation, and instructed the jury that it could not consider any other criminal activity as aggravating evidence, including escape from custody, burglaries unrelated to the case, and the sale and use of narcotics. The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so. (*People v. Lewis* (2008) 43 Cal.4th 415, 461 [75 Cal.Rptr.3d 588, 181 P.3d

947]; *People v. Taylor* (2001) 26 Cal.4th 1155, 1173–1174 [113 Cal.Rptr.2d 827, 34 P.3d 937]; *Ervin, supra,* 22 Cal.4th at pp. 95–96.) The record demonstrates the jury did separately consider each defendant's penalty, because after several days of deliberations it notified the court that it had reached a verdict as to one defendant, but at that time was unable to reach a verdict as to the other.[33] (See *Roberts, supra,* 2 Cal.4th at p. 328 [concluding that the record and the jury's "careful consideration of its penalty verdict" demonstrated that the defendant received an individualized determination of culpability].) Moreover, in light of the circumstance that the jury reached a death verdict as to both defendants, we discern even less of a possibility that the jury improperly assigned culpability based upon one defendant's attempt to mitigate the seriousness of his own actions by shifting accountability to his codefendant. (See *Ervin, supra,* 22 Cal.4th at p. 96 [concluding there was "nothing in the record suggesting the jury assigned undue culpability to defendant after hearing his codefendants' mitigating evidence"]; cf. *Foster v. Commonwealth* (Ky. 1991) 827 S.W.2d 670, 683 [concluding, in a case in which the codefendant did not receive a death verdict, that reversal of the death sentence was required as a result of the "accumulated errors" of admitting the codefendant's mitigation evidence that was prejudicial to the defendant who did receive a death verdict].) "In the absence of a showing that the jurors in this joint trial were unable or unwilling to assess independently the respective culpability of each codefendant, we can find no abuse of discretion [or violation of defendants' constitutional rights] in failing to sever the trial . . . ." (*Taylor, supra,* 26 Cal.4th at p. 1174.)

In a supplemental brief filed prior to oral argument, Letner raises another basis for claiming that the trial court erred by denying the motions to sever. Relying upon the United States Supreme Court's decision in *Kennedy v. Louisiana* (2008) 554 U.S. 407 [117 L.Ed.2d 525, 128 S.Ct. 2641], he contends the denial of severance was reversible error because, by extension of the high court's holding in *Kennedy,* that court, in effect, overruled its decision in *Tison, supra,* 481 U.S. 137, discussed, *ante,* in part II.B.4.j., and therefore separate penalty phase trials were necessary so that the jury would be required to find which of the defendants was the actual killer. Even assuming this claim is properly before us, we must reject it because *Kennedy* did not overrule *Tison*—indeed, the single citation to *Tison* in the court's opinion in *Kennedy* simply describes *Tison*'s holding. (*Kennedy, supra,* 554 U.S. at p. 421 [128 S.Ct. at p. 2650].) "Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court." (*Auto*

---

[33] After receiving notification from the jury that it appeared to be deadlocked as to a verdict regarding one of the defendants, the trial court excused the jury for a long weekend. After the jury returned to deliberations following the break, it reached a verdict concerning the second defendant later that day.

*Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]; see also *Rodriguez de Quijas v. Shearson/Am. Exp.* (1989) 490 U.S. 477, 484 [104 L.Ed.2d 526, 109 S.Ct. 1917] ["If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."].)

### 2. *Assertedly Improper Cross-examination of Letner Regarding Letters He Wrote Concerning the Crimes (Tobin)*

During the direct examination of Letner, he briefly testified concerning five letters regarding Pontbriant's murder that he wrote to fellow jail inmate Danny Payne that were part of a plan by which Payne and Letner would offer information to the prosecution in return for favorable treatment. On cross-examination, the prosecutor questioned Letner at length concerning the letters, primarily focusing upon the inconsistencies between the letters and Letner's penalty phase testimony regarding the murder. This cross-examination was supported by a display of enlarged copies of the letters placed before the jury, and Letner's reading aloud from portions of the letters.

In the first letter, Letner told Payne that Tobin decided to kill Pontbriant while Letner was out purchasing beer, but that when Letner arrived back at the house he found Tobin stabbing her in the neck. In this account, Tobin told Letner that he killed Pontbriant because she had refused his sexual advances. Letner testified that in the first letter, he did not tell Payne the "truth," because he did not want to admit to being a coward and letting Tobin kill Pontbriant while he (Letner) merely watched. According to Letner's testimony, Payne did not believe this version of the murder, and Letner subsequently wrote several more letters recounting "the exact truth." These additional letters generally were consistent with Letner's trial testimony. Letner, however, also wrote that he had gone to Pontbriant's house to steal her car and to have sexual relations with her so that she would give him money. He further stated that he did have sexual intercourse with her on the couch (contrary to his trial testimony), and that Tobin also had demanded to have sex with her. Pontbriant, however, became angry and threatened to call the police, which triggered a heated response by both Tobin and Letner, although it was Tobin who went to the unexpected extreme of murdering her. Letner did not mention in the letters that Tobin had threatened to kill him if he interfered. Letner testified, however, that some of the content of these letters was *Payne's* version of the murder, which Payne had told Letner to incorporate into the letters.

Tobin twice moved for a mistrial based upon Letner's testimony introducing assertedly prejudicial information concerning Tobin that was *not* contained in the letters,[34] but did not object specifically to the prosecutor's cross-examination of Letner concerning the letters. Moreover, Tobin's attorney also cross-examined Letner concerning the letters.

On appeal, Tobin contends, however, that the testimony elicited by the prosecutor's cross-examination concerning the letters was improper because it (1) precipitated the introduction of inadmissible hearsay, (2) violated section 352 of the Evidence Code, (3) precipitated the introduction of inappropriate aggravating evidence, and (4) denied Tobin his constitutional right to confront the witnesses against him. Tobin, however, forfeited his appellate claims by failing to raise them in the trial court. To the extent Tobin contends that Letner's objection, based upon hearsay, to testimony concerning one of the letters was sufficient to preserve Tobin's appellate hearsay claim, he is mistaken. Even if Tobin's failure to join in the objection did not foreclose this claim, Letner's objection concerned a letter written by Danny Payne, which, as the prosecutor stated, was not offered for the truth of what Payne wrote, but for the purpose of explaining what Letner did in response, that is, write the letters regarding the murder. The trial court properly overruled the objection. Moreover, the contents of that letter have no bearing upon the issue whether the prosecution's cross-examination concerning the letters written by Letner introduced improper hearsay evidence as to Tobin.

In any event, Tobin's appellate claims are without merit. The prosecution's cross-examination concerning the letters explored a proper basis upon which to rebut Letner's testimony, which included the subject of the letters. (*Mayfield, supra*, 14 Cal.4th at p. 754 [cross-examination can explore a defendant's testimony in greater detail than the direct testimony, and, in general, the permissible scope of cross-examination is very broad].) To the extent this claim restates Tobin's challenge to the denial of the motion to sever the penalty phase trials, we reject such a claim for the reasons stated, *ante*, in part II.C.1. Use of the letters also did not violate Tobin's constitutional right to confront the witnesses against him, even were we to agree with his assertion that the letters were, to some degree, actually the statements of Danny Payne, who did not testify. Although Letner testified that the letter writing was supposedly part of a plan to gain leniency from the prosecution, there is no evidence in the record suggesting that Payne was acting as a law enforcement agent in this process. Therefore, the statements in the letters did not constitute "testimonial" evidence as that term has been defined after the United States Supreme Court's decision in *Crawford v. Washington* (2004)

---

[34] Letner mentioned that Tobin told Letner that he (Tobin) had killed someone in Napa, and Letner testified that Tobin was about to shoot Earl Bothwell during the argument at the Iowana Motel but that Letner was able to disarm Tobin.

541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354], and their admission did not violate Tobin's confrontation rights. (*People v. Geier* (2007) 41 Cal.4th 555, 605 [61 Cal.Rptr.3d 580, 161 P.3d 104] [holding that only "testimonial" statements implicate the confrontation clause, and "a statement is testimonial if (1) it is made to a law enforcement officer or by or to a law enforcement agent and (2) describes a past fact related to criminal activity for (3) possible use at a later trial"]; see also *People v. Cage* (2007) 40 Cal.4th 965, 986–987 [56 Cal.Rptr.3d 789, 155 P.3d 205] [statement made to physician at hospital for purposes of treatment was not testimonial and was not admitted in violation of *Crawford*].)

### 3. *Assertedly Erroneous Admission of Unadjudicated Prior Offenses (Letner, Tobin)*

 Defendants contend the admission at trial of evidence concerning their unadjudicated prior offenses violated their rights to due process and a reliable penalty determination because of the passage of time, the supposed unreliability of the evidence, and the circumstance that the jury that considered whether the unadjudicated offenses had been proved already had found defendants guilty of the charges in this case, thereby assertedly eroding the presumption of innocence. Assuming that this claim constitutes a challenge to the constitutionality of the death penalty statute, and that defendants therefore may raise it for the first time on appeal, the claim nonetheless fails. We previously have concluded that the requirement that such unadjudicated offenses be proved beyond a reasonable doubt before the jury may consider them in aggravation is sufficient to protect a defendant's constitutional rights. (*People v. Valencia* (2008) 43 Cal.4th 268, 311 [74 Cal.Rptr.3d 605, 180 P.3d 351]; *People v. Smith* (2005) 35 Cal.4th 334, 368 [25 Cal.Rptr.3d 554, 107 P.3d 229]; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1060–1061 [90 Cal.Rptr.2d 607, 988 P.2d 531]; *People v. Williams* (1997) 16 Cal.4th 153, 239 [66 Cal.Rptr.2d 123, 940 P.2d 710]; *People v. Stanley* (1995) 10 Cal.4th 764, 822–823 [42 Cal.Rptr.2d 543, 897 P.2d 481].) Defendants have not persuaded us that this conclusion is incorrect.

### 4. *Asserted Prosecutorial Misconduct During Penalty Phase Closing Argument (Letner, Tobin)*

Defendants contend the prosecutor committed misconduct by stating, at the conclusion of her closing argument to the jury: "Lastly, ladies and gentlemen, remember this proverb. Remember that Jesus forgave the thief on the cross next to him, who, by his own admission was justly condemned. He gave the thief a place in paradise. But the thief still had to die for his crimes. In the name of the [P]eople of the State of California, I ask you to return the death penalty."

"A prosecutor may not cite the Bible or religion as a basis to impose the death penalty. [Citations.] On the other hand, we have suggested it is not impermissible to argue, for the benefit of religious jurors who might fear otherwise, that application of the death penalty according to secular law does not *contravene* biblical doctrine [citations], or that the Bible shows society's historical acceptance of capital punishment [citation]." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1169 [63 Cal.Rptr.3d 297, 163 P.3d 4] (*Zambrano*).) We have recognized that biblical references made by attorneys in argument to the jury are improper if they would tend to convince the jury that their verdict should be based upon legal or other principles apart from what is stated in the trial court's instructions. (*People v. Wash* (1993) 6 Cal.4th 215, 261 [24 Cal.Rptr.2d 421, 861 P.2d 1107] ["[t]he primary vice in referring to the Bible and other religious authority is that such argument may 'diminish the jury's sense of responsibility for its verdict and . . . imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions.' [Citations.]"].)[35]

Defendants failed to object to the statement, or to request that the jury be admonished to follow the law as set forth in the court's instructions rather than a biblical proverb. Because we cannot assume that an objection and admonition would have been futile or ineffective, defendants have forfeited their appellate claim of misconduct. (*Zambrano, supra,* 41 Cal.4th at p. 1169; *People v. Slaughter* (2002) 27 Cal.4th 1187, 1209 [120 Cal.Rptr.2d 477, 47 P.3d 262] (*Slaughter*); *People v. Wrest* (1992) 3 Cal.4th 1088, 1105 [13 Cal.Rptr.2d 511, 839 P.2d 1020].) In any event, the prosecutor's biblical reference did not constitute prejudicial misconduct.

In *Zambrano,* we concluded that, although the prosecutor prefaced his religious remarks by explaining he was attempting to allay any concerns a juror might have that voting for the death penalty would be contrary to biblical teachings, his actual remarks went beyond addressing that concern and instead asserted that the Bible demanded that the death penalty be imposed when a defendant has committed murder. The prosecutor quoted Genesis chapter 9, verse 6 "('whoever sheds the blood of man, by man shall his blood be shed, for in [H]is image did God make man')" (*Zambrano, supra,* 41 Cal.4th at p. 1168), and told the jury that "this stood for two concepts: 'The first is that capital punishment for murderers is necessary to preserve the

---

[35] We observe that defendants' trial occurred before we rendered our decisions explicitly condemning biblical references in counsel's argument that lessen the jury's sense of responsibility or imply that the jury should follow some law other than that set forth in the trial court's instructions. Accordingly, we are not faced with a prosecutor's argument that "postdates and deliberately contravenes the holdings in those decisions [which might] constitute[] a more serious form of prosecutorial misconduct warranting reversal of the penalty phase judgment." (*People v. Vieira* (2005) 35 Cal.4th 264, 298, fn. 11 [25 Cal.Rptr.3d 337, 106 P.3d 990] (*Vieira*).)

sanctity of human life, and second being it is man's obligation to do it.' The sanctity of life, the prosecutor continued, does not forbid, but demands, the death penalty for murder, because a lesser penalty 'means that the taking of life is not that serious an offense.' [¶] The prosecutor followed with other biblically attributed quotes on a similar theme: 'He who fatally strikes a man shall be put to death'; 'You shall not make reparations for the soul of a murderer who deserves to die, and he shall be put to death'; 'Vengeance is mine, I will repay, saith the Lord'; 'The ruler bears not the sword in vain for he is a minister of God, a revenger to execute wrath upon him that doeth evil.' " (*Zambrano, supra*, 41 Cal.4th at pp. 1168–1169.) We assumed the prosecutor's comments went too far, but concluded that the defendant had suffered no prejudice. (*Id.* at p. 1170.)

Defendants contend the prosecutor's biblical reference in the present case, which constituted her penultimate statement to the jury, was improper because it (1) contrasted the seriousness of defendants' offenses with those of the thief who was crucified, implying that defendants were more deserving of a death sentence, and (2) lessened the significance of a death verdict by implying that defendants could be forgiven for their crimes in the afterlife, and might be more likely to obtain such forgiveness if they were sentenced to death. The Attorney General, on the other hand, asserts that the prosecutor's comments might be viewed as simply contrasting the concepts of secular accountability and religious forgiveness, and that the brief biblical reference, which followed the prosecutor's extensive arguments regarding why, under the applicable statutory law, the death penalty was justified, would not have been interpreted by the jury as an argument that the Bible or religion afforded reasons to impose this sentence, or lessened the jury's responsibility in weighing a death verdict.

Even assuming for the sake of argument that the prosecutor's biblical references overstepped the proper bounds of penalty phase argument, we conclude they do not require reversal of defendants' judgments. In the present case, as in *Zambrano*, "the prosecutor's biblical comments 'were part of a longer argument that properly focused upon the factors in aggravation and mitigation.' " (*Zambrano, supra*, 41 Cal.4th at p. 1170.) Moreover, in contrast to the comments at issue in *Zambrano*, the prosecutor here did not tell the jury that the Bible "makes it man's duty to impose [the death penalty] to preserve the sanctity of human life." (*Ibid.*; see also *Vieira, supra*, 35 Cal.4th at pp. 296–298 [concluding that prosecutor's biblical references, which included stating that under Judeo-Christian religious doctrine "capital punishment for murder is necessary in order to preserve the sanctity of human life, and . . . only the severest penalty of death can underscore the severity of taking life," were not prejudicial]; *Slaughter, supra*, 27 Cal.4th at p. 1211 [similar argument was not prejudicial].) Although the biblical reference in the present case came at the end of the prosecutor's argument and therefore

might have been somewhat more prominent in the minds of the jurors than if it had fallen somewhere in the middle of that argument, if the statement crossed the line of improper argument it did so by a much narrower margin than in other cases in which we have found the error harmless. For these reasons, we conclude there is no reasonable possibility the jury would have reached a verdict more favorable to defendants had the prosecutor not made the biblical references. (See *People v. Williams* (2010) 49 Cal.4th 405, 466–467.)

### 5. *Failure to Instruct Concerning the Jury's Sentencing Options (Letner, Tobin)*

Defendants contend the trial court erred by denying their requests to instruct the jury regarding the probability that the sentence it chose in its verdict would be carried out. Each defendant requested slightly different instructions, both of which, as we shall explain, properly were refused by the trial court.

■ We have long held that the standard jury instructions, which the trial court gave in the present case, adequately inform the jury of the meaning of the sentences that are legally permissible when the jury has found that a defendant has committed special circumstance murder. (See, e.g., *Abilez, supra,* 41 Cal.4th at pp. 527–528; *Prieto, supra,* 30 Cal.4th at p. 270; *People v. Barnett* (1998) 17 Cal.4th 1044, 1176–1177 [74 Cal.Rptr.2d 121, 954 P.2d 384].) At the same time, courts often have been faced with the issue of deciding the appropriate response when there is concern that the jurors may contemplate the possibility that the sentence they choose might not be carried out because of future actions by the courts, the Legislature, or the Governor—either the concern that the defendant nonetheless will be released from prison if the sentence is life without the possibility of parole, or the concern that he or she will not actually be executed if the sentence is death. In *People v. Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430] (*Ramos*), we disapproved of the so-called "Briggs Instruction" that informed the jury that " 'a sentence of confinement to state prison for a term of life without the possibility of parole may in [the] future after sentence is imposed, be commuted or modified to a sentence that includes the possibility of parole by the Governor of the State of California' " (*id.* at p. 150), because the instruction was "seriously and prejudicially misleading and . . . invite[d] the jury to be influenced by speculative and improper considerations" (*id.* at p. 153). In a concluding footnote, we addressed the question whether any instruction regarding the subject of commutation of the sentence should be given. We stated: "When the jury raises the commutation issue itself—either during voir dire or in a question posed to the court during deliberations—the matter obviously cannot be avoided and is probably best handled by a short

statement indicating that the Governor's commutation power applies to both sentences but emphasizing that it would be a violation of the juror's duty to consider the possibility of such commutation in determining the appropriate sentence. [Citation.] [¶] When the issue is not expressly raised by the jury, it is a close question whether it is preferable for the court to give such a cautionary instruction on the assumption that some jurors might otherwise be aware of the possibility of commutation and improperly consider it, or whether such an instruction is simply more likely to bring the matter to the jury's attention and, as a practical matter, be difficult to follow." We therefore concluded that when (as in the present case) the jury does not raise the issue, the trial court has no duty to give an instruction concerning the subject on its own motion, but must do so if the defendant requests one. (*Id.* at p. 159, fn. 12.)

In the wake of *Ramos*, we have addressed numerous claims of error arising from the trial court's refusal to give defense-requested jury instructions that sought to convey to the jury that it should not consider the possibility that some future event might prevent the fulfillment of the sentence it imposes. One clear rule that has emerged from the cases is that, although the trial court generally must give an instruction when the defendant requests one, the trial court is not required to do so on its own motion, and of course it should not give an instruction that is incorrect. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1275 [270 Cal.Rptr. 451, 792 P.2d 251] ["It is of course virtually axiomatic that a court may give only such instructions as are correct statements of the law."].) Further, we have held that "[i]t is as incorrect to tell the jury the penalty of death or life without possibility of parole will inexorably be carried out as it is to suggest they need not take their responsibility as seriously because the ultimate determination of penalty rests elsewhere." (*People v. Thompson* (1988) 45 Cal.3d 86, 130 [246 Cal.Rptr. 245, 753 P.2d 37] (*Thompson*); see also *People v. Ashmus* (1991) 54 Cal.3d 932, 994–996 [2 Cal.Rptr.2d 112, 820 P.2d 214] (*Ashmus*).) In the present case, the trial court therefore properly refused to give the following instruction requested by defendant Tobin: "A sentence of life without possibility of parole means that MR. TOBIN will remain in state prison for the rest of his life and will not be paroled at anytime. A sentence of death means that MR. TOBIN will be executed in the gas chamber." We reiterate that such an instruction is an incorrect statement of the law. (See *People v. Lindberg* (2008) 45 Cal.4th 1, 53 [82 Cal.Rptr.3d 323, 190 P.3d 664]; *Thompson, supra,* 45 Cal.3d at pp. 130–131.)

We must acknowledge that our cases have displayed some inconsistency concerning instructions akin to the following one requested by Letner: "You are to presume that if a defendant is sentenced to life without the possibility of parole, he will spend the rest of his life in state prison. [¶] You are to presume that if a defendant is sentenced to death, he will be executed in the

gas chamber." In *Ramos*, we suggested that an appropriate instruction would consist of a "short statement indicating that the Governor's commutation power applies to both sentences but emphasizing that it would be a violation of the juror's duty to consider the possibility of such commutation in determining the appropriate sentence." (*Ramos, supra,* 37 Cal.3d at p. 159, fn. 12.) In *Thompson*, after holding that a trial court should not instruct the jury that the sentence inexorably will be carried out, we suggested—in what we described in *Ashmus* as dictum (*Ashmus, supra,* 54 Cal.3d at p. 995)—that a correct statement of the law to be given upon the defendant's request would instruct the jurors "that whether or not there were circumstances that might preclude either the death penalty or life without possibility of parole from being carried out, they should assume it would be carried out for purposes of determining the appropriate sentence for this defendant . . . ." (*Thompson, supra,* 45 Cal.3d at p. 131.) Subsequently, some defendants requested instructions that omitted the "whether or not" part of our statement in *Thompson* and simply would have told the jury, in a manner similar to Letner's proposed instruction, that the jury must "assume" that the sentence it imposes will be carried out. In *People v. Fierro* (1991) 1 Cal.4th 173, 250 [3 Cal.Rptr.2d 426, 821 P.2d 1302] (*Fierro*), we concluded that such an instruction, as compared to one that incorrectly tells the jury that the sentence it chooses inexorably will be carried out, "was not similarly misleading, and, as we have previously observed [in *Thompson*], should have been given."

Some of our decisions, however, also appear to have concluded that telling the jury to assume the sentence will be carried out *is* misleading and incorrect. (*People v. Arias* (1996) 13 Cal.4th 92, 172 [51 Cal.Rptr.2d 770, 913 P.2d 980] [the trial court properly refused to give "an instruction that the jury must assume a sentence of death meant defendant would be executed, while a sentence of life imprisonment without possibility of parole meant '[defendant] will spend the rest of his life confined in state prison and will not be paroled at any time' "]; *People v. Hawthorne* (1992) 4 Cal.4th 43, 75–76 [14 Cal.Rptr.2d 133, 841 P.2d 118] [rejecting claim that trial court had a duty on its own motion to instruct the jury that it must assume a death sentence will be carried out, because such an instruction "misstates the law"].) We also have concluded that a proposed instruction that would have told the jury that a sentence of life in prison without possibility of parole means the defendant never will be released on parole, and that therefore the jury " 'must assume in determining penalty in this case defendant will not be released from prison ever,' " was incorrect. (*People v. Roybal* (1998) 19 Cal.4th 481, 524–525 [79 Cal.Rptr.2d 487, 966 P.2d 521].) More recently, in *People v. Cox* (2003) 30 Cal.4th 916, 967 [135 Cal.Rptr.2d 272, 70 P.3d 277], we addressed a claim that the trial court erred by giving, at the defendant's request, an instruction providing: " '[I]f you find that a verdict of death is appropriate, you must assume that such penalty will be imposed,' without

giving a similar instruction regarding a sentence of life without the possibility of parole." We concluded the trial court did not err in so instructing the jury regarding a death verdict, because although "it would be erroneous to instruct the jury that if it returns a death verdict, the sentence of death will inexorably be carried out[,] the trial court may give such an instruction at the defendant's request." (*Cox, supra*, 30 Cal.4th at p. 967; see also *People v. Williams* (2008) 43 Cal.4th 584, 647 [75 Cal.Rptr.3d 691, 181 P.3d 1035] [observing that "to instruct the jury that it must assume that a sentence of life without the possibility of parole means the defendant will be imprisoned for the rest of his or her life is inaccurate because it fails to acknowledge that the Governor retains the power of commutation"].)

 It appears that the apparent tension among our decisions regarding this subject stems from the evolution of the instructions that we have reviewed, which have not always reflected the basic purpose to be served by such instructions. As we observed in *Ramos, supra*, 37 Cal.3d at page 155, a jury should not "consider matters that are both totally speculative and that should not, in any event, influence [its] determination." Accordingly, the purpose of an instruction to the jury concerning the possibility that the punishment it selects will or will not actually be carried out is to inform the jury that such speculation concerning possible future events—of which no evidence has been presented at the trial—is improper and should not play any part in the jury's deliberations regarding the appropriate penalty. Telling the jury that it should "assume" or "presume" that the sentence will be carried out obscures the purpose of the instruction. Such an instruction also is misleading in the sense that, although other presumptions and assumptions that juries are instructed to consider have their bases in logic and experience, a presumption or assumption that the sentence will be carried out is, in fact, contradicted by the real possibility, of which some jurors may be aware, that the sentence will not be carried out. We therefore conclude the trial court did not err by refusing to give Letner's proposed instruction.

In the future, if in a particular case the parties and the trial court decide that an instruction on this issue would be appropriate, the court might instruct the jury as follows: "It is your responsibility to decide which penalty is appropriate in this case. You must base your decision upon the evidence you have heard in court, informed by the instructions I have given you. You must not be influenced by speculation or by any considerations other than those upon which I have instructed you."

 Even to the extent we might conclude, in light of our decisions in cases such as *Fierro*, that in the present case the trial court's failure to give the instruction requested by Letner was error, any such error was harmless under any standard. "[A]bsent any evidence to suggest that the jury was

confused about the issue or concerned that [defendants'] sentence[s] would not be carried out, the failure to so instruct cannot be deemed prejudicial." (*Fierro, supra*, 1 Cal.4th at p. 250.) There was no evidence of jury confusion or concern in the present case, nor do we accept defendants' arguments that "empirical studies" establish that jurors typically are confused or concerned with these questions even when they do not expressly bring up the issue. (See *Boyer, supra*, 38 Cal.4th at p. 487.) We also have rejected repeatedly the contention that the absence of an instruction concerning the meaning of a sentence of life imprisonment without the possibility of parole violates a defendant's federal constitutional rights under the high court's decisions in *Simmons v. South Carolina* (1994) 512 U.S. 154 [129 L.Ed.2d 133, 114 S.Ct. 2187] and similar cases. (*Rundle, supra*, 43 Cal.4th at p. 187.)

### 6. *Assertedly Erroneous Failure to Give Instruction Concerning Accomplice Testimony (Tobin)*

 Tobin contends the trial court erred and violated his constitutional rights by not giving, on its own motion, instructions concerning accomplice testimony, in light of the circumstance that Letner testified at the penalty phase of the trial. This claim parallels Letner's guilt phase claim that the trial court should have given similar instructions during the guilt phase of the trial based upon Tobin's testimony, a claim that we addressed, *ante*, in part II.B.4.b. "In both the guilt and penalty phases of trial, the court ordinarily must instruct the jury sua sponte with CALJIC No. 3.18 [(to view an accomplice's testimony with care and caution)] when out-of-court statements to police by accomplices are admitted into evidence. [Citations.] We have recognized an exception, however, when the penalty phase accomplice testimony relates to an offense of which the defendant has already been convicted." (*People v. Carter* (2003) 30 Cal.4th 1166, 1223 [135 Cal.Rptr.2d 553, 70 P.3d 981].) Even in the event the failure to give accomplice-testimony instructions was error (that is, if the exception mentioned in *Carter* did not apply in the present case because Tobin contested "the extent of his culpability" (*ibid.*)), any error in failing to give such instructions was, as with Letner's guilt phase claim, harmless under any standard. The jury obviously discounted Letner's testimony, because it also sentenced him to death despite his testimony that Pontbriant was the victim of a murderous rampage by Tobin, which Letner had tried to prevent. In addition, there was adequate corroboration of Letner's testimony to the extent it incriminated Tobin. Tobin already had testified that he was at Pontbriant's house that night; he was found in the victim's car after the murder, and he fled with Letner to Iowa. A rational juror could find that this testimony, plus the physical evidence found at the house and in the car, implicated Tobin in the crimes.

### 7. Challenges to the Constitutionality of California's Death Penalty Statute (Letner, Tobin)

Defendants raise a number of constitutional challenges to California's death penalty law that, as they acknowledge, have been rejected repeatedly by this court. They provide no persuasive reason why we should reexamine our prior decisions.

As we recently observed in *People v. Alexander* (2010) 49 Cal.4th 846, 938 [113 Cal.Rptr.3d 190, 235 P.3d 873] (*Alexander*): "[W]e reiterate that the death penalty statutes adequately narrow the class of murderers eligible for the death penalty, are not impermissibly vague or overbroad, and do not result in an 'arbitrary and capricious' or 'wanton and freakish' penalty determination. [We] also have held that the statutes do not require that the prosecution carry the burden of proof or persuasion at the penalty phase, that the jury make written findings or reach unanimous decisions regarding aggravating factors, or that the jury find beyond a reasonable doubt that (1) the aggravating factors have been proved, (2) the aggravating factors outweigh the mitigating factors, or (3) death is the appropriate sentence. *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] do not render the statutes invalid; neither does *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]. [Citation.] There is no violation of the equal protection of the laws as a result of the statutes' asserted failure to provide for capital defendants some procedural guarantees afforded to noncapital defendants."

The statutes are not invalid because they permit the jury to consider in aggravation, under section 190.3, factor (b), evidence of a defendant's unadjudicated offenses. (*Rundle, supra*, 43 Cal.4th at p. 198.)

"The use in the statutes, and in the standard jury instructions, of terms such as 'extreme,' 'substantial,' 'reasonably believed,' and 'at the time of the offense' in setting forth the mitigating factors does not impermissibly limit the mitigation evidence or otherwise result in an arbitrary or capricious penalty determination. The statutes, as translated into those standard jury instructions, adequately and properly describe the process by which the jury is to reach its penalty determination. There is no need to instruct the jury at the penalty phase (1) regarding a burden of proof, except as to section 190.3, factors (b) and (c), or the absence of a burden of proof, (2) regarding the meaning of the term 'mitigation,' (3) that mitigating factors can be considered only in mitigation, (4) that if the mitigating evidence outweighs the aggravating evidence, the jury must impose a sentence of life without the possibility of parole, or (5) that the jury is not required to impose the death penalty even if it finds the aggravating evidence outweighs the mitigating evidence. The

trial court need not omit from the instructions any mitigating factors that appear not to apply to the defendant's case." (*Alexander, supra*, 49 Cal.4th at p. 938.)

"There is no requirement that the trial court or this court engage in intercase proportionality review when examining a death verdict. A sentence of death that comports with state and federal statutory and constitutional law does not violate international law or norms, or the Eighth Amendment to the United States Constitution." (*Alexander, supra*, 49 Cal.4th at pp. 938–939.)

### D. *Asserted Cumulative Error (Letner, Tobin)*

Defendants contend the cumulative effect of the asserted errors they have raised on appeal requires reversal of their convictions and sentences, even if none of the errors is prejudicial individually. We reject this claim. In those few instances in which we have found error or assumed the existence of error, we have concluded that any error was harmless. In combination, these errors do not compel the conclusion that defendants were denied a fair trial.

### III. DISPOSITION

The judgment as to each defendant is affirmed in its entirety.

Baxter, J., Chin, J., and Corrigan, J., concurred.

**WERDEGAR, J.,** Concurring and Dissenting.—Late in the night of March 1, 1988, a red-and-white Ford Fairmont speckled with rain traveled through deserted downtown Visalia. Officer Alan Wightman of the Visalia Police Department, aware of recent auto thefts in the area, saw the car and had a hunch the driver was involved in some illegality, so he followed it. Wightman confirmed by radio that the car had not been reported stolen. Still suspicious, he imagined that the driver might be under the influence of drugs or alcohol and, like a properly trained peace officer, followed the car but observed no violations of the traffic laws common to such offenders, nor did he see either the driver or the passenger imbibe an alcoholic beverage. The car eventually left the downtown area and entered the freeway, whereupon Officer Wightman observed that it was traveling 40 miles per hour on a stretch of highway where the speed limit was 55. At that point Wightman effected a traffic stop; briefly detained and questioned the driver and passenger, defendants Richard Lacy Letner and Christopher Allan Tobin; and conducted a quick visual scan of the car's interior and trunk. Several hours later, after the discovery of Ivon Pontbriant's murder, police located the car and searched it, finding additional evidence.

As fully explained by Justice Kennard, Officer Wightman lacked reasonable cause to believe the driver of the Ford Fairmont had violated any law, and the officer thus had no legally justifiable reason to detain—in effect, seize—defendants. I therefore join that portion of Justice Kennard's dissenting opinion that concludes Officer Wightman's traffic stop and ensuing detention violated defendants' Fourth Amendment rights. (See dis. opn., *post*, at pp. 217–220.) But as explained below, because I conclude this constitutional violation was harmless beyond a reasonable doubt, it does not require reversal. Accordingly, I concur in the majority's decision to affirm the judgment.

## I.

As a general rule, violations of the United States Constitution require reversal of the resulting criminal judgment unless the error can be found harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) This stringent standard of review applies to violations of the Fourth Amendment. (*Bumper v. North Carolina* (1968) 391 U.S. 543, 550 [20 L.Ed.2d 797, 88 S.Ct. 1788]; *People v. Rich* (1988) 45 Cal.3d 1036, 1080 [248 Cal.Rptr. 510, 755 P.2d 960]; *People v. Jasmin* (2008) 167 Cal.App.4th 98, 114 [84 Cal.Rptr.3d 19].) In this case, the People obtained two categories of evidence from the unjustified traffic stop: evidence obtained during the detention itself, and evidence from a search of the car the next evening. As explained below, the inculpatory power of the evidence gathered as a direct result of the traffic stop was negligible, and its admission was thus harmless. As for the later car search, because defendants had no recognizable possessory interest in the vehicle, they may not challenge the search or object to the admission at trial of the evidence thereby obtained, nor in any event was that evidence of particular significance to the prosecution. Applying *Chapman* to this case, and recognizing the evidence of defendants' guilt was extensive, I conclude the error in admitting the evidence defendants now challenge as a result of Officer Wightman's traffic stop was harmless beyond a reasonable doubt.

## II.

Officer Wightman's decision to stop and detain defendants resulted in the following evidence being admitted against them in their criminal trial: (a) Wightman's discovery of a common buck knife when he conducted a patsearch of defendant Letner; (b) Wightman's observation of Heineken and Lowenbrau beer bottles in the car (*ibid.*); (c) defendants' statements concerning their destination that night; and (d) Wightman's observation and identification of defendants as the driver and passenger of Pontbriant's car just hours after the crimes. Because all this evidence came to the People by directly

exploiting the traffic stop, a seizure that, as explained in Justice Kennard's dissenting opinion, was unsupported by reasonable cause to believe the driver was in violation of any law (dis. opn., *post*, at pp. 218–219), the evidence should have been suppressed under the Fourth Amendment to the United States Constitution as " 'fruit of the poisonous tree.' " (*Wong Sun v. United States* (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 83 S.Ct. 407]; see *People v. Sims* (1993) 5 Cal.4th 405, 445 [20 Cal.Rptr.2d 537, 853 P.2d 992].) Only if the admission of this evidence can be found harmless beyond a reasonable doubt can we affirm the judgment.

We may quickly discount the first two items for lack of probative value. The type of knife Officer Wightman found in defendant Letner's pocket was not uncommon or unusual and was an otherwise legal implement, nor was the blade matched to the wound suffered by the victim. Moreover, when police experts disassembled the knife and examined its component parts, they found no blood, suggesting that, given the copious amount of blood spilled by the victim due to the severing of her carotid artery, Letner's buck knife was not the murder weapon.

Nor was Officer Wightman's observation of the beer bottles in the car particularly inculpatory. The bottles were of common brands and, although those brands were linked to the murder scene, the evidence of the officer's observations was cumulative to other evidence: police discovered the same bottles in their later search of the car, and defendant Tobin testified at trial that he had bought both Heineken and Lowenbrau beer and shared it with Letner and the victim on the night she was murdered. Neither Wightman's discovery of Letner's knife nor his observation of the beer bottles could have been significant to the jury's decision.

The People also introduced into evidence certain statements defendants had made during the illegal detention, but none was of particular significance. Officer Wightman testified at trial that Letner told him the Ford Fairmont he was driving belonged to Ivon Pontbriant, that she lived on North Jacob Street, but that he did not know the exact address. But as Wightman testified at the suppression hearing—and presumably could have testified at trial—before he stopped defendants he had already received information via police radio that the car belonged to Pontbriant.

Officer Wightman also testified at trial that at the time of the stop Letner said he was taking Tobin home, whereas Tobin said that Letner was taking him home to Tobin's house on South Crenshaw, where he lived with

"Jeanette" (presumably his girlfriend Jeanette Mayberry). Despite the majority's characterization of defendants' statements during this detention as "inconsistent and apparently untruthful" (maj. opn., *ante*, at p. 143), no inconsistency is apparent and the statements would not have given the jury occasion to believe that defendants were being evasive.[1]

The most inculpatory evidence the People obtained from the unjustified traffic stop was the identity of defendants as the persons driving Pontbriant's car shortly after she was murdered. But considering all the circumstances, as detailed below, this evidence was of little importance in connecting defendants to the murder. An acquaintance of Letner's placed the pair at a bar between 7:30 p.m. and 9:30 p.m. the evening Pontbriant was killed. Tobin also testified he and Letner were at a bar that evening, but left to go to Pontbriant's house. The three of them spent the evening drinking together, and Pontbriant and Letner made phone calls to Edward Burdette and Kathy Coronado. Burdette corroborated that Pontbriant and Letner had called him that night around 8:00 p.m. or later. Forensic experts determined that Pontbriant was killed late that evening. Sometime after midnight, and before making the now challenged traffic stop, Officer Wightman observed two White men driving a red-and-white Ford Fairmont and determined by radio that the car's registered owner was Pontbriant.[2] Setting aside the evidence of the traffic stop, defendants were then seen around 4:00 a.m. that same morning, on foot, at Denise Novotny's home. Apparently without access to a car, they asked if her husband could give them a ride to work, saying it was an emergency. Novotny was acquainted with defendants and recognized them, but told them her husband was out of town. Defendants thereafter fled the city under suspicious circumstances suggestive of guilt. (See *People v. Abilez* (2007) 41 Cal.4th 472, 521–522 [61 Cal.Rptr.3d 526, 161 P.3d 58] [flight logically permits an inference of guilty knowledge].) That evening police found defendants' property in Pontbriant's car. Once in Iowa, defendants confessed to their new employer, Earl Bothwell, that they were wanted for murder in California and had taken a red-and-white Ford from a woman. After being apprehended in Iowa, Letner temporarily escaped law enforcement custody.

In sum, Officer Wightman's discovery of defendant Letner's buck knife, his observation of the beer bottles in the car, and his recounting of defendants' statements, considered singly or together, were not particularly inculpatory or important to the prosecution. Although Wightman's testimony placing defendants in the victim's car shortly after she was killed was, by contrast, undoubtedly useful to the prosecution, this information was presented to the

---

[1] Wightman's testimony at the suppression hearing revealed a few more inconsistencies, but these were not heard by the jury.

[2] The officer at this point did not yet know that Pontbriant was a murder victim.

jury by other means as well. Wightman's legal observation of two White men in Pontbriant's car that night, coupled with the later discovery by police of defendants' belongings in the abandoned Ford Fairmont, sufficiently placed defendants in the car at that critical time. Thus, when weighed against the web of other evidence connecting defendants to Pontbriant's murder, the admission of the evidence obtained from Officer Wightman's improper detention of both defendants was harmless beyond a reasonable doubt.

## III.

The evening after the traffic stop, police returned to Pontbriant's Ford Fairmont, which was still parked where defendants had left it, and searched it for clues. In the car, police discovered a white rag bearing evidence of blood and some unopened bottles of Heineken and Lowenbrau beer. In the trunk, police found some stolen cosmetic and hair care items identified by witness Jeanette Mayberry as belonging to defendant Letner. (*Id.* at p. 121.) Police also found in the trunk a sword and a shotgun that defendant Tobin testified belonged to him. These items were significant evidence that defendants had been in the car and, inferentially, had participated in Pontbriant's murder. Defendants contend the items should have been suppressed as tainted by the initial illegality of the unjustified traffic stop. (*Wong Sun v. United States*, *supra*, 371 U.S. at p. 488.) But because neither defendant owned or legitimately possessed the car in which this evidence was found, they are foreclosed from challenging the legality of the car's search.

" 'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.' [Citations.] A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. [Citation.] And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, [citation], it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." (*Rakas v. Illinois* (1978) 439 U.S. 128, 133–134 [58 L.Ed.2d 387, 99 S.Ct. 421].) "[S]ince voter approval of Proposition 8 in June 1982, state and federal claims relating to exclusion of evidence on grounds of unreasonable search and seizure are measured by the same standard." (*People v. Camacho* (2000) 23 Cal.4th 824, 830 [98 Cal.Rptr.2d 232, 3 P.3d 878].) "A defendant has the burden at trial of establishing a legitimate expectation of privacy in the place searched or the thing seized." (*People v. Jenkins* (2000) 22 Cal.4th 900, 972 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; see also *Rawlings v. Kentucky* (1980) 448 U.S. 98, 104 [65 L.Ed.2d 633, 100 S.Ct. 2556].)

A person who, with permission, borrows a vehicle from the rightful owner and thereby exercises legitimate control over it for a temporary period of time has a recognizable expectation of privacy in the car. (*People v. Leonard* (1987) 197 Cal.App.3d 235, 239 [242 Cal.Rptr. 757].) However, "[t]o mount a challenge to a search of a vehicle, defendants must show, among other things, a legitimate basis for being in it, such as permission from the owner. [Citation.] Defendants who do not have a legitimate basis for being in a car that is not registered in the name of any of the car's occupants cannot object to the search of the vehicle." (*U.S. v. Ponce* (2d Cir. 1991) 947 F.2d 646, 649.) Here, although Tobin testified that Letner had asked Pontbriant if he could borrow her car, and Officer Wightman testified that Letner told him they had borrowed the car from Pontbriant, Tobin's testimony was self-serving, and both witnesses' statements were hearsay and thus inadmissible for the truth of the matter stated. Walter Gilliland, by contrast, who lived with and was romantically involved with Pontbriant, testified she was protective of her car and rarely allowed anyone to drive it. In the absence of solid evidence Pontbriant had loaned her car to defendants or that they were driving it with her permission, and in light of Gilliland's testimony, I conclude defendants lacked a legitimate expectation of privacy in the car's contents. Consequently, defendants may not challenge the admission of the evidence discovered therein.

But even were we to assume defendants established that Pontbriant had lent them her car and that they at one time had a possessory interest in it sufficient to create a legitimate expectation of privacy in its contents, any such expectation had ceased by the time police searched it. Officer Wightman effected the now challenged traffic stop shortly after midnight. Because Letner did not have a driver's license and Tobin appeared too intoxicated to drive, Officer Wightman instructed defendants to leave the car on the side of the road. Although defendants had ample time to retrieve the car the following day, Wightman recalled seeing the red-and-white Ford Fairmont, still parked where defendants had left it, many hours later at 5:30 p.m. the next evening. Police did not seize the car until around 9:00 p.m. By that time Pontbriant, the car's owner, had been identified as a murder victim and police had determined that she was the owner of the Ford Fairmont. Given the passage of time and indications that defendants had abandoned the car, any temporary possessory interest they may have had in the car the previous night had expired by the time police searched it. (See *People v. Smith* (1966) 63 Cal.2d 779, 800–801 [48 Cal.Rptr. 382, 409 P.2d 222] [no reasonable expectation of privacy in an abandoned rental car]; *People v. Shepherd* (1994) 23 Cal.App.4th 825, 828–829 [28 Cal.Rptr.2d 458] [no expectation of privacy in a purse abandoned in a stolen truck].)

In any event, even were I to conclude defendants could challenge the admission of this evidence,[3] its admission was not particularly damaging. A forensic analysis of the bloody rag could not match the blood definitively to either defendant; the blood was found to be merely consistent with defendant Tobin's blood, as it was also with Gilliland's blood. Because Gilliland co-habitated with the victim and presumably had access to her car, and because the victim's blood was not found on the rag, the persuasive force of the forensic evidence of the bloody rag was negligible, even considering that Tobin had allegedly told fellow inmate Gregory Gerrard he was worried about the discovery of the rag. The diminished probative value of the rag is clear when we compare it to the evidence police found at the murder scene: (a) bloody hairs on the victim's body that matched defendant Letner's hair; (b) blood on a pillowcase (consistent with both defendant Tobin's and Gilliland's blood); (c) a semen stain on the carpet consistent with Tobin's antigenic activity (and inconsistent with Gilliland's); and (d) strong evidence, including Tobin's own testimony, that both defendants had spent much of the evening with the victim.

Police found a Heineken beer bottle and a Lowenbrau beer bottle cap at the crime scene, lending some significance to the bottles of beer of the same brand police found in the Ford Fairmont when they searched it. But these brands of beer are not particularly distinctive or unusual and, in any event, Tobin testified he had purchased some Heineken and Lowenbrau beer and drank it with the victim the night she was murdered. Accordingly, the evidence from the car was merely cumulative and hence not particularly inculpatory.

The balance of the evidence found by police in Pontbriant's car is of even less importance. Jeanette Mayberry identified the stolen cosmetics and hair care items police found in the trunk as defendant Letner's property, but there

---

[3] A question is presented whether defendants may be viewed as having abandoned Pontbriant's car only because Officer Wightman illegally stopped the car and detained them. (See, e.g., *U.S. v. Ienco* (7th Cir. 1999) 182 F.3d 517, 529, fn. 12 [evidence left in a police car by an arrestee following an illegal arrest cannot be held to have been voluntarily abandoned].) Because more than 18 hours had elapsed between Officer Wightman's traffic stop and the police search, however, and the car was left parked on a public street and was not situated so as to suggest defendants retained a possessory interest in it (such as being parked in a private driveway or garage), to conclude defendants intended to abandon Pontbriant's car and its contents, irrespective of the stop, is reasonable. Defendants' abandonment of the car, moreover, distinguishes this case from the authorities cited in the dissent. (Dis. opn., *post*, at pp. 220–221, fn. 2.) In any event, we need not resolve whether the subsequent car search was tainted by the illegal traffic stop because, as explained below, the evidence found in the car could not have been very significant to the jury's decision to find defendants guilty, and any error was thus harmless beyond a reasonable doubt.

was little doubt Letner was with the victim the night she was murdered: defendant Tobin so testified, and both Edward Burdette and Kathy Coronado testified that Letner (together with Pontbriant) had made a series of aggressive telephone calls to them on the night in question. This evidence unequivocally places Letner at the victim's home on the night of the murder. Nor was either the sword or the shotgun, found by police in the car's trunk, significant: Tobin testified the items belonged to him, and neither was used in the crimes. Finally, Tobin testified and admitted being with the victim on the night she was killed.

In sum, even were I to conclude defendants were entitled to challenge the warrantless search of Pontbriant's car due to some fleeting possessory interest in it, the evidence found in the car was either of little inculpatory value or cumulative to other evidence. The admission of the evidence from the car was thus harmless beyond a reasonable doubt.[4]

For the reasons stated above, although I agree with Justice Kennard's dissenting opinion that Officer Wightman's traffic stop was not supported by reasonable cause, I concur in the majority's decision to affirm the judgments of conviction.

Moreno, J., concurred.

**KENNARD, J.,** Dissenting.—In this case, a police officer stopped a car late at night. Because the car was traveling below the posted speed limit, the officer suspected the driver of being intoxicated. The day after the stop, police discovered that the driver and his passenger (the defendants in this case) had been traveling in a car owned by a woman who had been murdered shortly before the stop. The majority upholds the legality of the detention. I disagree.

## I

Around midnight on March 1, 1988, Visalia Police Officer Alan Wightman saw a Ford Fairmont traveling through downtown Visalia. It had rained heavily in that area a couple of hours earlier; parked cars in the area were wet, while many moving vehicles were dry because the drops had blown off. Because the Ford Fairmont's exterior was wet, Officer Wightman suspected it had been parked nearby until recently. In the previous three months, the

---

[4] This conclusion renders it unnecessary to address defendants' additional claim that because the People did not, at the suppression hearing below, rely on defendants' lack of a possessory interest in the car, the People have forfeited the right to raise that theory on appeal. (See *People v. Wilkinson* (2008) 163 Cal.App.4th 1554, 1574 [78 Cal.Rptr.3d 501] ["the People may not . . . tender a new theory not raised at the original suppression hearing"]; see also *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 640 [108 Cal.Rptr. 585, 511 P.2d 33].)

police had received many reports of vehicle theft and vehicle tampering at approximately 10 used car lots in downtown Visalia. A week earlier, one of the lots, which the officer described as a "used Ford car lot," had reported a car theft. Suspecting that the Ford Fairmont might be stolen, Wightman followed the car as it traveled through town (breaking no laws) and turned onto an on-ramp to State Highway 198, on which no other cars were traveling at the time. A call-in by Wightman soon revealed that the car was owned by a private party, Ivon Pontbriant, and that it had not been reported stolen.

At the point where the car entered State Highway 198, it was a freeway, with a maximum speed limit of 55 miles per hour. But after a very short distance, which Officer Wightman estimated at "a half, three quarters of a mile, closer to a mile maybe," it became a highway with a maximum speed limit of 45 miles per hour. The car traveled at 40 miles per hour on the short stretch of freeway; the officer then stopped the car where the speed limit dropped. He did so primarily because he suspected the driver of being intoxicated, explaining that in his experience intoxicated drivers tend to drive slowly for no apparent reason.

In the car were defendants Richard Lacy Letner (the driver) and Christopher Allan Tobin (the passenger). Letner told Officer Wightman that he had borrowed the car from Ivon Pontbriant; Letner and Tobin, who was drunk, made inconsistent statements regarding their destination. Officer Wightman patted down Letner and found a buck knife in his pants pocket; he also saw an opened beer bottle in plain view in the car. When Letner could not produce a license, Officer Wightman ordered the two defendants to walk home.

The next day, after learning of Pontbriant's murder, police officers searched the car and found, in addition to personal property belonging to both defendants, a rag with blood on it consistent with defendant Tobin's. At Pontbriant's house, the police found beer bottles of the same brand as the opened bottle that Officer Wightman had seen in the car at the time of the stop the previous night.

## II

"[L]aw enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity. [Citation.] Although stopping a car and detaining its occupants constitute a seizure within the meaning of the Fourth Amendment, the governmental interest in investigating an officer's reasonable suspicion, based on specific and articulable facts, may outweigh the Fourth Amendment interest of the driver and passengers in remaining secure from the intrusion.

[Citation.]" (*United States v. Hensley* (1985) 469 U.S. 221, 226 [83 L.Ed.2d 604, 105 S.Ct. 675].) Here, as explained below, at the time of the car stop Officer Wightman lacked a reasonable suspicion that defendants were involved in criminal activity.

That the car, while being followed by a marked police car, was traveling 15 miles per hour below the maximum speed limit of 55 on State Highway 198, did not give rise to a reasonable suspicion that the driver had stolen the car and was therefore trying to avoid contact with the police: It is not at all unusual for a driver to slow down upon seeing a police car, irrespective of any wrongdoing. Here, the driver did not suddenly slow down when Officer Wightman began following the car. Rather, the driver merely did not accelerate to the maximum speed limit after entering the freeway.

Four reasons come to mind as to why, under the circumstances of this case, a driver might have driven slowly on the freeway. First, if, as Officer Wightman testified, parked cars in downtown Visalia were still wet from a recent heavy rain, it is reasonable to infer that the freeway too was still wet, which would lead most motorists to slow down because of slippery road conditions.[1] Second, it is not at all unusual for drivers not to accelerate to a maximum speed limit when, as here, they can drive at that speed only for just about a mile before a drop of the posted speed limit. If defendant Letner, instead of driving at 40 miles per hour on the freeway, had immediately accelerated to the maximum speed limit of 55 miles per hour after entering the freeway, he could have maintained that speed only for a minute before the speed limit on the stretch that became a highway fell to 45 miles per hour. Third, the stop occurred at midnight; many people drive slower late at night, because of poor visibility. Fourth, Officer Wightman testified that the car's engine was "running rough"; a driver experiencing that problem might fear a mechanical problem and decide not to drive at the maximum posted speed limit.

Although there is no published California decision on the legality of stopping a car simply because it is traveling below the maximum speed limit, courts in other states have concluded that such a stop lacks the requisite reasonable cause to believe that the driver is engaged in criminal activity unless there are other suspicious circumstances. (See *Faunce v. State* (Fla.Dist.Ct.App. 2004) 884 So.2d 504, 506 ["the fact that the defendant in this case was driving slowly is not alone sufficient to give rise to a reasonable suspicion"]; *State v. Brown* (N.D. 1993) 509 N.W.2d 69, 71 ["The mere fact

---

[1] A handbook for California drivers published by the California's Department of Motor Vehicles recommends that motorists reduce their speed by five to 10 miles per hour on wet roads. (Dept. Motor Vehicles, 2010 Cal. Driver Handbook (2010) p. 67 <http://www.dmv.ca.gov/pubs/dl600.pdf> [as of July 29, 2010].)

that a driver is traveling at a slower than usual speed on a roadway does not by itself create a reasonable suspicion of driving under the influence of alcohol or of other illegal activity."]; *State v. Bacher* (2007) 170 Ohio App.3d 457 [2007 Ohio 727, 867 N.E.2d 864, 867]; *State v. Rincon* (2006) 122 Nev. 1170 [147 P.3d 233, 236–237]; *Richardson v. State* (Tex.Ct.App. 2000) 39 S.W.3d 634, 640; *Raulerson v. State* (1996) 223 Ga.App. 556 [479 S.E.2d 386, 387]; *People v. Rotkvich* (1993) 256 Ill.App.3d 124 [195 Ill.Dec. 424, 628 N.E.2d 888, 892]; see also *U.S. v. Diaz* (5th Cir. 1992) 977 F.2d 163, 165; *U.S. v. Abdon-Limas* (D.N.M. 1991) 780 F.Supp. 773, 780.) Here, there were no suspicious circumstances tending to show that the occupants of the car were engaged in illegal activity.

Because of the recent rain, Officer Wightman found it significant that droplets of water were still on the car. This led him to suspect that the car had been stolen from one of the car lots in downtown Visalia. At most, however, the presence of raindrops on the car indicated that it had not been driven a long distance. It did not indicate that the car had been stolen from a carlot; the car could have been parked in the downtown area before it was driven to the freeway. And once Officer Wightman learned, *before stopping the car*, that it was registered to a private owner rather than a car dealer, it was no longer reasonable for him to believe that the car had been stolen from a carlot.

According to the majority, however, Officer Wightman reasonably suspected the car was stolen from a car lot in downtown Visalia. To explain why this suspicion was reasonable even after Officer Wightman learned that the car was owned not by a car dealer, but by a private party (Pontbriant), the majority asserts that "the dealer might have recently purchased [the car] and not yet updated the ownership records, or the car could have been at the dealership for repairs." (Maj. opn., *ante*, at p. 148.) These hypothetical assertions are too speculative to support the majority's conclusion of reasonable suspicion by the officer that the car had been stolen from a car lot.

The majority also cites three cases to support its conclusion that, because the car in question was traveling 15 miles per hour below the maximum speed limit of 55, "a reasonable officer might suspect the driver of the car was attempting to avoid contact with the police." (Maj. opn., *ante*, at p. 147.) These three cases are distinguishable, however.

The first case, *U.S. v. Villalobos* (5th Cir. 1998) 161 F.3d 285, states that "noticeable deceleration in the presence of a patrol car can contribute to reasonable suspicion, even though drivers often slow when they see law enforcement personnel." (*Id.* at p. 291.) But here the car *did not decelerate*; rather, it merely failed to *accelerate* to the maximum 55-mile-per-hour speed limit when it entered the freeway.

The second case, *U.S. v. Lopez-Martinez* (10th Cir. 1994) 25 F.3d 1481, states that "maintaining a noticeably slow speed in the presence of a police officer may suggest nervousness . . . ." (*Id.* at p. 1486.) But in that case two cars were *both* traveling near the Mexican border, at a speed far below the posted speed limit (30 miles per hour when the posted speed limit was 55 miles per hour) in broad daylight and in good weather, when no other cars were on the road; there was no apparent explanation for the cars' slow speed. Here, the car driven by defendant Letner was going significantly faster (40 miles per hour in a 55-mile-per-hour zone) when stopped and, as explained earlier (see pp. 218–219, *ante*), the circumstances surrounding the stop indicated that the car was traveling at that speed for valid reasons.

The third case on which the majority relies is *People v. Gibson* (1963) 220 Cal.App.2d 15 [33 Cal.Rptr. 775], which states: "The fact that a driver proceeds at a speed slower than the speed limit under circumstances where he might normally proceed at the higher speed also is a factor appearing to justify an officer's investigation." (*Id.* at p. 20.) But in *Gibson* the detaining officers observed the slow-moving vehicle within two minutes after learning of a robbery on the same street, at a time (4:00 a.m.) when no other cars were on the street; while following the car, the officers "observed a motion . . . which looked to them like 'someone was trying to put something in the back part of the car' or 'someone moving something in the car.' " (*Id.* at p. 18.) Such facts are lacking here.

When, as in this case, a trial court erroneously denies a motion to suppress evidence obtained in violation of the federal Constitution's Fourth Amendment, the error is harmless only if the reviewing court can say "beyond a reasonable doubt that the evidence complained of did not contribute to" the conviction. (*Franks v. Delaware* (1978) 438 U.S. 154, 162 [57 L.Ed.2d 667, 98 S.Ct. 2674]; see also *Bumper v. North Carolina* (1968) 391 U.S. 543, 550 [20 L.Ed.2d 797, 88 S.Ct. 1788].) Here, Officer Wightman's midnight observation of both defendants in a car that belonged to Ivon Pontbriant, together with evidence indicating that Pontbriant was murdered earlier that night, played a key role in the prosecution's case. Although the prosecution also presented other evidence tending to show guilt, I cannot say beyond a reasonable doubt that Officer Wightman's testimony did not contribute to the jury's verdict.[2]

---

[2] Justice Werdegar's concurring and dissenting opinion agrees with me that Officer Wightman's detention of defendants was illegal. But she concludes that certain evidence found in the car linked defendants to the murder and was admissible against defendants notwithstanding the illegal detention. She reasons: "[B]ecause neither defendant owned or legitimately possessed the car in which this evidence was found, they are foreclosed from challenging the legality of

For the reasons given above, I would reverse both defendants' murder convictions and judgments of death.

Appellants' petition for a rehearing was denied September 15, 2010. Kennard, J., was of the opinion that the petition should be granted.

---

the car's search." (Conc. & dis. opn. of Werdegar, J., *ante*, at p. 213.) Based in part on this conclusion, she reasons that the trial court's erroneous denial of defendants' motion to suppress the seized evidence was harmless beyond a reasonable doubt. I disagree.

I do agree that defendants are foreclosed from challenging the legality of the car *search*, because the car was not owned by defendants but by murder victim Pontbriant. But at issue here is not the legality of the search; at issue here is the legality of the *detention* that preceded the search. "If the physical evidence found in the vehicle[] was the fruit of the defendants' unlawful detention, it must be suppressed," even though the defendants lacked a possessory interest in the vehicle. (*U.S. v. Shareef* (10th Cir. 1996) 100 F.3d 1491, 1499–1500; see also 6 LaFave, Search and Seizure (4th ed. 2004) § 11.3(e), pp. 194–196; *People v. Glick* (1988) 203 Cal.App.3d 796, 799–800 [250 Cal.Rptr. 315].) Here, the seizure of the evidence linking defendants to the murder followed Officer Wightman's illegal detention, after he ordered both defendants to leave the car, which still contained the incriminating evidence, by the road. Thus, that seizure was a fruit of Officer Wightman's illegal detention of defendants (see *Wong Sun v. United States* (1963) 371 U.S. 471, 487–488 [9 L.Ed.2d 441, 83 S.Ct. 407]), and the items found in the car should have been suppressed.